## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**LIBERTY MUTUAL FIRE INSURANCE COMPANY**

**CIVIL ACTION**

**VERSUS**

**NO. 3:20-CV-871-JWD-RLB**

**THE SHAW GROUP, INC. (n/k/a CB&I GROUP, INC.)**

<u>**RULING AND ORDER**</u>

Before the Court is *Liberty Mutual Fire Insurance Company's Motion to Dismiss for Failure to State a Claim* ("*Motion*") (Doc.18) brought by plaintiff, Liberty Mutual Fire Insurance Company ("Liberty"). It is opposed by defendant and counterclaimant, The Shaw Group Inc., n/k/a CB&I Group, Inc. ("Shaw"). (Doc. 23.) Liberty filed a reply brief. (Doc. 29.) The Court has carefully considered the *Motion*, the pleadings, the submissions of the parties and the arguments of counsel and is prepared to rule. For the following reasons, the *Motion* is granted in part and denied in part.

### I.    FACTUAL OVERVIEW

This dispute concerns two commercial general liability policies issued by Liberty to Shaw covering the policy periods of September 1, 2003, to September 1, 2004, (Doc. 18-2), and September 1, 2004, to September 1, 2005, (Doc. 18-3) (collectively, the "Policies"). (Doc. 18-1 at 5 (citing Doc. 10 at 19–20, ¶ 9).)  Each policy had a $1.5 million aggregate limit, subject to deductibles of $500,000 and $750,000 respectively. (Docs. 18-2 at 1, 42; Doc. 18-3 at 1, 42.)

Endorsements to each policy required Shaw to reimburse Liberty for "both damages and defense costs, including amounts paid in settlement, 'up to the deductible amount' for a covered claim." (Doc. 18-1 at 5–7 (citing Doc. 10, at ¶ 11; Docs. 18-2 and 18-3 at 42).) Liberty claims the

1

"deductible" included both settlement proceeds and defense costs. (*Id*. at 5–6.) Shaw agrees. (Doc. 52 at 1–3.) Thus, while Liberty might advance the entire $3 million limit, Shaw's deductible requirements had the effect of reducing the policies' limits, so that Shaw would owe $1.25 million when Liberty expended the full $3 million. (Doc. 18-1 at 7.) Liberty claims that "Shaw, and Shaw alone, is responsible [under the Policies] for reimbursing to Liberty the full $1.25 million deductible amount." (*Id*. (citing Docs. 18-2 and 18-3 at 42–43).) Shaw disagrees.

Shaw purchased a second primary insurance policy from Chartis Specialty Insurance Company, n/k/a AIG Specialty Insurance Company ("AIG") for the same time periods that Liberty's policies covered ("AIG Policy").[1] (Doc. 23 at 6.) The AIG Policy had a $1 million deductible. (*Id*.)

In 2012, Shaw and certain affiliates[2] were named as defendants in litigation ("Abernathy Lawsuit")[3] involving the alleged exposure of certain workers at a plant owned and operated by Occidental Chemical Corporation ("Occidental" or "OxyChem"). (Doc. 18-1 at 8; Doc. 23 at 2.) On November 15, 2013, Shaw "demanded defense and indemnity from Liberty with respect to the Abernathy Lawsuit." (Doc. 23 at 5.) Shaw claims that "Liberty repeatedly rejected [Shaw's] tender and wrongfully denied coverage[.]" (*Id.* at 5.) From Liberty's perspective, the initial rejection was because of "multiple coverage defenses[.]" (Doc. 18-1 at 8.) In any event, after some 17 months, on June 5, 2015, Liberty agreed to participate in Shaw's defense subject to a reservation of rights. (Doc. 23 at 5; Doc. 18-1 at 8.)

During the 17 months in which Liberty refused to defend Shaw, Shaw's other primary

---

[1] Contractors Pollution Liability Policy No. CPO 61823904. (Doc. 23 at 6.)
[2] "Shaw" will be used herein to include both Shaw and these affiliates. According to Shaw, all of the affiliates are named insureds under the Liberty Policies. (Doc. 23 at 5.)
[3] *Abernathy, et al*. *v. Occidental Petroleum Corporation*, *et al*., No. 2011-900266, originally filed in the Circuit Court of Colbert County, Alabama. (Doc. 23 at 2.) Both parties refer to this as the "Abernathy Lawsuit", and so will the Court.

insurer, AIG, incurred the costs of the litigation according to Shaw. (*See* Doc. 23 at 6.) Shaw claims that the AIG Policy "paid at least $665,591.56 in defense costs for which Liberty was responsible." (*Id.* (citing Doc. 10 at 24–26, ¶¶ 33–34, 38).) In addition, Shaw claims that it "was forced to incur . . . at least $155,894.82" directly for its defense. (*Id.* (citing Doc. 10 at 26, ¶ 40).) It claims that AIG's "$1 million deductible . . . was fully satisfied by payments made directly by [Shaw]. . . ." (Doc. 10 at 25, ¶ 35.)

According to Shaw, once Liberty began defending Shaw in July of 2016, Liberty began invoicing Shaw for defense costs, and, as a result of Shaw's "administrative error", it paid $62,242.65 to Liberty. (*Id.* at 27, ¶ 47.)

In or around December 2019, Shaw and its insurers settled the Abernathy Lawsuit, (*id.* at 27, ¶ 48), for a total of $26,543,092.50, (Doc. 18-4 at 1, 3, ¶ 1.) Of that amount, Liberty contributed $3 million, and AIG contributed $3.3 million. (*Id.* at 3, ¶ 1.) Other insurers paid the rest. (*Id.*)

In March, 2020, in connection with the settlement of the Abernathy Lawsuit, Shaw and its insurers entered into a Settlement and Mutual Release Agreement ("Insurance Settlement") (Doc. 10 at 27, ¶ 49; Doc. 18-4). It "sets forth the various amounts that the respective parties would contribute to fund the settlement[.]" (Doc. 10 at 27, ¶ 49.) It also purports to settle certain claims as between Shaw and its insurers but reserves certain rights to Shaw and Liberty. (Doc. 18-4 at 3–6, ¶¶ 1–2, 4, 7, 10; Doc. 10 at 27–28, ¶¶ 49–51.)

In May of 2020, Liberty "demand[ed] full payment of $1.25 million for deductibles and threaten[ed] to file suit should [Shaw] fail to pay (or commit to pay) the full amount within twenty-one days." (Doc. 10 at 28, ¶ 55.) Shaw alleges that on October 9, 2020, Liberty stated it "would refrain drawing on [Shaw's] letter of credit" if Shaw "committed to paying . . . $439,627 within thirty days[.]" (*Id.* at 30, ¶ 62.) Shaw paid that amount on October 29, 2020. (*Id.* at 30, ¶ 64.)

3

On December 23, 2020, Liberty sued Shaw in this Court, (Doc. 1), demanding $749,538.63 representing, Liberty alleges, the unpaid part of the $1.25 million deductible, (*id*. at 14, ¶ 54), plus late payment charges, (*id*. at 18, ¶ 76). Liberty also asks the Court to declare that it is entitled to "draw on Shaw's letter of credit . . . to secure payment of the $749,538.63[,]" plus the late charge (*Id*. at 19, ¶ 82).

On April 23, 2021, Shaw filed an answer and counterclaim ("Counterclaim"). (Doc. 10.) In it, Shaw denies responsibility and liability for the amounts claimed by Liberty, (*see id.* at 35), and further claims that by virtue of Liberty's wrongful conduct, Liberty owes Shaw damages for unjust enrichment, breach of contract and bad faith under Louisiana Revised Statutes Section 22:1973, (*id*. at 31–35, ¶¶ 67–91.). Shaw claims that Liberty wrongfully failed to credit towards its deductible obligation the following amounts:

| | |
|---|---|
| $665,591.56 | Defense costs paid by AIG on behalf of Shaw which was in fact owed by Liberty. (*Id*. at 26–27, ¶¶ 38, 43-45.) |
| $155,894.92 | Paid by Shaw directly to third parties for defense costs. (*Id*. at 26, ¶ 40.) |
| $62,242.65 | Paid by Shaw to Liberty as a result of an "administrative error." (*Id*. at 27, ¶ 47.) |
| <u>$439,627.00</u> | Paid by Shaw to Liberty only to avoid Liberty's drawing on Shaw's letter of credit. (*Id*. at 29–30, ¶¶ 60–61). |

Total:      $1,323,356.13

Shaw claims that it is entitled to have its deductible obligation credited with these amounts. (*See id.* at 30–32, ¶¶ 65–66, 69.) The total of these payments exceeds the deductible by $73,356.03 which represents, argues Shaw, an overpayment by Shaw which Liberty owes to Shaw. (*Id.* at 31–32, ¶ 69.)

4

Shaw utilizes three theories of liability in support of its effort to negate any obligation it has to reimburse Liberty for amounts paid in connection with the deductible and to recover damages and its "overpayment" of monies paid directly by Shaw or indirectly by others in satisfaction of its deductible obligation, (*id.* at 30–31, ¶ 66; *id.* at 34, ¶ 87): unjust enrichment (Count I, *id.* at 31–32, ¶¶ 67–71); breach of contract (Count II, *id.* at 32–34, ¶¶ 72–87); and bad faith (Count III, *id.* at 34–35, ¶¶ 88–91).

In addition to demanding a credit against its deductible obligation and a return of the overpayment, Shaw asks for a return of monies it paid to Liberty on the deductible because of Liberty's failure to credit AIG's payments, (Doc. 10 at 34, ¶ 85); the amounts Shaw paid in "costs and fees in defending itself," (*id*); "all foreseeable and unforeseeable damages arising" from these alleged breaches, (*id*. at 34, ¶ 86); and penalties and attorney's fees as a result of Liberty's bad faith violation of its duties under La. R.S. 22:1973, (*id*. at 35, ¶ 90.)

In response, Liberty filed the present *Motion*. (Doc. 18.)

## II.    PARTIES' ARGUMENTS

### A.  Liberty's *Motion* (Doc. 18) and Original Memorandum (Doc. 18-1_

Liberty argues that Shaw's counterclaim should be dismissed under Rule 12(b)(6) because (i) Shaw released its claims in the Insurance Settlement, (ii) Shaw does not allege any acts of bad faith recognized under Louisiana law, and (iii) the plain terms of Liberty's Policies foreclose Shaw's unjust enrichment theory. (Doc. 18 at 1–2; Doc. 18-1 at 3–4.) In support of its motion, Liberty attaches a copy of the Policies, (Docs. 18-2 and 18-3), and the Insurance Settlement, (Doc. 18-4). Though Rule 12(b)(6) motions are usually limited to the allegations in the complaint, Liberty seeks to "enlarge" the pleadings to allow the Court to consider the Insurance Settlement because it is "central to plaintiff's [counter]claims." (Doc. 18-1 at 12–13 (citing, among others,

*Murchison Cap. Partners, L.P. v. Nuance Commc'ns Inc.*, 625 F. App'x 617, n. 1 (5th Cir. 2015)).)

### 1. Shaw released any and all claims regarding the Abernathy lawsuit.

First, Liberty argues that Shaw's counterclaim is precluded by the Insurance Settlement. (Doc. 18-1 at 13.) Liberty maintains that the release applies broadly to "any and all claims . . . relating to or arising out of the Underlying Lawsuits and the claims against Shaw that are being settled by the Shaw settlement." (*Id.* at 13–14 (quoting Doc. 18-4 at 3–4, ¶ 2).) Under Louisiana law, argues Liberty, "only one conclusion can be drawn: Shaw released the very actions asserted in the [C]ounterclaim[.]" (*Id.* at 14.) According to Liberty, every claim within Shaw's Counterclaim falls under the broad language of the release, which covered both present and future claims related to the Abernathy Lawsuit and the coverage provided in Liberty's Policies. (*Id.* at 14–15.)

Next, Liberty contends that Shaw's release of Liberty in the Insurance Settlement was "a binding, enforceable compromise." (*Id.* at 15.) Liberty points to Louisiana Civil Code article 3071, which states, "[a] compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." (*Id.*) Louisiana law favors compromise. (*Id.* (citing *Hymel v. Eagle, Inc.*, 2008-1287 (La. App. 4 Cir. 3/18/09), 7 So. 3d 1249, 1252).) Liberty then argues that, since this was a compromise, Shaw is "preclude[d] . . . from bringing a subsequent action based upon the matter that was compromised." (*Id.* (quoting La. Civ. Code art. 3080).) Moreover, Liberty maintains that when persons attempt to re-litigate claims that were released by settlement agreements, Louisiana courts routinely dismiss such claims at the pleading stage. (*Id.* at 15–16 (citations omitted).)

Next, Liberty contends that the breadth of the Insurance Settlement's release is not a reason for invalidation. (*Id.* at 16 (citing *Hudson v. Progressive Sec. Ins. Co.*, 43,857 (La. App. 2 Cir.

12/10/08), 1 So. 3d 627, 633).) According to Liberty, "*Hudson* recognized that such broad language 'evinced nothing other than an intent to settle and dismiss all claims against anyone arising out of' litigation and settlement." (*Id.* (quoting *Hudson*, 1 So. 3d at 634).) Liberty claims that the only way Shaw can avoid the enforcement of the release is by establishing some "mistaken intent" in the agreement. (*Id.* (quoting *Hudson*, 1 So. 3d at 633).) Since Shaw acknowledges the settlement and does not assert any mistaken intent in its counterclaim, the plain language of that agreement controls, and Shaw's claims are barred. (*Id.*)

Finally, Liberty preemptively argues that Shaw's claims were not reserved under Paragraph 10 of the release. (*Id.*) According to Liberty, Paragraph 10 states that "Shaw's release of Liberty and other insurers is 'not intended and do[es] not alter or affect any rights, claims or defenses that Shaw may have to the deductible claims' asserted by Liberty to collect the deductible." (*Id.*) Liberty argues that this language, read *in pari materia* with Paragraph 7 of the release, reveals that Paragraph 10 does not provide Shaw with affirmative causes of action against Liberty surrounding insurance coverage for the Abernathy Lawsuit. (*Id.* at 16–17.) Instead, Liberty contends that Paragraph 10 was intended merely to allow Shaw to assert defenses to Liberty's efforts to collect the deductible. (*Id.* at 17.) In support, Liberty insists that Paragraph 10 reserved only Shaw's " 'rights, claims or defenses that Shaw may have pertaining to the deductible claims[,]' " and that language cannot be read to invalidate Paragraph 2's "much broader" language. (*Id.* (quoting Doc. 18-4 at 3–4, 6, ¶¶ 2, 10).) As such, Shaw's counterclaim should be dismissed with prejudice. (*Id.*)

### 2. Shaw has not and cannot state an insurance bad faith claim against Liberty under Louisiana law.

Second, Liberty contends that Shaw's bad faith claim also fails because it does not allege sufficient factual support. (Doc. 18-1 at 18.) Louisiana Revised Statutes § 22:1973 lists actions that constitute bad faith, including:

> (1) "misrepresenting pertinent facts or insurance policy provisions,"
> (2) "failing to pay a settlement within thirty days," (3) "denying
> coverage or attempting to settle a claim on the basis of an application
> which the insurer knows was altered," (4) "misleading a claimant as
> to the applicable prescriptive period," and (5) "failing to pay the
> amount of any claim due . . . when such failure is arbitrary,
> capricious, or without probable cause."

(*Id.* (quoting La. R.S. 22:1973).) Liberty argues that this punitive statute should be strictly

construed, according to Louisiana law. (*Id.* (citing *Shreve v. State Farm Fire & Cas. Co.*, 52,032

(La. App. 2 Cir. 5/23/18), 247 So. 3d 1175).)

According to Liberty, Shaw "baldly claims Liberty 'misrepresent[ed] pertinent facts,' [but]

Shaw never assert[ed] any facts to support that threadbare accusation." (*Id.* at 18.) Next, Liberty

contends that Shaw's additional bad faith claims for Liberty's " 'seeking to recover' the deductible

and 'threatening to draw' on Shaw's letter of credit [ ] are not recognized under the statute;" thus,

these allegations cannot satisfy bad faith. (*Id.*) As such, Liberty contends that the only potential

allegation which could support a bad faith claim is the denial of coverage allegation, but "there is

no doubt that Shaw released any such claims based on Liberty's handling of the *Abernathy* Lawsuit

in the Insurance Settlement." (*Id.*)

Moreover, Liberty maintains that any bad faith argument regarding Liberty enforcing its

right to collect the deductible and draw on Shaw's letter of credit is "especially frail." (*Id.* at 19.)

According to Liberty, "permit[ting] such claims would open the door to bad faith suits based on

an insurer's enforcement of *any* policy provision, and would prevent insurers from enforcing their

limits, exclusions, or other terms and conditions in their policies." (*Id.* (emphasis in original)

(citing *Williams v. Great Am. Ins. Co.*, 240 F. Supp. 3d 523, 528 (E.D. La. 2017)).) The deductible

provision does not violate any state law or public policy, so "Liberty is free to enforce those

contractual provisions to which Shaw agreed." (*Id.*) Since Shaw already complied in part by

8

reimbursing a portion of the deductible and there was no bad faith, Liberty seeks dismissal of Shaw's counterclaim. (*Id.*)

### 3. Shaw is exclusively liable for the deductible, and therefore Liberty was not unjustly enriched.

Next, Liberty maintains that it was not unjustly enriched by Shaw and Shaw must still reimburse the remaining amounts due to Liberty, described in Liberty's complaint. (Doc. 18-1 at 19–20.) Unjust enrichment claims derive from "payments of 'thing[s] not owed[.]' " (*Id.* at 20 (quoting La. Civ. Code art. 2299).) "A person who has received a payment or a thing not owed to him is bound to restore it to the person from whom he received it." (*Id.* (quoting La. Civ. Code art. 2299).) Notably, "an unjust enrichment claim fails when a payment is actually due and owed." (*Id.* (citing *Miller v. Blattner*, 676 F. Supp. 2d 485, 496 (E.D. La. 2009)).) As such, Liberty argues that "Shaw's payment of $439,627 was owed to Liberty, and therefore it cannot be said that Liberty was 'unjustly enriched.' " (*Id.*)

Liberty maintains that Shaw's assertion that Liberty was overpaid is "directly contradicted by its own factual allegations, which concede that Shaw agreed to pay $439,627 in October 2020 as an 'undisputed amount' owed to Liberty toward the deductible." (*Id.* (quoting Doc. 10 at 29–30, ¶ 61).) "[T]he Policies make clear that Shaw, and Shaw alone, is responsible for reimbursing the full $1.25 million deductible amount to Liberty[.]" (*Id.* at 21.) Quoting specific portions of those Policies' language, Liberty asserts that these provisions undoubtedly require Shaw to reimburse the full amount and foreclose any argument that defense costs paid by another could satisfy this obligation. (*Id.*) Liberty then points the Court to Louisiana jurisprudence which enforced policy language requiring the insured and the insured alone to pay the applicable deductible. (*Id.* at 22 (citing *Citgo Petro. Corp. v. Yeargin, Inc.*, 95-1574 (La. App. 3 Cir. 2/19/97), 690 So. 2d 154, 169–70; *Titan Holdings, Inc. v. St. Tammany Police Jury*, No. 88-5011, 1990 WL

170116, at *4 (E.D. La. Oct. 30, 1990); *Sias v. Weiner's Stores, Inc.*, 97-938 (La. App. 3 Cir. 2/11/98), 708 So. 2d 442, 446).)

Next, Liberty argues that jurisprudence has rejected the same argument that Shaw raises, "finding that defense costs and indemnity payments by the insured and other insurers *do not* satisfy a deductible when the policy specifically requires the insured to *reimburse* the deductible to the insurer, as Liberty's Polices do here." (*Id.* at 23 (citing *Zurich Am. Ins. Co. v. Centex Corp.*, 373 F. Supp. 3d 692 (N.D. Tex. 2016).) Liberty maintains that the policy at issue in *Zurich* was nearly identical to the language of the current policies. (*Id.*) Consequently, Liberty asks this Court to follow the *Zurich* decision, "require Shaw to reimburse the full deductible amount to Liberty," and hold "that payments by other sources do not satisfy that obligation." (*Id.* at 24.)

### 4. Shaw should not be permitted to take discovery or amend its counterclaim.

Finally, Liberty argues that Shaw should not be permitted discovery nor an opportunity to amend its counterclaim. (Doc. 18-1 at 24.) Liberty asserts that Shaw's causes of action are barred under the plain terms of the Policies and the Insurance Settlement, so further proceedings are futile. (*Id.*) Liberty argues that under well-settled Louisiana law it is proper to deny further considerations of extrinsic evidence when claims are barred under the clear and unambiguous terms of an insurance policy. (*Id.* (citing *Orleans Par. Sch. Bd. v. Lexington Ins. Co.*, 2012-1686 (La. App. 4 Cir. 6/5/13), 118 So. 3d 1203, 1223; *Hamilton v. Willis*, 2009-0370 (La. App. 4 Cir. 11/4/09), 24 So. 3d 946, 948; *River Bend Cap., LLC v. Lloyd's of London*, 2010-1317 (La. App. 4 Cir. 4/13/11), 63 So. 3d 1092, 1096; *Randall v. Martin*, 03-1311 (La. App. 5 Cir. 2/23/04), 868 So. 2d 913, 916).) Additionally, Liberty argues that amending the complaint would be in vain because Shaw cannot change the language of the Policies as they are written. (*Id.* at 25 (citing *In re Mastercard Int'l.*, No. 00-1322, 2003 WL 21783301, at *1–3 (E.D. La. Jul. 30, 2003)).)

### B.  Shaw's Memorandum in Opposition (Doc. 23)

Shaw's opposition to Liberty's *Motion* primarily relies on the premise that Shaw's "claims were expressly preserved to respond to any assertion by Liberty of entitlement to reimbursement of deductible amounts." (Doc. 23 at 1.) Additionally, Shaw contends that it "could not have released claims for Liberty's future bad faith as a matter of law." (*Id.*) In the event that Shaw's Counterclaim is deficient in any way, Shaw requests an opportunity to amend its Counterclaim to correct that deficiency. (*Id.* at 1–2.)

Moreover, Shaw argues that Liberty's attachment of the Insurance Settlement to its memorandum in support was improper, and this Court should not consider that evidence on a Rule 12(b)(6) motion. (*Id.* at 3.) Nonetheless, Shaw contends that the Insurance Settlement expressly preserves its claims asserted in the Counterclaim. (*Id.*) As a result, Shaw maintains that its "Counterclaim establishes *prima facie* claims against Liberty," so "Liberty's Motion should be denied." (*Id.* at 4.)

#### 1. Liberty improperly disputes the factual allegations of the Counterclaim and attaches inappropriate evidence, which must be stricken or disregarded by this Court.

As explained by the Fifth Circuit, " 'a motion to dismiss an action for failure to state a claim "admits the facts alleged in the complaint, but challenges plaintiff's rights to relief based upon those facts." ' " (Doc. 23 at 11 (quoting *Ramming v. United States*, 281 F.3d 158, 162 (5th Cir. 2001)).) Shaw emphasizes that, "unless it appears *from the pleadings* beyond doubt" that no set of facts could support Shaw's entitlement to relief in its claim, the motion to dismiss should be denied. (*Id.* (quoting *Oaxaca v. Roscoe*, 641 F.2d 386, 391 (5th Cir. 1981)).) Consequently, argues Shaw, anywhere Liberty's motion "challenges factual allegations of the Counterclaim rather than [Shaw's] right to relief based upon the facts asserted, [the *Motion*] must fail." (*Id.*)

11

In support, Shaw specifies that Liberty's assertion that Shaw "admitted" to owing the $439,627 it paid to Liberty is a "gross mischaracterization of the Counterclaim's allegations[.]" (*Id.*) Instead, Shaw argues that it was "forced into this agreement 'to pay $439,627, as an "undisputed amount" to mitigate additional collateral damages that would be caused by Liberty wrongfully drawing on their letter of credit.'" (*Id.* (citing Doc. 10 at 29–30, ¶¶ 57–61).) Despite calling this an "undisputed amount," Shaw insists that it disputes what amount, if any, is actually due and owed. (*Id.* at 11–12.) Additionally, Shaw contends that Liberty's repeated assertions that Shaw released these claims are unsupported because Shaw's "Counterclaim establish[ed] that these claims were expressly preserved by the Insurance Settlement." (*Id.* at 12.) Shaw maintains that these disputes concern Shaw's factual allegations rather than challenging Shaw's rights to relief based upon those factual allegations, and Shaw argues this is "procedurally improper." (*Id.*)

Relatedly, Shaw argues that Liberty's attaching the Insurance Settlement to its memorandum in support is improper. (*Id.*) Shaw agrees that Fifth Circuit jurisprudence allows a court to consider more than the complaint alone for a Rule 12(b)(6) motion when those documents are attached to such motion and are central to the claim. (*Id.* (citing *Baudy v. Countrywide Home Loans, Inc.*, No. 08-3580, 2009 WL 10737162, at *2 (E.D. La. Apr. 29, 2009)).) However, Shaw contends that, while the Liberty Policies are central to Shaw's claim, the Insurance Settlement is not; instead, "the Insurance Settlement is central to Liberty's *defenses* that [Shaw's] claims have allegedly been released." (*Id.* (emphasis in original).) Since it is not central to Shaw's claim, Shaw argues it would be inappropriate for this Court to consider this document at this time. (*Id.*)

In support, Shaw argues that the Fifth Circuit clarified that courts must not consider documents attached to the defendant's motion to dismiss—even where the complaint refers to it— "if it is central to the defendant's defenses rather than the plaintiff's allegations." (*Id.* at 13 (citing

12

*Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 537 (5th Cir. 2003)).)

Not only is the Insurance Settlement "far from 'central' to [Shaw's] claims," but Shaw's Counterclaim allegation that the Insurance Settlement preserved the claims asserted within that Counterclaim must be taken as true at the motion to dismiss level. (*Id.* (citing *Scanlan*, 343 F.3d at 537).) Shaw argues that Liberty improperly asks this Court to rely on Liberty's view of the Insurance Settlement's effect, which Shaw argues this Court cannot do because facts must be construed in a light most favorable to Shaw for this motion to dismiss. (*Id.* at 13.) Accordingly, Shaw asks this Court to disregard the Insurance Settlement and "Liberty's factual contentions that contradict the Counterclaim." (*Id.* at 13–14.)

### 2. Should this Court consider the Insurance Settlement as evidence, the language therein expressly preserves the claims within Shaw's counterclaim.

Alternatively, if this Court elects to consider the Insurance Settlement as evidence, Shaw argues that it expressly preserves every claim within Shaw's Counterclaim. (Doc. 23 at 14.) Relying on the Insurance Settlement's preservation of all of Shaw's " 'rights, claims, *and* defenses,' " (*id.* (quoting Doc. 18-4 at 6, ¶ 10)), Shaw contends that this Court must impute meaning to that language and that this language cannot be construed in a way that disregards other provisions of the contract, (*id.* (citing *John Bailey Contractor, Inc. v. State*, 439 So. 2d 1055, 1058 (La. 1983); *Hood v. Ashby P'ship*, 446 So. 2d 1347, 1351 (La. App. 1 Cir. 1984))).

Supported by a direct quote of Paragraph 10 of the Insurance Settlement, Shaw maintains that Liberty's assertion that this Paragraph preserves only Shaw's defenses is contradicted by the plain language of that Paragraph. (*Id.* at 14–15.) Shaw contends that its *rights* and *claims* are expressly reserved under the Insurance Settlement just as Liberty's deductible claims are reserved. (*Id.* at 15.) Shaw argues that Liberty's contractual interpretation "eviscerate[s]" the word "claims"

from the agreement, which is in direct contravention of "[w]ell-established principles of contract interpretation[.]" (*Id.*)

In support, Shaw asserts that "[t]his Court has further recognized that under Louisiana law, 'a compromise settles only those differences that the parties clearly intended to settle.' " (*Id.* (citing *Entergy Gulf States La., L.L.C. v. Louisiana Generating, L.L.C.*, 14-385, 2018 WL 11302911, at *4 (M.D. La., Nov. 5, 2018) (Dick, J.) (quoting La. Civ. Code art. 3076)).) Accordingly, where the parties' interpretations are " 'sufficiently at odds to give rise to doubt as to whether there was ever a meeting of the minds regarding the compromise,' the agreement must not be construed to release claims that a party did not clearly intend to release." (*Id.* (quoting *Entergy Gulf States*, 2018 WL 11302911, at *4).) Thus, concludes Shaw, the Insurance Settlement cannot be construed to release its claims, and Liberty's motion should be denied. (*Id.* at 16.)

### 3. Alternatively, there is ambiguity as to whether the parties to the Insurance Settlement intended to preserve the claims asserted in the Counterclaim, and that ambiguity cannot be resolved through a Rule 12(b)(6) motion.

Alternatively, Shaw contends that, if this "Court find[s] that the Insurance Agreement does not unambiguously preserve all claims asserted by [Shaw] in the Counterclaim, . . . there is an ambiguity as to whether the parties intended to preserve these claims[.]" (Doc. 23 at 16.) Shaw maintains that where the parties' intent for a contract is not readily ascertainable from the plain language of the contract, the contract contains an ambiguity. (*Id.* (citing *Texas E. Transmission Corp. v. Amerada Hess Corp.*, 145 F.3d 737, 741 (5th Cir. 1998); *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007)).) As such, Shaw contends that the parties' intent is a question of fact that cannot be resolved on the pleadings. (*Id.* (citing *Guidry*, 512 F.3d at 181).) As a result, Shaw argues that the language of Paragraph 10 of the Insurance Settlement at least creates ambiguity that cannot be decided on a Rule 12(b)(6) motion. (*Id.*)

**4. The Insurance Settlement cannot release claims for bad faith for conduct after the execution of the Insurance Agreement.**

While Shaw disputes that it released any claims within the Counterclaim, it especially disagrees that the release dispelled any future bad faith claims. (Doc. 23 at 17.) In fact, Shaw maintains that "the law does not allow the prospective release of future bad faith claims." (*Id.*) In support, Shaw cites Civil Code article 2004, which states, " 'Any clause is null that, in advance, excludes or limits the liability of one party of intentional or gross fault that causes damage to the other party.' " (*Id.*) Furthermore, the Fifth Circuit has recognized that "gross fault" within article 2004 encompasses bad faith. (*Id.* (citing *Alonso v. Westcoast Corp.*, 920 F.3d 878, 885 (5th Cir. 2019)).)

Additionally, Shaw quotes the Louisiana Fourth Circuit Court of Appeal, which explained that allowing a prospective waiver for future bad faith claims is against public policy because it essentially invites the bad faith behavior. (*Id.* (citing *Hymel*, 7 So. 3d 1249).) Accordingly, Shaw argues that any provision of the Insurance Settlement that could release future bad faith claims is unenforceable under Louisiana law. (*Id.* at 17–18.)

**5. It is inappropriate to convert Liberty's 12(b)(6) *Motion* into a motion for summary judgement.**

Though Shaw acknowledges this Court's ability to convert Rule 12(b)(6) motions into motions for summary judgement, Shaw claims that the lack of opportunity for discovery precludes doing so in this case. (Doc. 23 at 18.) Shaw argues that courts should decline to convert motions to dismiss to summary judgements when there has been insufficient time for discovery or " 'when the material outside the pleadings is scanty, incomplete, or inconclusive and when it will not aid in the rational resolution of a motion for summary judgment.' " (*Id.* (quoting *Poe v. Transp.*, No. 10-220, 2011 WL 13202941 at *1 (M.D. La. Nov. 14, 2011) (cleaned up)).)

Listing the specific bad faith actions alleged within the Counterclaim, (*id.* at 18–19 (citing Doc. 10 at 29, 34 ¶¶ 60, 89)), Shaw argues that it must conduct discovery to obtain more evidence of Liberty's knowledge of these facts at the time of its threat against Shaw. (*Id.*) Additionally, Shaw claims that the evidence attached to Liberty's memorandum in support cannot satisfy the Rule 56 burden, that "this litigation is in its infancy," and that "Liberty has refused to participate in any discovery" thus far. (*Id.* at 19.) Therefore, Shaw asks this Court to decline to convert the motion to dismiss into a motion for summary judgement. (*Id.*)

### C.  Liberty's Reply Memorandum (Doc. 29)

Liberty repeats many of the arguments made in its opening brief. The Insurance Settlement was mentioned in Shaw's Counterclaim and is central to same. (Doc. 29 at 4 (citing Doc. 10 at 31, ¶¶ 67–68; 28, ¶ 51; and 15,Third through Fifth Affirmative Defenses).) It contends that the weight of Fifth Circuit jurisprudence allows consideration of settlement agreements referenced in the complaint. (*Id.* at 5–6 (citations omitted).)

Liberty disputes Shaw's contention that the reservation of matters "pertaining to the deductible" in Paragraph 10 of the Insurance Settlement overcomes Shaw's release in Paragraph 2. (*Id.* at 6.) Shaw's attempt to cast its Counterclaim as one pertaining to the deductible "is nothing more than a transparent attempt to escape the broad release language in Paragraph 2." (*Id.* at 8.)

As to Shaw's bad faith claim, Liberty insists this was released in Paragraph 2 of the Insurance Settlement not once, but twice. (*Id.* at 12.) While Liberty concedes that "a claim under La. R.S. 22:1973(b) is not limited to the proscribed acts listed in the statute, the alleged acts listed in Shaw's opposition do not give rise to liability under the Statute." (*Id.* at 13.) Shaw's "prospective" bad faith claims were settled in the Insurance Settlement as settlement agreements are an exception to Louisiana Civil Code article 2004's prohibition against settlements of "future

bad acts." (*Id*. at 13 (citing *Hymel*, 7 So.3d at 1255–56; *Savoie v. Penn. Gen. Ins. Co.*, No. 15-1220, 2017 WL 4574197 (E.D. La. Oct. 13, 2017)).) In any event, Liberty's acts following the settlement amount to no more than enforcing the terms of the Policies which cannot possibly be deemed bad faith. (*Id*. at 13–14.)

Liberty returns to its earlier arguments that Shaw did not "overpay" Liberty for the Deductible because the Liberty Policies require Shaw to *reimburse* Liberty for what Liberty paid, and AIG's and Shaw's payment to others did not reimburse Liberty for what Liberty paid. (*Id*. at 14–17.) The cases relied upon by Shaw involved self-insured retentions (SIRs) and not deductibles and had no reimbursement clause comparable to the ones in the Liberty Policies. (*Id*. at 16–18.)

Liberty closes its Reply by arguing that Shaw should not be given the opportunity to amend its Counterclaim since this would be futile. (*Id*. at 18.)

## III.     RULE 12(b)(6) STANDARD

"Federal pleading rules call for 'a short and plain statement of the claim showing that the pleader is entitled to relief[.]' " *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014) (quoting Fed. R. Civ. P. 8(a)(2)). "They do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Id.* (cleaned up).

Interpreting Rule 8(a) of the Federal Rules of Civil Procedure, the Fifth Circuit has explained:

> The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 556 (2007)).

Applying the above case law, the Western District of Louisiana has stated:

> Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)]; *Twombly*, 55[0] U.S. at 556 [ ]. This analysis is not substantively different from that set forth in *Lormand, supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. Rule Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 55[0] U.S. at 556 [ ].

*Diamond Servs. Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3 (W.D. La. Feb. 9, 2011) (citation omitted).

In deciding a Rule 12(b)(6) motion, all well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff. *Thompson v. City of Waco, Tex.*, 764 F.3d 500, 502 (5th Cir. 2014) (citing *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 854 (5th Cir. 2012) (en banc)). The Court "need not, however, accept the plaintiff's legal conclusions as true." *Id.* at 502–03 (citing *Iqbal*, 556 U.S. at 678). The task of the Court is not to decide if the plaintiff will eventually be successful, but to determine if a "legally cognizable claim" has been asserted. *Id.* at 503 (cleaned up).

IV.    **DISCUSSION**

    **A.  Can the Insurance Settlement Be Considered in Connection with This *Motion*?**

A threshold issue is whether the Court can consider the Insurance Settlement in deciding

this 12(b)(6) motion. Liberty claims that in this agreement, Shaw settled and released the rights it

now urges in the Counterclaim. Shaw argues that because this agreement is not attached to or

central to the Counterclaim, it is extrinsic to Liberty's Rule 12(b)(6) Motion and may not be

considered by the Court. (Doc. 23 at 12–14.)

The general rule regarding what may be considered in deciding a Rule 12(b)(6) motion is

well known.

> "In determining whether a plaintiff's claims survive a Rule 12(b)(6)
> motion to dismiss, the factual information to which the court
> addresses its inquiry is limited to (1) the facts set forth in the
> complaint, (2) documents attached to the complaint, and (3) matters
> of which judicial notice may be taken under Federal Rule of
> Evidence 201."

*Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021) (per curiam) (quoting *Walker v. Beaumont*

*Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019)). *See also Innova Hosp. San Antonio, Ltd.*

*P'ship v. Blue Cross & Blue Shield of Georgia, Inc.*, 892 F.3d 719, 726 (5th Cir. 2018).

However, there is an exception to this rule: a court may consider documents attached to a

motion to dismiss "where the complaint refers to the documents and they are central to the claim."

*Kane Enters. v. MacGregor (USA) Inc.*, 322 F.3d 371, 374 (5th Cir. 2003) (citing *Collins v.*

*Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000)).  *See also Wilson v. GMFS*

*LLC*, No. 18-840, 2019 WL 8301667, at *3 (M.D. La. May 24, 2019); *McCann v. Best Buy Co.*,

No. 17-108, 2017 WL 5985570, at *2 (M.D. La. Dec. 1, 2017).

Here, the Insurance Settlement is attached to Liberty's *Motion*, (Doc. 18-4), and is referred

to in Shaw's Counterclaim, (Doc. 10 at 27–28, ¶¶ 49–52). Two of the three prerequisites for the

application of the exception are therefore clearly present. However, Shaw contends the Insurance Settlement is "far from 'central' " to its claims against Liberty and therefore the exception does not apply. (Doc. 23 at 13). While it may be central to Liberty's *defenses*, Shaw argues, it is not central to Shaw's claims. (*Id.* at 12–14.)

Liberty counters that the Insurance Agreement is central to Shaw's Counterclaim and enumerates the ways in which it is. (Doc. 29 at 4–5 (citing Doc. 10 at 31, ¶¶ 67–68; 28, ¶ 51; and 15, Third through Fifth Affirmative Defenses)).)

Here, the Court agrees with Liberty. Paragraphs 50 and 51 of the Counterclaim state:

> 50.      Pursuant to the Insurance Settlement, Liberty admitted that its policies provided coverage or waived the right to challenge that its policies provided coverage in favor of the Shaw Defendants. Liberty further released all of its claims against the other participating insurers, but expressly reserved "all rights and claims to recover from [Shaw] arising out of the deductible provisions of the Liberty Mutual Policies."

> 51.      Conversely, [Shaw] expressly reserved all of its rights, claims, or defenses associated with the deductible provisions of the Liberty Policies or with Liberty's right to pursue recovery of the "deductible amount" from [Shaw].

(Doc. 10 at 28, ¶¶ 50, 51; *see also* Doc. 18-4 at 5–6, ¶¶ 7, 10.)

These are the very rights Shaw is pursuing against Liberty in the Counterclaim. The Court finds that the Insurance Agreement is central to Shaw's claims against Liberty and therefore may be considered in connection with the present Motion.

### B. What Was Released and Reserved in the Insurance Settlement and Is There Ambiguity?

The pertinent portions of the relevant paragraphs of the Insurance Settlement read as follows:

2.      **Shaw Release of Insurers**

Except for and subject to the rights specifically reserved in Paragraph 10 below, with respect to the policies issued to Shaw . . . by the Insurers . . . and in consideration of . . . payments by the Insurers of the $26,543,092.50 required by the Shaw Settlement . . ., Shaw . . . hereby release[s], aquit[s], and discharge[s] the Insurers . . . from any and all claims, actions, causes of actions, obligations, indebtedness, breaches of duty, breaches of claims handling, bad faith, claims for declaratory relief, claims for injunctive relief and other equitable relief, suits, liens, damages, losses, costs or expense, including attorney fees, claims for defense and/or indemnity and/or insurance coverage of any kind (including but not limited to, any claims for bad faith or statutory penalties of any kind) . . . past, present or future . . . relating to or arising out of the Underlying Lawsuits and the claims against Shaw that are being settled by the Shaw Settlement. . . . This reservation by Shaw is not inconsistent with, nor is it intended to nullify Liberty Mutual's . . . right to pursue collection of any deductibles owned under [its policy] . . . as specifically reserved below in paragraph[ ] 7. . . .

7.      **Liberty Mutual's Reservation of Rights and Exceptions to Release of Shaw**

Notwithstanding . . . any other provision of this Agreement, and in consideration of Liberty Mutual's payment on behalf of Shaw for the settlement memorialized in the Shaw Settlement, Shaw and Liberty Mutual agree and acknowledge that the Shaw Agreement and this Agreement are not intended to and do not alter or affect any rights of Liberty Mutual or obligations of Shaw owed to Liberty Mutual under the Liberty Mutual Policies. . . . Shaw and Liberty Mutual further agree that Liberty Mutual's rights and claims to recover from Shaw arising out of the deductible provisions of the Liberty Mutual Policies are expressly reserved, and are not addressed, waived, released or affected by the Shaw Settlement or this Agreement. . . .

10.     **Shaw's Exceptions to Release of Insurers**

Notwithstanding the agreements in the Shaw Settlement between certain Claimants in the Lawsuits and . . . Shaw[,] . . . or any other provision of this Agreement, Shaw and the Insurers agree and acknowledge that the Shaw Settlement and this Agreement are not intended to and do not alter or affect any rights, claims or defenses that Shaw may have pertaining to the deductible claims excepted and reserved by the Insurers in Paragraph[ ] 7 . . . of this Agreement,

and Shaw's rights, claims and defenses are expressly reserved, and are not addressed, waived, released or affected by the Shaw Settlement or this Agreement.

(Doc. 18-4 at 3–6, ¶¶ 2, 7, 10.)

In interpreting contracts, the Louisiana Supreme Court has instructed:

> Contracts have the effect of law for the parties and the interpretation of a contract is the determination of the common intent of the parties. The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract. Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit, as it is not the duty of the courts to bend the meaning of the words of a contract into harmony with a supposed reasonable intention of the parties. However, even when the language of the contract is clear, courts should refrain from construing the contract in such a manner as to lead to absurd consequences. Most importantly, a contract must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance. Moreover, a contract provision that is susceptible to different meanings must be interpreted with a meaning that renders the provision effective, and not with one that renders it ineffective. Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.

*Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC*, 2012-2055 (La. 3/19/13); 112 So. 3d 187, 192 (cleaned up). *See also Trinity Med. Servs., LLC v. Merge Healthcare Sols., Inc.*, No. 17-592, 2020 WL 97162, at *14 (M.D. La. Jan. 8, 2020) (deGravelles, J.).

Liberty contends the claims Shaw is pursuing in the Counterclaim are not the rights it reserved in the Insurance Settlement, i.e., the "rights, claims or defenses that Shaw may have pertaining to the deductible[.]" (Doc. 18-4 at 6, ¶ 10.) Rather, argues Liberty, Shaw's claims made in the Counterclaim are "based on Liberty's claims handling and the underlying mercury exposure

litigation." (Doc. 18-1 at 3; *see also id*. at 10–11 (conceding that Shaw reserved rights regarding its "defenses to the deductible," but arguing that "Shaw did not, however, reserve any rights to challenge or contest Liberty's claims handling or defense of the *Abernathy* Lawsuit or to assert new causes of action related to insurance coverage. . . .").) Indeed, Liberty accuses Shaw of "thinly disguis[ing]" its claim as one pertaining to the deductible when in fact it is one for Liberty's alleged "belated agreement to participate" in its defense. (Doc. 29 at 7–8.)

Shaw responds that Liberty is "edit[ing] and mischarateriz[ing]" Paragraph 10 which "expressly reserves *all* of [Shaw's] rights, *claims*, and defenses pertaining to the deductible claims of its insurers." (Doc. 23 at 8 (emphasis in original); *see also id*. at 15 ("Under Liberty's wishful contractual interpretation, . . . the word 'claims' is eviscerated from the Insurance Settlement.").)

Here the Court agrees with Shaw. The language in Paragraphs 2, 7, and 10 of the Insurance Settlement, when read in isolation and in *pari materia,* are clear and unambiguous: while Shaw gave up broad rights in Paragraph 2, both Liberty and Shaw reserved all their "rights, claims and defenses" pertaining to the deductible. In doing so, both parties made clear that these reservations were made deliberately and were intended to be excepted from the broad release. Paragraph 10 clearly states that Shaw's "expressly reserved" rights are "*are not addressed, waived, released or affected by* the Shaw Settlement or *this Agreement*." (Doc. 18-4 at 6, ¶ 10 (emphasis added).)

It is also clear that the claimed damages and the allegedly wrongful conduct of Liberty giving rise to same "pertain" to the deductible. These rights therefore were not released in the Insurance Agreement and are reserved to Shaw. The damages that Shaw claims flow from Liberty's wrongful conduct all deal with amounts Shaw argues were paid toward the deductible and have the effect of reducing the deductible or requiring the return of amounts paid on the deductible. Specifically, they are:

$665,591.56   Defense costs paid by AIG on behalf of Shaw which Shaw claims were in fact owed by Liberty and which should reduce Shaw's deductible obligation. (Doc. 10 at 26–27, ¶¶ 38, 43-45.)

$155,894.92   Defense costs paid by Shaw directly to third parties which Shaw claims should reduce Shaw's deductible obligation. (*Id*. at 26, ¶ 40.)

$62,242.65   Paid by Shaw to Liberty as a result of an "administrative error" but which should nonetheless reduce Shaw's deductible obligation. (*Id*. at 27, ¶ 47.)

$439,627.00   Paid by Shaw only to avoid Liberty's drawing on Shaw's letter of credit but which should nonetheless reduce Shaw's deductible obligation.  (*Id*. at 29–30, ¶¶ 60–61).

Total:       $1,323,356.13

All of the above-enumerated damages involve defense costs which Liberty claims is part of the deductible owed by Shaw. According to Liberty, "[e]ach of the Policies contain[s] endorsements that expressly make Shaw responsible for both damages and defense costs[.]" (Doc. 18-1 at 5–6 (referencing "Amendatory Endorsement – Deductible," Docs. 18-2 and 18-3 at 42); *see also* Liberty's Complaint, Doc. 1 at 10–11, ¶¶ 37–44).) Each of these items claimed in the Counterclaim deal with defense costs and therefore "pertain" to deductibles. Because claims pertaining to deductibles were reserved to Shaw and by the express language of Paragraph 10 "*are not addressed, waived, released or affected by*" the Insurance Settlement, (Doc. 18-4 at 6, ¶ 10), the Court finds that the Insurance Settlement did not settle Shaw's Counterclaim and did not release same.

As stated above, Shaw utilizes three theories of liability in support of its effort to negate any obligation it has to reimburse Liberty for amounts Liberty paid in connection with the deductible, and to recover damages and the alleged "overpayment" of monies paid directly by AIG

24

and Shaw in satisfaction of its deductible obligation, (Doc. 10 at 30–31, ¶ 66): unjust enrichment (Count I, Doc. 10 at 31–32, ¶¶ 67–71); breach of contract (Count II, *id.* at 32–34, ¶¶ 72–87); and bad faith (Count III, *id.* at 34–35, ¶¶ 88–91).

These claims will be addressed separately, starting with Shaw's breach of contract claim. However, all of these claims, to one degree or another, hinge on the viability of Shaw's claim (disputed by Liberty) that defense costs paid by AIG and Shaw to others reduces the amount owed by Shaw on the deductible. That issue, in turn, hinges on the interpretation of the Liberty Policies.

### C.  Has Shaw Stated a Claim for Breach of Contract?

#### 1. Arguments of the Parties

Shaw claims that Liberty breached its contracts of insurance with Shaw by wrongfully refusing for nearly seventeen months to defend Shaw in the Abernathy Lawsuit. (Doc. 10 at 32, ¶¶ 76–77.) As a result, the "breach caused [Shaw] to incur substantial expenses and fees in defending itself against the Abernathy Lawsuit." (*Id.* at 33, ¶ 78.) Specifically, Shaw paid $155,894.82 "out of pocket in connection with defense of the Abernathy Lawsuit." (*Id.* at 33, ¶ 79.)

Shaw alleges that Liberty also breached the Liberty Policies by, as alleged elsewhere in the Counterclaim, (1) "failing to credit [Shaw] for payments made by AIG on behalf of [Shaw] in satisfaction of [Shaw's] deductible obligations to Liberty", (*id.* at 34, ¶ 84); (2) "forc[ing]" Shaw "to pay Liberty amounts not due to prevent Liberty from wrongfully drawing on its letter of credit", (*id.* at 34, ¶ 85); and (3) forcing Shaw "to incur substantial costs and fees in defending itself against Liberty's unfounded deductible claims", (*id.*).

Liberty responds by repeating its arguments that Shaw released these claims in the Insurance Settlement, (*see, e.g.*, Doc. 29 at 11–12); that payments by Shaw and the other insurers did not satisfy Shaw's deductible obligation to Liberty, (*see, e.g.*, *id.* at 12); and that Shaw did not

"overpay" its deductible, (*see, e.g.*, *id.* at 14–18). Liberty explains that its initial refusal to defend was based on multiple coverage defenses and its ultimate agreement to participate in Shaw's defense under a reservation of rights was a "business accommodation." (Doc. 18-1 at 8; *see also* Liberty's Complaint, Doc. 1 at 8–10, ¶¶ 31–37.)

The specific arguments of the parties on each of these points is considered in detail below. But the viability of the arguments depends largely on the proper interpretation of Liberty's Policies.

### 2. Applicable Law – Breach of Contract

This Court has explained:

> "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. "The central elements of a breach of contract action are the existence of a contract, a party's breach thereof, and damages." *Favrot v. Favrot*, 2010-0986 (La. App. 4 Cir. 2/9/11), 68 So.3d 1099, 1108-09 (quoting *Hercules Machinery Corp. v. McElwee Bros., Inc.*, 2002 WL 31015598, at *9 (E.D. La. Sept. 2, 2002)). Stated differently, the elements of a cause of action for breach of contract are: "(1) the obligor's undertaking of an obligation to perform (the contract), (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Denham Homes, L.L.C. v. Teche Federal Bank*, 14-1576 (La. App. 1 Cir. 9/18/15), 182 So.3d 108,118.

*JMF Med., LLC v. Team Health, LLC*, 490 F. Supp. 3d 947, 973 (M.D. La. 2020).

### 3. Applicable Law - Interpretation of the Liberty Insurance Policy

Not surprisingly, the parties differ in their interpretation of the pertinent parts of the Liberty Policies. The Louisiana Supreme Court laid out the comprehensive and well-established framework for interpreting insurance policies under Louisiana law in *Sims v. Mulhearn Funeral Home, Inc.*, 2007-0054 (La. 5/22/07), 956 So. 2d 583, which this Court now quotes in full:

> In analyzing insurance polices, certain elementary legal principles apply. First and foremost is the rule that an insurance policy is a

contract between the parties and should be construed using the general rules of interpretation of contracts set forth in the Civil Code. *LeBlanc v. Aysenne,* 05–0297, p. 3 (La. 1/19/06), 921 So. 2d 85, 89; *Edwards v. Daugherty,* 03–2103, p. 11 (La. 10/1/04), 883 So. 2d 932, 940; *Cadwallader v. Allstate Insurance Co.,* 02–1637, p. 3 (La. 6/27/03), 848 So. 2d 577, 580; *Louisiana Insurance Guaranty Association v. Interstate Fire & Casualty Co.,* 93–0911, p. 5 (La. 1/14/94), 630 So. 2d 759, 763.

According to those rules, the responsibility of the judiciary in interpreting insurance contracts is to determine the parties' common intent. *See,* [La. Civ. Code] art. 2045; *Edwards,* 03–2103, p. 11, 883 So. 2d at 940; *Cadwallader,* 02–1637 at 3, 848 So. 2d at 580; *Blackburn v. National Union Fire Insurance Co. of Pittsburgh,* 00–2668, p. 6 (La. 4/3/01), 784 So. 2d 637, 641. Courts begin their analysis of the parties' common intent by examining the words of the insurance contract itself. *See,* [La. Civ. Code] art. 2046; *Succession of Fannaly v. Lafayette Insurance Co.,* 01–1355, p. 3 (La. 1/15/02), 805 So. 2d 1134, 1137; *Blackburn,* 00–2668 at 6, 784 So. 2d at 641 ("[T]he initial determination of the parties' intent is found in the insurance policy itself."). In ascertaining the common intent, words and phrases in an insurance policy are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning, in which case the words must be ascribed their technical meaning. *See,* [La. Civ. Code] art. 2047; *Edwards,* 03–2103 at 11, 883 So. 2d at 940–941; *Cadwallader,* 02–1637 at 3, 848 So. 2d at 580; *Succession of Fannaly,* 01–1355 at 3, 805 So. 2d at 1137.

An insurance contract is to be construed as a whole and each provision in the contract must be interpreted in light of the other provisions. One provision of the contract should not be construed separately at the expense of disregarding other provisions. *See,* [La. Civ. Code] art. 2050; *Hill v. Shelter Mutual Insurance Co.,* 05–1783, p. 3 (La. 7/10/06), 935 So. 2d 691, 694; *Succession of Fannaly,* 01–1355 at 4–5, 805 So. 2d at 1137; *Peterson v. Schimek,* 98–1712, p. 5 (La. 3/2/99), 729 So. 2d 1024, 1029. Neither should an insurance policy be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. *LeBlanc,* 05–0297, at 3, 921 So. 2d at 89; *Edwards,* 03–2103 at 11, 883 So. 2d at 941; *Cadwallader,* 02–1637 at 3, 848 So. 2d at 580; *Peterson,* 98–1712 at 5, 729 So. 2d at 1028.

When the words of an insurance contract are clear and explicit and

lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and courts must enforce the contract as written. *See,* [La. Civ. Code] art. 2046; *Hill,* 05–1783 at 3, 935 So. 2d at 694; *Peterson,* 98–1712 at 4–5, 729 So. 2d at 1028. Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms. *Cadwallader,* 02–1637 at 4, 848 So. 2d at 580; *Succession of Fannaly,* 01–1355 at 4, 805 So. 2d at 1138. The rules of contractual interpretation simply do not authorize a perversion of the words or the exercise of inventive powers to create an ambiguity where none exists or the making of a new contract when the terms express with sufficient clarity the parties' intent. *Edwards,* 03–2103 at 12, 883 So. 2d at 941; *Succession of Fannaly,* 01–1355 at 4, 805 So. 2d at 1138; *Peterson,* 98–1712 at 5, 729 So. 2d at 1029.

Nevertheless, if, after applying the general rules of contractual interpretation to an insurance contract, an ambiguity remains, the ambiguous contractual provision is generally construed against the insurer and in favor of coverage. *See,* [La. Civ. Code] art. 2056; *Succession of Fannaly,* 01–1355 at 4, 805 So. 2d at 1138; *Peterson,* 98–1712 at 5, 729 So. 2d at 1029. Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. *Edwards,* 03–2103 at 12, 883 So. 2d at 941; *Cadwallader,* 02–1637 at 4, 848 So. 2d at 580; *Carrier v. Reliance Insurance Co.,* 99–2573, p. 12 (La. 4/11/00), 759 So. 2d 37, 43. This strict construction principle applies, however, only if the ambiguous policy provision is susceptible to two or more reasonable interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable. *Edwards,* 03–2103 at 12, 883 So. 2d at 941; *Cadwallader,* 02–1637 at 4, 848 So. 2d at 580; *Carrier,* 99–2573 at 12, 759 So. 2d at 43.

The determination of whether a contract is clear or ambiguous is a question of law. *Edwards,* 03–2103 at 12–13, 883 So. 2d at 941; *Cadwallader,* 02–1637 at 4, 848 So. 2d at 580; *Louisiana Insurance Guaranty Association,* 93–0911 at 7, 630 So. 2d at 764. Moreover, when a contract can be construed from the four corners of the instrument without looking to extrinsic evidence, the question of contractual interpretation is answered as a matter of law and summary judgment is appropriate. *Robinson v. Heard,* 01–1697, p. 4 (La. 2/26/02), 809 So. 2d 943, 945; *Peterson,* 98–1712 at 5, 729 So. 2d at 1029.

*Sims*, 956 So. 2d at 588–90. *See also Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 670–71 (M.D. La. 2019) (deGravelles, J.).

#### 4.Was Liberty's deductible reduced by amounts paid by AIG?

Shaw's contention that Liberty was "overpaid" hinges on its argument that AIG's payment of defense costs, which Shaw reimbursed to AIG, reduces the deductible amount on Liberty's Policies. The viability of this argument depends on the proper interpretation of the Policies' "Amendatory Endorsement – Deductible" clause. (Docs. 18-2 and 18-3 at 42–43.) They are identical in the two Policies. They state, in pertinent part:

> You [Shaw] are responsible, up to the deductible amount shown above, for the total of:
>
> a.  all damages, including amounts paid in settlement of a claim or "suit", plus
>
> b.  any other expenses described in SUPPLEMENTARY PAYMENTS – COVERAGES A AND B;
>
> because of "personal injury" and "property damage" as the result of any one "occurrence".
>
> We [Liberty] are responsible for those amounts of damages to which this insurance applies (subject to the applicable limits of insurance) and Supplementary Payments that exceed the applicable deductible amount shown above.
>
> We [Liberty] have the right but not the duty to advance any part or all of the deductible amount. If we exercise this right, you must promptly reimburse us for any such amounts advanced. All such amounts advanced remain your sole and exclusive liability. . . .

(Doc. 18-2 at 42; Doc. 18-3 at 42.)

The "SUPPLEMENTARY PAYMENTS – COVERAGES A AND B" provision states in pertinent part:

> 1.  We will pay, with respect to any claim we investigate or settle,

or any "suit" against an insured we defend:

a.  All expenses we incur. . . .

(Doc. 18-2 at 11, 75; Doc. 18-3 at 11, 73.)[4]

Liberty and Shaw agree that "expenses" as used in the "Amendatory Endorsement – Deductible" clause and the "SUPPLEMENTARY PAYMENTS – COVERAGES A AND B" provision includes defense costs. (Doc. 51 at 3 and Doc. 52 at 2–3 (both citing, *inter alia*, *Amerisure Mut. Ins. Co. v. Arch Specialty Ins. Co*., 784 F.3d 270, 275 (5th Cir. 2015)).)

While Shaw concedes that "it is obligated to satisfy [Liberty's] deductible," it argues it "has fully satisfied the obligation in part by AIG's payment of defense costs that were owed by Liberty." (Doc. 23 at 26.) In its Counterclaim, Shaw alleges that one of its other insurers, AIG, paid $665,591.56 in defense costs "on behalf of [Shaw]." (Doc. 10 at 26, ¶ 38.) According to Shaw, Liberty should give Shaw credit against its deductible for these and other payments made by AIG since they were made "in satisfaction of [Shaw's] deductible obligation pursuant to the Liberty Policies." (*Id*. at 26, ¶ 39.)

The starting point for Shaw's argument is that there is no "explicit restrictive language" in the Policies that would "support an interpretation that only [Shaw] could discharge its deductible obligations." (Doc. 23 at 23.) It then points the Court to La. Civ. Code art. 1855 ("Performance [of an obligation] may be rendered by a third person, even against the will of the obligee, unless the obligor or the obligee has an interest in performance only by the obligee"), La. Civ. Code art. 1766 ("When the performance requires the special skill or qualifications of the obligor, the obligation is presumed to be strictly personal on the part of the obligor" and therefore "its performance can be

---

[4] There are two Supplementary Payments provisions in each policy. (Doc. 18-2 at 11, 75; Doc. 18-3 at 11, 73.) While the parties disagree as to which one applies in this case, (*compare* Doc. 51 at 3–4, *with* Doc. 52 at 2), the dispute does not matter since the operative language for purposes of this case is identical in each.

enforced . . . only against the obligor"), and various cases including *Continental Casualty Co. v. North America Capacity Insurance Co.*, 683 F.3d 79 (5th Cir. 2012), to support its position. (Doc. 23 at 23–27.)

Liberty counters that its Policies are clear and explicit that "Shaw, and Shaw alone, is responsible for reimbursing to Liberty the full $1.25 million deductible amount[.]" (Doc. 18-1 at 7, 21.) It points the Court to seven separate statements in the Policies that support its position, (Doc. 18-1 at 21 (quoting Docs. 18-2 and 18-3 at 42–43)), including, "*All such amounts advanced shall remain your [Shaw's] sole and exclusive liability,*" (*id.* (emphasis added) (quoting Docs. 18-2 and 18-3 at 42)). It contends that its position is supported by Louisiana jurisprudence. (Doc. 18-1 at 22–24 (citations omitted).) Furthermore, the language of the Policies is explicit that Shaw is to *reimburse Liberty* for what *Liberty* has expended, language inconsistent with Shaw's position that monies spent independently by AIG can offset Shaw's obligation to Liberty. (Doc. 29 at 16.) Finally, Liberty urges that the cases relied upon by Shaw are distinguishable. (Doc. 29 at 16–18.)

In resolving disputes about the meaning of contracts in general, a court must start with the language of policy.

> When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. Common intent is determined, therefore, in accordance with the general, ordinary, plain and popular meaning of the words used in the contract.

*Clovelly Oil*, 112 So. 3d at 192 (cleaned up).

The rule is the same when the contract is one for insurance. "When the words of an insurance contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent and courts must enforce the contract as written." *Sims*, 956 So. 2d at 589 (citations omitted).

The language here is clear and explicit: Shaw's deductible obligation requires it to *reimburse* to *Liberty* expenses that *Liberty* advanced. The Policies are clear and explicit that Shaw owes Liberty *reimbursement* of the deductible amounts expended by Liberty, and AIG's payment of third parties on Shaw's behalf does not satisfy that obligation. For example, the Policies provide:

- "*You* will *reimburse* us for any deductible amounts that we advance or are required to by law to pay." (Docs 18-2 at 42 (emphasis added).)

- "If we exercise this right [to advance deductible payments], *you* must promptly *reimburse* us for any such amounts advanced." (*Id*. (emphasis added).)

In *Zurich American Insurance Co. v. Centex Corp*., 373 F. Supp. 3d 692 (N.D. Tex. 2016), an insured made an argument identical to the one made by Shaw here, i.e., that controlling law "permits other entities to satisfy a deductible on the insured's behalf, even where the language of the policy appears to require payment by the insured itself." *Id*. at 698. But the Court rejected that argument based on language in the Zurich policy similar to that found in Liberty's Policies.

> But the Zurich Policy requires Centex to *reimburse* the deductible to Zurich. The Fifth Circuit has noted that "reimbursement requires one to put forth something in order to be paid back." *TIG Ins. Co. v. Eagle Inc*., 294 Fed. App'x 920, 923 (5th Cir. 2008) (internal quotation marks and citation omitted). The language of the Deductible Endorsement comports with this definition of "reimbursement." It specifically requires Centex to reimburse Zurich "for deductible amounts that [Zurich] pay[s] on [Centex's] behalf." Centex App. 734. In other words, the policy requires Centex to pay back deductible amounts that Zurich puts forth, obliging Centex to meet the reimbursable requirement after Zurich covers the deductible amount, not before.

*Zurich Am. Ins.*, 373 F. Supp. 3d at 699.

Here the situation is the same. AIG's payment of defense costs to third parties does not reimburse Liberty for amounts Liberty paid in connection with the case.

Shaw points the Court to cases it contends support its position but these cases are inapposite in that they involved self-insured retention ("SIR") provisions without the clear and explicit reimbursement requirement found in Liberty's Policies:  *Cont'l Cas. Co. v. N. Am. Capacity Ins. Co.*, 683 F.3d 79, 90 (5th Cir. 2012) ("Although it is undisputed that Encompass never paid its self-insured retention limit, the policy does not explicitly require the insured to pay the amount itself."); *Am. Econ. Ins. Co. v. Scottsdale Ins. Co.*, No. 14-188, 2015 WL 12764955, at *14–16 (S.D. Tex. Oct. 29, 2015) (holding that a third party's payment of defense costs satisfied the SIR); *Nationwide Mut. Ins. Co. v. Certain Underwriters at Lloyd's, London*, No. 15-5503, 2016 WL 3648610, at *4 (N.D. Cal. July 7, 2016) (allowing an insured to satisfy SIR obligation by purchasing other insurance to make the payment.); *Intervest Const. of Jax, Inc. v. Gen. Fid. Ins. Co.,* 133 So. 3d 494, 503 (Fla. 2014) (answering a question posed to it by the U.S. Court of Appeals, Eleventh Circuit, and "find[ing] that the General Fidelity policy allows the insured to apply indemnification payments received from a third party toward satisfaction of its $1 million self-insured retention"); *Intervest Const. of Jax, Inc. v. Gen. Fid. Ins. Co.*, 746 F.3d 1261, 1263 (11th Cir. 2014) (mem.) (adopting the opinion of the Florida Supreme Court). *See also* 15 William Shelby McKenzie and H. Alston Johnson, *Louisiana Civil Law Treatise*, *Insurance Law and Practice* § 7.23 (4th ed. 2021) (drawing distinction between deductible and SIR).

 Liberty points the Court to other language in its Policies which supports its position that AIG's payments to third parties do not satisfy Shaw's deductible obligation, (Doc. 18-1 at 21; Doc. 29 at 15), including, "All such [deductible] amounts advanced shall remain your [Shaw's] sole and exclusive responsibility," (Docs. 18-2 and 18-3 at 42.)

In conclusion, the Court finds that the clear and explicit language of the Policies requires the deductible amounts expended by Liberty to be reimbursed to Liberty and that AIG's payments

to third parties made on Shaw's behalf do not reduce Shaw's deductible obligation. Accordingly, Liberty's *Motion* is granted insofar as Shaw claims a credit or right of reimbursement of AIG's payments of $665,591.56, and this claim will be dismissed.

It is not clear from the Counterclaim whether Shaw is claiming a credit against the deductible for the $155,894.82 paid by Shaw to third parties for defense costs based on the same arguments it makes in connection with the amounts paid by AIG. (*See, e.g.*, Doc. 10 at 33, ¶¶ 80–82.) For the reasons previously detailed, because this money was not paid to Liberty to reimburse it for money Liberty spent, this amount cannot be deducted from Shaw's deductible obligation on this ground. However, the Court considers next whether Shaw can claim this amount as a damage item for breach of contract.

### 5. Does Shaw state a breach of contract claim for damages or credit because of Liberty's wrongful refusal to timely defend it?

In its Counterclaim, Shaw alleges that it paid $155,894.82 directly "to various entities in connection with the defense of the Shaw Defendants [in] the Abernathy Lawsuit[.]" (Doc. 10 at 26, ¶ 40. *See also* Doc. 23 at 6.) Shaw incurred these costs "from the time of [Shaw's] initial tender of defense and indemnity to Liberty until Liberty's belated agreement to participate [in Shaw's defense] seventeen months later[.]" (Doc. 10 at 31, ¶ 67.) Shaw alleges that Shaw was forced to spend these monies "as a result of Liberty's refusal to fulfill its defense obligations" arising under the Insurance Policies. (*Id*. at 33, ¶ 79.) According to Shaw's Counterclaim,

> Liberty wrongfully rejected the tender and denied coverage . . . [because] Liberty erroneously asserted that the Liberty Policies' Total Pollution Exclusion excluded any potential coverage, and further erroneously stated that the Shaw Defendants' "alleged involvement at the facility did not begin until 2008, well after the policy periods of the [Liberty Policies], the last of which expired in 2005."

(*Id*. at 21, ¶ 17.) Shaw claims that another erroneous reason given for Liberty's denial was that "the Complaints . . . in the Abernathy Lawsuit contained no allegations that the Shaw Defendants were present and working within the OxyChem plant during the Liberty Coverage Period." (*Id*. at 22, ¶ 20.) In addition, Liberty "misreprent[ed] pertinent facts and/or policy provisions. . . ." (*Id*. at 34, ¶ 89.)

For purposes of the present *Motion*, these allegations must be taken as true and viewed in the light most favorable to Shaw. *Thompson*, 764 F.3d at 502–03 (citation omitted). Furthermore, as this Court has already explained, because these allegations are alleged to have adversely affected Shaw's deductible obligation, they "pertain" to the deductible and were reserved in the Insurance Settlement.

The Court therefore finds that Shaw's claim meets the requirements for a breach of contract: the existence of an insurance contract between the parties, an alleged breach and resulting damages. *JMF Med.*, 490 F. Supp. 3d at 973. Shaw has stated a claim for breach of contract for the recovery of damages caused by the breach, including $155,894.82.

### 6. Is Liberty's deductible reduced by amounts paid by Shaw directly to Liberty?

Shaw paid the following items directly to Liberty in satisfaction of its deductible obligation:

$62,242.65   Paid by Shaw to Liberty as a result of an "administrative error." (Doc. 10 at 27, ¶ 47.)

$439,627.00  Paid by Shaw to Liberty only to avoid Liberty's drawing on Shaw's letter of credit. (*Id*. at 29–30, ¶¶ 60–61.)

Shaw claims that the $62,242.64 was paid to Liberty as a result of an "administrative error" which it was not required to pay because "a substantial portion of its deductible obligations to

Liberty had already been satisfied." (Doc. 10 at 27, ¶ 47.) As to the $439,627, Shaw claims that it paid Liberty this amount only "to prevent Liberty from wrongfully drawing on [Shaw's] letter of credit thereby causing additional damages to [Shaw]." (Doc. 23 at 33 (citing Doc. 10 at 29–, ¶¶ 61–64).)

The payment of these amounts supports Shaw's allegation that, when combined with AIG's payments and its own, Liberty's deductible was "overpaid" therefore entitling Shaw to the amount of overpayment. The Court has rejected that argument. However, to the extent Shaw's Counterclaim is simply asking for a credit against its deductible obligation for the amounts paid by Shaw directly to Liberty, it would appear that it is entitled to a credit. Liberty does not appear to be arguing otherwise. (*See* Doc. 1, ¶¶ 46, 51, and 54 (conceding that Shaw has "voluntarily paid $500,461.37[5] toward the Deductible Amounts" under the Policies but insisting that "Shaw has refused to reimburse the remaining $749,583.63.")).) For the reasons given earlier, to the extent that Shaw is demanding repayment of these amounts from Liberty based on the assumption that Shaw is entitled to take credit for the amounts paid by AIG, Liberty's Motion is granted.

### D. Has Shaw Stated a Claim for Bad Faith Pursuant to La. R.S. 22:1973?

#### 1. Arguments of the Parties

Shaw claims that Liberty breached its statutory obligation of good faith and fair dealing under La. R.S. 22:1973[6] by,

> among other things, (1) misrepresenting pertinent facts and/or policy provisions relating to the coverages applicable to the Abernathy Lawsuit, (2) wrongfully denying coverage with respect to the Abernathy Lawsuit, (3) seeking to recover from [Shaw] deductible amounts that had already been satisfied and/or that Liberty was aware [Shaw] disputed; and, (4) wrongfully threatening

---

[5] The Court notes that there appears to be a small difference between Liberty's and Shaw's calculations of the total of these amounts. The total of the amounts paid by Shaw directly to Liberty, according to Shaw's Counterclaim, is $501,869.65. (*See* Doc. 10 at 27, ¶ 47; 29–30, ¶¶ 60–61.)

[6] In Shaw's Counterclaim, Shaw erroneously refers to the pertinent statute as La. R.S. 22:1793. (Doc. 10 at 34, ¶ 88.)

> to draw on [Shaw's] letter of credit for amounts not due and/or that
> Liberty was aware [Shaw] disputed.

(Doc. 10 at 34, ¶ 89.) It claims that these "bad faith breaches . . . serve as a complete defense to, an offset against, Liberty's deductible claims[,] . . . [and] [a]ccordingly, [Shaw] is entitled to recover all amounts allowed by applicable law." (*Id.* at 35, ¶ 91.)

Shaw denies that the Insurance Settlement released the bad faith claims but, to the extent it did, it could not have released Shaw's cause of action for Liberty's conduct *after* the settlement (including "wrongfully threatening to draw on [Shaw's] letter of credit for amounts not due and/or that Liberty was aware [Shaw] disputed"). (Doc. 10 at 34, ¶ 89.) This is because such a release would contravene Louisiana Civil Code Article 2004 which declares null a contractual provision which "in advance, excludes or limits the liability of one party of intentional or gross fault that causes damage to the other party." (Doc. 23 at 17 (quoting La. Civ. Code art. 2004).) Acts of bad faith have been held to be within the meaning of "gross fault." (*Id*. at 17–18 (citations omitted).)

Liberty argues that Shaw's bad faith claim was settled and released by virtue of the Insurance Settlement. (Doc. 18-1 at 18.) As to Shaw's argument that prospective settlement of a bad faith claim is prohibited by La. Civ. Code Art. 2004, Liberty responds that this prohibition "does not apply to settlement agreements[] because public policy 'favors settlement and compromise.' " (Doc. 29 at 13 (quoting and citing *Hymel*, 7 So.3d at 1255–56; *Savoie*, 2017 WL 4574197).)

Next, Liberty maintains that Shaw's bad faith claim also fails because Shaw does not allege specific facts to support such a cause of action." (*Id*. at 13–14.) Finally, while Liberty concedes that the acts constituting bad faith listed in La. R.S. 22:1973(b) are not exclusive, what Shaw accuses Liberty of doing does not constitute bad faith but was merely Liberty "enforcing its rights under the policy." (*Id.*; Doc. 18-1 at 19.)

## 2. Applicable Law – Bad Faith

Louisiana Revised Statutes Section 22:1973 states, in pertinent part:

> § 1973. Good faith duty; claims settlement practices; cause of action; penalties
>
> A. An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
>
> B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer's duties imposed in Subsection A of this Section:
>
>> (1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
>>
>> (2) Failing to pay a settlement within thirty days after an agreement is reduced to writing.
>>
>> (3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
>>
>> (4) Misleading a claimant as to the applicable prescriptive period.
>>
>> (5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
>>
>> (6) Failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.
>
> C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to

38

> exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospective loss experience for the purpose of setting rates or making rate filings.

La. R.S. 22:1973

"This statute recognizes the jurisprudentially established duty of good faith and fair dealing owed to the insured, which is an outgrowth of the contractual and fiduciary relationship between the insured and the insurer." *Republic Ins. Co. v. Hous. Auth. of New Orleans*, No. 08-4748, 2013 WL 1897135, at *8 (E.D. La. May 2, 2013) (cleaned up). The Louisiana Supreme Court has recently reiterated:

> In [*Kelly v. State Farm Fire & Casualty Co.*,] . . . we acknowledged the reasoning in *Stanley v. Trinchard*, 500 F.3d 411 (5th Cir. 2007), in which the federal court explained "[i]nasmuch as it is not the statute that creates the insured's cause of action against the insurer, the bases for an *insured's* cause of action for a breach of the implied covenant of good faith and fair dealing are not limited to the prohibited acts listed in La. R.S. 22:[1973](B)." [*Kelly*, 14-1921 (La. 5/15/15), 169 So. 3d 328, 336] (quoting *Stanley*, 500 F.3d at 427).

*Smith v. Citadel Ins. Co.*, 2019-00052 (La. 10/22/19), 285 So. 3d 1062, 1069. The Louisiana Supreme Court continued:

> The insurer's duty to act in good faith includes the duty to deal fairly in handling claims. *Smith v. Audubon Ins. Co.*, 95-2057 (La. 9/5/96), 679 So. 2d 372, 376. Additionally, this court has stated that ". . . in every case, the insurance company is held to a high fiduciary duty to discharge its policy obligations to its insured in good faith—including the duty to defend the insured against covered claims and to consider the interests of the insured in every settlement." *Pareti v. Sentry Indem. Co.*, 536 So. 2d 417, 423 (La. 1988).

*Id.* at 1067.

"It is generally accepted that an insurer must carefully consider the interests of its insured, instead of only consulting its own self-interests, when handling and settling claims in order to

protect the insured from exposure to excess liability" *Id.* (quoting *Holtzclaw v. Falco, Inc.*, 355 So. 2d 1279, 1283–84 (La. 1977)).

### 3. Discussion

Assuming the truth of Shaw's allegations and drawing all reasonable inferences in favor of Shaw, the Court finds that Shaw has stated a claim for bad faith against Liberty for at least some of the bad faith allegations made. The four areas of allegedly wrongful conduct supporting Shaw's bad faith claim are:

> (1) misrepresenting pertinent facts and/or policy provisions relating to the coverages applicable to the Abernathy Lawsuit, (2) wrongfully denying coverage with respect to the Abernathy Lawsuit, (3) seeking to recover from [Shaw] deductible amounts that had already been satisfied and/or that Liberty was aware [Shaw] disputed; and, (4) wrongfully threatening to draw on [Shaw's] letter of credit for amounts not due and/or that Liberty was aware [Shaw] disputed.

(Doc. 10 at 34, ¶ 89.)

The first two claims of alleged bad faith, when joined together, accuse Liberty of willfully misrepresenting both the underlying facts giving rise to Shaw's exposure in the Abernathy Lawsuit and the provisions in Liberty Policies in order to wrongfully deny coverage. These broad allegations are supported by specific ones: *see id.* at 19–24, ¶¶ 6–31. Liberty's *Motion* is denied as to this part of the bad faith claim. Because of its alleged bad faith, Shaw was forced to spend $155,894.82 in defense costs before Liberty agreed to participate in Shaw's defense. (*Id.* at 26, ¶ 40.)

The Court finds that Shaw has not stated a cause of action for the third area of alleged bad faith conduct on the part of Liberty, i.e. Liberty's "seeking to recover from [Shaw] deductible amounts that had already been satisfied and/or that Liberty was aware [Shaw] disputed." (*Id.* at 34, ¶ 89.) Here, the Court finds that, for reasons already given, Shaw is not entitled to a credit in

40

its deductible obligation to Liberty through amounts paid by AIG. Therefore, Liberty cannot be in bad faith for denying that claim.

Similarly, Shaw's fourth main area of alleged bad faith also seems to be premised on its allegation that Shaw is entitled to a credit for AIG's payments. Furthermore, Shaw's Counterclaim does not provide facts to explain or support why Liberty's threat to draw on Shaw's letter of credit given by Shaw to secure repayment of the deductible could be in bad faith otherwise. Therefore, Liberty's *Motion* as to the third and fourth areas of Liberty's alleged bad faith is granted.

### E.  Has Shaw Stated a Claim for Unjust Enrichment?

#### 1. Arguments of the Parties

Based on essentially the same allegations made in connection with the breach of contract and bad faith claims, Shaw claims that Liberty was wrongfully overpaid and thus "Liberty was unjustly enriched and [Shaw] was impoverished." (Doc. 10 at 31, ¶ 68. *See generally id*. at 31–32, ¶¶ 67–71.) Shaw claims it is "entitled to recover the full amount of its overpayment from Liberty." (*Id*. at 32, ¶ 71.)

Liberty responds simply that the amounts paid to Liberty by Shaw were "due and owed . . . and therefore cannot give rise to any unjust enrichment claim as a matter of law." (Doc. 18-1 at 20.) As to that portion of the claim based on amounts paid by AIG, Liberty returns to its refrain that credit was not due because the deductible endorsement requires Shaw, and Shaw alone, to *reimburse* Liberty for what Liberty has paid. (*Id*. at 21–24.) The payments by AIG to third parties did not do that. (*Id.*)

#### 2. Applicable Law - Unjust Enrichment Claim

Louisiana Civil Code article 2298 sets out the cause of action for unjust enrichment:

> A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term

> "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.

La. Civ. Code art. 2298.

> To establish a claim for unjust enrichment under Louisiana law, a claimant must prove: "(1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the resulting impoverishment, (4) an absence of 'justification' or 'cause' for the enrichment and impoverishment, and (5) no other remedy at law." *Brown v. Coleman Investments, Inc.*, 993 F. Supp. 432, 439 (M.D. La. 1998), citing *Baker v. Maclay Properties Co.*, 648 So. 2d 888, 897 (La. 1995) (citations omitted). Courts may " 'resort to equity only in cases of unjust enrichment for which there is no justification in law or contract.' " *Id.*, citing *SMP Sales Mgt., Inc. v. Fleet Credit Corp.*, 960 F.2d 557, 560 (5th Cir. 1992) (citations omitted). Stated simply, " '[q]uasi-contractual remedies may not supplant a contract between the parties.' " *Id.*, quoting *Marple v. Kurzweg*, 902 F.2d 397, 401 (5th Cir. 1990) (citations omitted) (emphasis added).

*JMF Med.*, 490 F. Supp. 3d at 979–80.

In addition to its claim of unjust enrichment, Shaw urges two other causes of action: breach of contract and bad faith. The existence of these two claims necessarily precludes Shaw's ability to recover for unjust enrichment. *Id.* at 980 ("[B]oth the state and federal courts hold that the existence of a contract between the parties alone defeats a claim for unjust enrichment."); *Williams v. Chesapeake Operating, Inc.*, No. 10-1906, 2011 WL 13160764, at *2 (W.D. La. Sept. 14, 2011) ("It is well-established that the absence of an available remedy at law is a threshold requirement, as the unjust enrichment remedy is available only to fill a gap in the law where no express remedy is provided." (cleaned up)).

There are circumstances in which a plaintiff's assertion of other causes of action does not require dismissal of an unjust enrichment claim at the motion stage.

>        To the extent that Defendant is positing that an unjust enrichment
> claim may never be pleaded alongside another claim, the Court
> disagrees. This Court has rejected the "blanket proposition that no
> plaintiff may ever plead an unjust enrichment claim alongside a
> claim which would grant a remedy at law." *Prop. One, Inc. v.
> USAgencies, L.L.C.*, 830 F. Supp. 2d 170, 181 (M.D. La. 2011). This
> Court has held that the law does not compel "an election of remedies
> between a contractual theory and an unjust enrichment theory prior
> to filing a complaint." *Id*. *See also Cent. Facilities Operating Co. v.
> Cinemark USA, Inc*., No. CIV.A. 11–660–JJB, 2014 WL 3866086,
> at *5 (M.D. La. Aug. 6, 2014) (finding cognizable unjust enrichment
> claim in same suit in which plaintiff maintained claim of open
> account).
>
>        *With the validity of Plaintiff's contract with Defendant still in
> question*, and with no other potential remedies at law, the Court does
> not find a sufficient basis to dismiss Plaintiff's unjust enrichment
> claim at summary judgment based on the availability of other
> remedies at law.

*United States ex rel. Sun Coast Contracting Servs., LLC v. DQSI, LLC*, No. 13-568, 2014 WL

7246936, at *5 (M.D. La. Dec. 17, 2014) (Jackson, J.) (emphasis added). *See also Schott, Tr. for

Est. of InforMD, LLC v. Massengale*, No. 18-759, 2019 WL 4741811, at *17 (M.D. La. Sept. 27,

2019) (deGravelles, J).

       But here, neither party questions the existence or validity of the insurance contract at issue.

The question is whether the contract was breached and, if so, what damages flow from that breach.

It is the availability of the remedy at law, not its success, that precludes the unjust enrichment

claim. As the Court explained in *Sun Coast Contracting Servs.*:

>        A plaintiff need not ultimately prevail on another claim for a court
> to find that it was available. "The existence of a 'remedy' which
> precludes application of unjust enrichment does not connote the
> ability to recoup your impoverishment . . . It merely connotes the
> ability to bring the action or seek the remedy." *Carriere v. Bank of
> La.,* 702 So. 2d 648, 672 (La. 1996). For example, courts have found
> remedies at law available even when claims based in law were time-
> barred or never advanced. *See, e.g., Walters v. MedSouth Record
> Mgmt., LLC,* 38 So. 3d 241, 242 (La. 2010); *JP Mack Indus. LLC v.
> Mosaic Fertilizer, LLC,* 970 F. Supp. 2d 516, 520–23 (E.D. La.

2013).

*Sun Coast Contracting Servs.,* 2014 WL 7246936, at *4.

Under these circumstances, the Court finds that Shaw fails to state a valid claim for unjust

enrichment. *JMF Med.*, 490 F. Supp. 3d at 980; *Andretti Sports Mktg. Louisiana, LLC v. NOLA*

*Motorsports Host Comm., Inc.*, No. 15-2167, 2015 WL 13540096, at *7–8 (E.D. La. Dec. 2, 2015)

("The existence of another remedy at law will preclude an unjust enrichment claim."); *Reel Pipe,*

*LLC v. USA Comserv, Inc.*, No. 18-6646, 2019 WL 127055, at *4 (E.D. La. Jan. 8, 2019) ("USA

Comserv cannot state a claim for unjust enrichment because other remedies are available at law."

(citation omitted)); *Cf. Schott*, 2019 WL 4741811, at *17 (declining to dismiss unjust enrichment

claim because, *inter alia*, "the validity of the other claims in the *Complaint* [was] still in

question.").

## V.      WHETHER TO ALLOW AN AMENDMENT OF THE COUNTERCLAIM

Shaw asks for the opportunity to amend its Counterclaim in the event the "Court find[s]

the Counterclaim to be deficient in stating a claim entitling [Shaw] to the relief sought. . . ." (Doc.

23 at 33.) Liberty opposes that request arguing that an "opportunity to amend would be futile."

(Doc. 29 at 18.)

"[A] court ordinarily should not dismiss the complaint except after affording every

opportunity to the plaintiff to state a claim upon which relief might be granted." *JMCB, LLC v.*

*Bd. of Com. & Indus.*, 336 F. Supp. 3d 620, 641 (M.D. La. 2018) (deGravelles, J.) (quoting *Byrd*

*v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955)). Moreover, the Fifth Circuit has stated:

> In view of the consequences of dismissal on the complaint alone,
> and the pull to decide cases on the merits rather than on the
> sufficiency of pleadings, district courts often afford plaintiffs at least
> one opportunity to cure pleading deficiencies before dismissing a
> case, unless it is clear that the defects are incurable or the plaintiffs

advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.

*Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).

Further:

> As the numerous case[s] . . . make clear, dismissal under Rule 12(b)(6) generally is not immediately final or on the merits because the district court normally will give the plaintiff leave to file an amended complaint to see if the shortcomings of the original document can be corrected. The federal rule policy of deciding cases on the basis of the substantive rights involved rather than on technicalities requires that the plaintiff be given every opportunity to cure a formal defect in the pleading. This is true even when the district judge doubts that the plaintiff will be able to overcome the shortcomings in the initial pleading. Thus, the cases make it clear that leave to amend the complaint should be refused only if it appears to a certainty that the plaintiff cannot state a claim. A district court's refusal to allow leave to amend is reviewed for abuse of discretion by the court of appeals. A wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief.

*JMCB*, 336 F. Supp. 3d at 642 (quoting 5B Charles A. Wright, Arthur R. Miller, *et al., Federal Practice and Procedure* § 1357 (3d ed. 2016)).

Accordingly, the Court will act according to the "wise judicial practice" and grant leave to amend. *See Watkins v. Gautreaux*, 515 F. Supp. 3d 500, 519 (M.D. La. 2021*) (deGravelles, J.) (citing, *inter alia*, *Fetty v. La. State Bd. of Private Sec. Exam'rs*, No. 18-517, 2020 WL 520026, at *15 (M.D. La. Jan. 31, 2020) (deGravelles, J.).

However, the Court reminds both parties of the need for judicial economy and their obligations under Federal Rule of Civil Procedure 11.  Specifically, by signing the pleading, all

attorneys must "certif[y] that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . .

> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]

Fed. R. Civ. P. 11(b)(2), (3).  Thus, if it appears to Shaw's counsel that they have no viable way of curing the defects to any dismissed claims (e.g., for unjust enrichment), then they should abandon same.  Similarly, Liberty is reminded of its obligation in raising arguments opposing any amended Counterclaim. In sum, given the complexity of this case, and given the Court's caseload (both generally and since the COVID-19 pandemic began), both parties are encouraged to act in a way to maximize judicial economy and conserve party, attorney, and judicial resources. Given the quality of attorneys in this case, the Court has little doubt that counsel will abide by this instruction.

## VI.    CONCLUSION

For the reasons stated above, *Liberty Mutual Fire Insurance Company's Motion to Dismiss for Failure to State a Claim* ("*Motion*") (Doc.18) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1) Liberty's *Motion* is **GRANTED** insofar as Shaw claims a credit for or right of reimbursement of AIG's payments of $665,591.56, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

2)  Liberty's *Motion* is **GRANTED** insofar as Shaw claims a credit for $155,894.82 based on Shaw's contention that Shaw's payments to third parties reduced its deductible obligation to Liberty, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

46

3)  Liberty's *Motion* is **GRANTED** insofar as Shaw claims amounts allegedly "overpaid" above the Liberty Policies' combined deductibles of $1,250,000, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

4)  Liberty's *Motion* is **GRANTED** to the extent Shaw is demanding repayment of amounts paid by Shaw directly to Liberty (approximately $501,869.65) based on the assumption that Shaw is entitled to take credit for the amounts paid by AIG, and this claim is **DISMISSED WITHOUT PREJUDICE**.

5)  Liberty's *Motion* is **GRANTED** as to Shaw's bad faith claims for Liberty's alleged (a) seeking to recover from Shaw deductible amounts that had already been satisfied and/or that Liberty was aware Shaw disputed, and (b) wrongfully threatening to draw on Shaw's letter of credit for amounts not due, and these claims will be **DISMISSED WITHOUT PREJUDICE**.

6)  Liberty's *Motion* is **GRANTED** insofar as Shaw claims damages for unjust enrichment, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

7)  In all other respect, Liberty's *Motion* is **DENIED**.

   **IT IS FURTHER ORDERED** that Shaw is hereby given twenty-eight (28) days in which to amend the Counterclaim to cure the deficiencies detailed in this ruling.  Failure to do so will result in the dismissal of these deficient counterclaims against Liberty with prejudice.

   Signed in Baton Rouge, Louisiana, on March 25, 2022.

   **JUDGE JOHN W. deGRAVELLES**
   **UNITED STATES DISTRICT COURT**
   **MIDDLE DISTRICT OF LOUISIANA**