## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

LIBERTY MUTUAL FIRE INSURANCE
COMPANY

                                   **CIVIL ACTION**

**VERSUS**

                                   **NO. 20-871-JWD-RLB**

**THE SHAW GROUP, INC. (n/k/a CB&I
GROUP, INC.)**

### RULING ON LIBERTY MUTUAL FIRE INSURANCE COMPANY'S MOTION TO DISMISS FIRST AMENDED AND RESTATED COUNTERCLAIM

Before the Court are two related motions brought by defendant Liberty Mutual Insurance Company ("Liberty"). The first is *Liberty Mutual Insurance Company's Motion to Dismiss First Amended and Restated Counterclaim* (Doc. 61) ("Renewed Motion") which is opposed by counterclaimant The Shaw Group, Inc. n/k/a CB&I Group Inc. ("Shaw") (Doc. 66). Liberty filed a reply brief. (Doc. 69.) The second, which the Court will consider and resolve in a separate ruling, is *Liberty Mutual Insurance Company's Motions for Sanctions Pursuant to Federal Rule of Civil Procedure 11(c)(2)* ("Sanctions Motion") (Doc. 70) which Shaw opposes (Doc. 72) and in response to which Liberty filed a reply (Doc. 73).[1] The Court has carefully considered the law, facts in the record, and arguments and submissions of the parties and is prepared to rule. For the following reasons, Liberty's Renewed Motion is granted in part and denied in part.

### I.      PROCEDURAL BACKGROUND

This suit arises out of a dispute over the meaning of certain provisions in two commercial insurance policies issued by Liberty to Shaw. Liberty filed suit claiming entitlement to deductible amounts paid by Liberty for damages and defense costs on Shaw's behalf. (Doc. 1.) Shaw filed an

---

[1] There is a third pending motion which the Court will also consider separately: *Liberty Mutual Fire Insurance Company's Motion for Summary Judgment*. (Doc. 80.) It is opposed by Shaw. (Doc. 85.) Liberty filed a reply brief. (Doc. 86.)

answer and counterclaim against Liberty ("Original Counterclaim") (Doc. 10), in which Shaw denied liability for the amounts sought by Liberty, claimed a credit for amounts paid by it and others, and claimed that by virtue of Liberty's wrongful conduct, Liberty owed Shaw damages for unjust enrichment, breach of contract, and bad faith.

On June 24, 2021, Liberty filed a motion to dismiss Shaw's counterclaim ("Original Motion"). (Doc. 18.) Shaw file an opposition (Doc. 23) and Liberty filed a reply (Doc. 29). On March 25, 2022, the Court issued a ruling granting in part and denying in part Liberty's motion to dismiss Shaw's Original Counterclaim ("Original Ruling"). (Doc. 53.) As is discussed in more detail *infra*, the Original Ruling granted six parts of Liberty's Original Motion and denied the remaining parts. (Doc. 53 at 46–47.) The Court also granted Shaw twenty-eight days "in which to amend the Counterclaim to cure the deficiencies detailed in this ruling." (*Id.* at 47.) However, the Court issued this warning to Shaw:

> However, the Court reminds both parties of the need for judicial economy and their obligations under Federal Rule of Civil Procedure 11. Specifically, by signing the pleading, all attorneys must "certif[y] that to the best of [their] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances: . . .
>
>> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
>>
>> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery[.]
>
> Fed. R. Civ. P. 11(b)(2), (3). Thus, if it appears to Shaw's counsel that they have no viable way of curing the defects to any dismissed claims (e.g., for unjust enrichment), then they should abandon same. Similarly, Liberty is reminded of its obligation in raising arguments opposing any amended Counterclaim. In sum, given the complexity of this case, and given the Court's caseload (both generally and since the COVID-19 pandemic began), both parties are encouraged to act in a way to maximize judicial economy and conserve party, attorney, and judicial resources.

Given the quality of attorneys in this case, the Court has little doubt that counsel will abide by this instruction.

(*Id*. at 45–46.)

On April 27, 2022, Shaw filed *CB&I Group Inc.'s First Amended and Restated Counterclaim* ("Amended Counterclaim"). (Doc. 56.) Following the filing of Shaw's Amended Counterclaim, Liberty filed the Renewed Motion. (Doc. 61.) Liberty also filed a separate motion for sanctions against Shaw, alleging that by filing its Amended Counterclaim, Shaw ignored and violated this Court's admonition quoted above. (Doc. 70.) Shaw opposes that motion as well. (Doc. 72.)

## II.    FACTUAL BACKGROUND

The Court repeats the factual overview given in this Court's Original Ruling.

This dispute concerns two commercial general liability policies issued by Liberty to Shaw covering the policy periods of September 1, 2003, to September 1, 2004, (Doc. 18-2), and September 1, 2004, to September 1, 2005, (Doc. 18-3) (collectively, the "Policies"). (Doc. 18-1 at 5 (citing Doc. 10 at 19–20, ¶ 9).) Each policy had a $1.5 million aggregate limit, subject to deductibles of $500,000 and $750,000 respectively. (Doc. 18-2 at 1, 42; Doc. 18-3 at 1, 42.)

Endorsements to each policy required Shaw to reimburse Liberty for "both damages and defense costs, including amounts paid in settlement, 'up to the deductible amount' for a covered claim." (Doc. 18-1 at 5–7 (citing Doc. 10, at ¶ 11; Docs. 18-2 and 18-3 at 42).) Liberty claims the "deductible" included both settlement proceeds and defense costs. (*Id*. at 5–6.) Shaw agrees. (Doc. 52 at 1–3.) Thus, while Liberty might advance the entire $3 million limit, Shaw's deductible requirements had the effect of reducing the policies' limits, so that Shaw would owe $1.25 million when Liberty expended the full $3 million. (Doc. 18-1 at 7.) Liberty claims that "Shaw, and Shaw alone, is responsible [under the Policies] for reimbursing to Liberty the full $1.25 million deductible amount." (*Id*. (citing Docs. 18-2 and 18-3 at 42–43).) Shaw disagrees.

Shaw purchased a second primary insurance policy from Chartis Specialty Insurance Company, n/k/a AIG Specialty Insurance Company ("AIG") for the same time periods that Liberty's policies covered ("AIG Policy").[2] (Doc. 23 at 6.) The

---

[2] Contractors Pollution Liability Policy No. CPO 61823904. (Doc. 23 at 6.)

AIG Policy had a $1 million deductible. (*Id.*)

In 2012, Shaw and certain affiliates[3] were named as defendants in litigation ("Abernathy Lawsuit")[4] involving the alleged exposure of certain workers at a plant owned and operated by Occidental Chemical Corporation ("Occidental" or "OxyChem"). (Doc. 18-1 at 8; Doc. 23 at 2.) On November 15, 2013, Shaw "demanded defense and indemnity from Liberty with respect to the Abernathy Lawsuit." (Doc. 23 at 5.) Shaw claims that "Liberty repeatedly rejected [Shaw's] tender and wrongfully denied coverage[.]" (*Id.* at 5.) From Liberty's perspective, the initial rejection was because of "multiple coverage defenses[.]" (Doc. 18-1 at 8.) In any event, after some 17 months, on June 5, 2015, Liberty agreed to participate in Shaw's defense subject to a reservation of rights. (Doc. 23 at 5; Doc. 18-1 at 8.)

During the 17 months in which Liberty refused to defend Shaw, Shaw's other primary insurer, AIG, incurred the costs of the litigation according to Shaw. (*See* Doc. 23 at 6.) Shaw claims that the AIG Policy "paid at least $665,591.56 in defense costs for which Liberty was responsible." (*Id.* (citing Doc. 10 at 24–26, ¶¶ 33–34, 38).) In addition, Shaw claims that it "was forced to incur . . . at least $155,894.82" directly for its defense. (*Id.* (citing Doc. 10 at 26, ¶ 40).) It claims that AIG's "$1 million deductible . . . was fully satisfied by payments made directly by [Shaw]. . . ." (Doc. 10 at 25, ¶ 35.)

According to Shaw, once Liberty began defending Shaw in July of 2016, Liberty began invoicing Shaw for defense costs, and, as a result of Shaw's "administrative error", it paid $62,242.65 to Liberty. (*Id.* at 27, ¶ 47.)

In or around December 2019, Shaw and its insurers settled the Abernathy Lawsuit, (*id.* at 27, ¶ 48), for a total of $26,543,092.50, (Doc. 18-4 at 1, 3, ¶ 1.) Of that amount, Liberty contributed $3 million, and AIG contributed $3.3 million. (*Id.* at 3, ¶ 1.) Other insurers paid the rest. (*Id.*)

In March, 2020, in connection with the settlement of the Abernathy Lawsuit, Shaw and its insurers entered into a Settlement and Mutual Release Agreement ("Insurance Settlement") (Doc. 10 at 27, ¶ 49; Doc. 18-4). It "sets forth the various amounts that the respective parties would contribute to fund the settlement[.]" (Doc. 10 at 27, ¶ 49.) It also purports to settle certain claims as between Shaw and its insurers but reserves certain rights to Shaw and Liberty. (Doc. 18-4 at 3–6, ¶¶ 1–2, 4, 7, 10; Doc. 10 at 27–28, ¶¶ 49–51.)

---

[3] "Shaw" will be used herein to include both Shaw and these affiliates. According to Shaw, all of the affiliates are named insureds under the Liberty Policies. (Doc. 23 at 5.)

[4] *Abernathy, et al. v. Occidental Petroleum Corporation, et al.*, No. 2011-900266, originally filed in the Circuit Court of Colbert County, Alabama. (Doc. 23 at 2.) Both parties refer to this as the "Abernathy Lawsuit", and so will the Court.

In May of 2020, Liberty "demand[ed] full payment of $1.25 million for deductibles and threaten[ed] to file suit should [Shaw] fail to pay (or commit to pay) the full amount within twenty-one days." (Doc. 10 at 28, ¶ 55.) Shaw alleges that on October 9, 2020, Liberty stated it "would refrain drawing on [Shaw's] letter of credit" if Shaw "committed to paying . . . $439,627 within thirty days[.]" (*Id*. at 30, ¶ 62.) Shaw paid that amount on October 29, 2020. (*Id*. at 30, ¶ 64.)

On December 23, 2020, Liberty sued Shaw in this Court, (Doc. 1), demanding $749,538.63 representing, Liberty alleges, the unpaid part of the $1.25 million deductible, (*id*. at 14, ¶ 54), plus late payment charges, (*id*. at 18, ¶ 76). Liberty also asks the Court to declare that it is entitled to "draw on Shaw's letter of credit . . . to secure payment of the $749,538.63[,]" plus the late charge (*Id*. at 19, ¶ 82).

On April 23, 2021, Shaw filed an answer and counterclaim ("Counterclaim"). (Doc. 10.) In it, Shaw denies responsibility and liability for the amounts claimed by Liberty, (*see id.* at 35), and further claims that by virtue of Liberty's wrongful conduct, Liberty owes Shaw damages for unjust enrichment, breach of contract and bad faith under Louisiana Revised Statutes Section 22:1973, (*id*. at 31–35, ¶¶ 67–91). Shaw claims that Liberty wrongfully failed to credit towards its deductible obligation the following amounts:

| | |
|---|---|
| $665,591.56 | Defense costs paid by AIG on behalf of Shaw which was in fact owed by Liberty. (*Id*. at 26–27, ¶¶ 38, 43-45.) |
| $155,894.92 | Paid by Shaw directly to third parties for defense costs. (*Id*. at 26, ¶ 40.) |
| $62,242.65 | Paid by Shaw to Liberty as a result of an "administrative error." (*Id*. at 27, ¶ 47.) |
| $439,627.00 | Paid by Shaw to Liberty only to avoid Liberty's drawing on Shaw's letter of credit. (*Id*. at 29–30, ¶¶ 60–61). |

Total:  $1,323,356.13

Shaw claims that it is entitled to have its deductible obligation credited with these amounts. (*See id.* at 30–32, ¶¶ 65–66, 69.) The total of these payments exceeds the deductible by $73,356.03 which represents, argues Shaw, an overpayment by Shaw which Liberty owes to Shaw. (*Id.* at 31–32, ¶ 69.)

(Doc. 53 at 1–4.)

### III.     THE COURT'S ORIGINAL RULING

To one degree or another, all of Shaw's claims made in the Original Counterclaim depended on Shaw's contention that Liberty was "overpaid" because Liberty should have given Shaw credit against Shaw's deductible obligation for the $665,591.56 paid in defense costs by AIG and the $155,894.92 Shaw paid directly in defense costs to third parties. (Doc. 53 at 33–34.)[5] Looking primarily at the "Amendatory Endorsement – Deductible" clause (Docs. 18-2 and 18-3 at 42–43), the Court rejected that argument and concluded:

> The language here is clear and explicit: Shaw's deductible obligation requires it to *reimburse* to *Liberty* expenses that *Liberty* advanced. The Policies are clear and explicit that Shaw owes Liberty *reimbursement* of the deductible amounts expended by Liberty, and AIG's payment of third parties on Shaw's behalf does not satisfy that obligation. For example, the Policies provide:
>
> - "*You* will *reimburse* us for any deductible amounts that we advance or are required to by law to pay." (Docs 18-2 at 42 (emphasis added).)
>
> - "If we exercise this right [to advance deductible payments], *you* must promptly *reimburse* us for any such amounts advanced." (*Id*. (emphasis added).)

(Doc. 53 at 32.)

> In conclusion, the Court finds that the clear and explicit language of the Policies requires the deductible amounts expended by Liberty to be reimbursed to Liberty and that AIG's payments to third parties made on Shaw's behalf do not reduce Shaw's deductible obligation. Accordingly, Liberty's *Motion* is granted insofar as Shaw claims a credit or right of reimbursement of AIG's payments of $665,591.56, and this claim will be dismissed. \*\*\*

---

[5] As to the two amounts paid by Shaw directly to Liberty ($62,242.65 and $439,627), the Court wrote:

> [T]o the extent Shaw's Counterclaim is simply asking for a credit against its deductible obligation for the amounts paid by Shaw directly to Liberty, it would appear that it is entitled to a credit. Liberty does not appear to be arguing otherwise. (*See* Doc. 1, ¶¶ 46, 51, and 54 (conceding that Shaw has "voluntarily paid $500,461.37 toward the Deductible Amounts" under the Policies but insisting that "Shaw has refused to reimburse the remaining $749,583.63.")).

(Doc. 53 at 36.)

(Doc. 53 at 33–34.)

As a result of the Court's interpretation of the Policies, the Court granted six parts of

Liberty's original motion to dismiss:

1) Liberty's *Motion* is **GRANTED** insofar as Shaw claims a credit for or right of reimbursement of AIG's payments of $665,591.56, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

2) Liberty's *Motion* is **GRANTED** insofar as Shaw claims a credit for $155,894.82 based on Shaw's contention that Shaw's payments to third parties reduced its deductible obligation to Liberty, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

3) Liberty's *Motion* is **GRANTED** insofar as Shaw claims amounts allegedly "overpaid" above the Liberty Policies' combined deductibles of $1,250,000, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

4) Liberty's *Motion* is **GRANTED** to the extent Shaw is demanding repayment of amounts paid by Shaw directly to Liberty (approximately $501,869.65) based on the assumption that Shaw is entitled to take credit for the amounts paid by AIG, and this claim is **DISMISSED WITHOUT PREJUDICE**.

5) Liberty's *Motion* is **GRANTED** as to Shaw's bad faith claims for Liberty's alleged (a) seeking to recover from Shaw deductible amounts that had already been satisfied and/or that Liberty was aware Shaw disputed, and (b) wrongfully threatening to draw on Shaw's letter of credit for amounts not due, and these claims will be **DISMISSED WITHOUT PREJUDICE**.

6) Liberty's *Motion* is **GRANTED** insofar as Shaw claims damages for unjust enrichment, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

(Doc. 53 at 46–47.)

With respect to Shaw's claim for breach of contract, the Court granted Liberty's Original

Motion insofar as Shaw claimed a contractual right of reimbursement but denied that motion

insofar as Shaw claimed it had been forced to pay $155,894.82 in defense costs as a result of

Liberty's alleged "refusal to fulfill its defense obligations." (Doc. 53 at 34–35.) The Court also

denied Liberty's Original Motion to dismiss Shaw's claim for Liberty's alleged breach of Liberty's

7

obligation of good faith and fair dealing based on 1) Liberty's alleged bad faith initial refusal to defend Shaw resulting in Shaw's expenditure of $155,894.82 for defense costs and 2) Liberty's alleged misrepresentation of facts regarding coverage. (Doc. 53 at 40.) However, the Court granted Liberty's Original Motion as to the other allegations of bad faith. (Doc. 53 at 40–41.)

Regarding Shaw's Original Counterclaim for unjust enrichment, the Court granted Liberty's Original Motion. The Court emphasized that

> [i]t is the availability of the remedy at law, not its success, that precludes the unjust enrichment claim. As the Court explained in *Sun Coast Contracting Servs.*:
>
>> A plaintiff need not ultimately prevail on another claim for a court to find that it was available. "The existence of a 'remedy' which precludes application of unjust enrichment does not connote the ability to recoup your impoverishment . . . It merely connotes the ability to bring the action or seek the remedy." *Carriere v. Bank of La.,* 702 So. 2d 648, 672 (La. 1996). For example, courts have found remedies at law available even when claims based in law were time-barred or never advanced. *See, e.g., Walters v. MedSouth Record Mgmt., LLC,* 38 So. 3d 241, 242 (La. 2010); *JP Mack Indus. LLC v. Mosaic Fertilizer, LLC,* 970 F. Supp. 2d 516, 520–23 (E.D. La. 2013).
>
> *Sun Coast Contracting Servs.*, 2014 WL 7246936, at *4.

(Doc. 53 at 43–44.)

Because neither party questioned the existence or the validity of the contracts of insurance, the only questions being the interpretation of the contracts and whether they were breached, and because Shaw was asserting claims for breach of contract and bad faith, the Court concluded that Shaw failed to state a claim for unjust enrichment. (Doc. 53 at 4.)

## IV.    ARGUMENTS OF THE PARTIES

### A.  Renewed Motion to Dismiss – Liberty's Argument in Support

Liberty asks the Court to dismiss Shaw's counterclaims. (Doc. 61 at 2.) Liberty accuses Shaw of asserting in its Amended Counterclaim "nearly identical and craftily reworded claims without curing the defects" in its Original Counterclaim. (Doc. 61-1 at 7.) The Amended Counterclaim, according to Liberty, again asserts that the $665,591.56 paid by AIG on behalf of Shaw, the $155,894.92 paid by Shaw to third parties for defense costs along with the $501,869.65 paid by Shaw directly to Liberty resulted in an overpayment of its deductible of at least $73,365.03 but "the Court already flatly rejected these same allegations*** because defense costs paid by Shaw and AIG were not reimbursed directly to Liberty" and hence cannot satisfy Shaw's deductible obligation. (*Id*. at 7–8.)

Liberty concedes that Shaw does add the following allegation in its Amended Counterclaim: "Liberty may decline to advance deductible amounts, in which case those amounts, which are the legal amount of Liberty, must be paid directly to the respective service providers (such as defense counsel)." (Doc. 61-1 at 8 (citing the Amended Counterclaim, Doc. 56 at ¶ 81).) Liberty counters this new allegation in two ways. First, it argues that "this allegation fails to cure the defect as Shaw candidly ignores the fact that Liberty did not decline to advance the deductible amount because it tendered the entire $3 million limit which included the full $1.25 million deductible amount." (Doc. 61-1 (citing Doc. 1 at ¶ 50).) Second, "Shaw's allegation is illogical and contrary to the policy's terms. Liberty has no obligation to advance the deductible and therefore has no obligation to pay amounts an advance may be used to pay." (Doc. 61-1 at 8 n.6.)

Regarding Shaw's renewed claim of unjust enrichment, Liberty notes that Shaw does not cure the central defect found by the Court in its dismissal of the claim in the Original Ruling, i.e., that Shaw has alleged three other causes of action upon which it rests its claims. (Doc. 61-1 at 10.) " '[I]t is not the success or failure of other causes of action' that matters; the mere 'existence of

9

other causes of action' precludes a plaintiff from pursuing unjust enrichment." (Doc. 61-1 at 10

(quoting *Ferrara Fire Apparatus, Inc. v. JLG Indus., Inc*., 581 F. App'x 440, 444 (5th Cir. 2014)

(emphasis added; other citations omitted)).) In addition, because there is no "enrichment" by

Liberty (let alone unjust enrichment), Shaw's new allegations again fail to state a claim. (Doc. 61-

1 at 11.)

Shaw's bad faith claim premised on Liberty wrongfully seeking to recover its deductible

and threatening Shaw that it would draw on Shaw's letter of credit also fails for the reasons set out

in the Court's Original Ruling, namely, that "Shaw is not entitled to a credit in its deductible

obligation to Liberty through amounts paid by AIG," and "Shaw's Counterclaim does not provide

facts to explain or support why Liberty's threat to draw on Shaw's letter of credit given by Shaw

to secure repayment of the deductible could be in bad faith otherwise." (Doc. 61-1 at 12 (quoting

Doc. 54 at 40–41).) Liberty concedes that Shaw has added new allegations to this claim (Doc. 61-

1 at 13 (citing Doc. 56 at ¶¶ 116–117)) but Liberty insists that the record is clear that Liberty did

not act in bad faith but merely exercised rights it possessed, as recognized in the Court's Original

Ruling (Doc. 61-1 at 13–14).

### B.  Renewed Motion to Dismiss – Shaw's Argument in Opposition

Shaw claims that, contrary to Liberty's accusations, it amended its counterclaim to "clarify

and expound the factual and legal bases" for its claims "in accordance with this Court's Ruling."

(Doc. 66 at 2.) Shaw accepts the blame for what it argues is the mistaken conclusion reached in

the Court's Original Ruling because Shaw "did not explain with sufficient clarity the applicable

provisions of the Liberty Policies . . . [s]pecifically, the Liberty Policies provide that Shaw is

responsible for defense costs and damages **up to the deductible amount**, and further provide that

while Liberty is obligated to defend Shaw against covered claims, Liberty is not bound to advance

defense costs to pay for that defense." (Doc. 66 at 2–3.) "Accordingly, . . . defense costs paid by Shaw, or on its behalf, necessarily reduce the unpaid deductible amount that Shaw owes . . ." (*Id.* at 3.) Because "Liberty has the right, *but not the duty*, to advance deductible amounts. . . . the Liberty Policies contemplated a situation in which Shaw would make direct payments of defense costs up to the deductible amount, but those payments would reduce the unsatisfied deductible amount for which Liberty could seek recovery." (*Id.*).

While Shaw agrees that Liberty is owed "*reimbursement* of the deductible amounts expended by Liberty[,] . . . the amount for which Liberty can seek reimbursement is limited to the portion of the deductible amount that has not already been satisfied by the insured." (*Id.* at 11.) "Liberty's option not to advance defense costs distinguishes the deductible provisions in the Liberty Policies from a typical deductible like the one at issue in the case *Zurich American Insurance Company v. Centex Corporation,* 373 F. Supp. 3d 692 (N.D. Tex. 2016), relied upon by Liberty in its motion to dismiss Shaw's Original Counterclaim, and makes Liberty's deductible provision more like a self-insured retention." (*Id.* at 12.) If Liberty's interpretation of the Policies is allowed to stand, it would have "the effect of increasing the deductible amount from $1.25 million to over $2.05 million." (*Id.* at 3.)

Shaw acknowledges that the Court's ruling preserved its breach of contract claim for recovery of $155,894.82 in defense costs allegedly resulting from Liberty's refusal to fulfill its duty to defend obligation (Doc. 66 at 14), but argues for the same reasons summarized above, that this damage claim should also attach to the amounts paid by AIG for Shaw's defense costs and Shaw's payments made directly to Liberty (*id.* at 14–15).

Regarding Shaw's unjust enrichment claims, Shaw argues that "[t]his Court has . . . acknowledged that where there is a question as to whether a contractual theory provides a remedy

for damages suffered by a plaintiff, a viable alternative unjust enrichment claim exists." (*Id.* at 16 (citing *Schott, Trustee for Estate of InforMD, LLC v. Massengale*, No. 18-759, 2019 WL 4738795, at *17 (M.D. La. Sept. 27, 2019); *Cooper v. Primary Care Solutions*, Inc., No. 16-259, 2017 WL 1086186, at *15 (M.D. La. Mar. 21, 2017)).) While continuing to argue the same underlying theory regarding why AIG's payments and its own payments reduced the deductible amount owed to Liberty, Shaw claims all the elements of an unjust enrichment claim are present to warrant the return of the $665,591.56 "unearned windfall" reaped by Liberty should the Court find that the AIG payments did not deplete the deductible amount owed by Shaw. (*Id.* at 16–17.)

Finally, Shaw argues that the Court's partial denial of its bad faith claim against Liberty was "based on [the Court's] incomplete understanding of the Liberty Policies and of the relevant facts[.]" (*Id.* at 17.) Based on Shaw's "clarification" of the bases for Shaw's claim, Shaw argues that it should now be clear that Liberty is liable for its "aggressive efforts to recover amounts not due from its insured[.]" (*Id.* at 18.) Shaw's "clarification" consists of its again re-urging its entitlement to a credit for the amounts it paid to directly to Liberty and which AIG paid on its behalf. (*Id.* at 19.) Shaw also objects to Liberty's use of "improper evidence . . . to which Shaw has objected," i.e., exhibits attached to Liberty's Original Motion. (*Id.* at 18.)

### C. Renewed Motion to Dismiss – Liberty's Reply

Liberty argues that "Shaw's opposition is essentially an improper motion for reconsideration, rehashing arguments this Court has already rejected, thinly disguised as new claims." (Doc. 69 at 1.) According to Liberty, Shaw's Amended Counterclaim "adds no new facts or viable legal theories." (*Id.*) Shaw "ignores the controlling, enforceable plain language of the Policies that require 'reimbursement' of amounts Liberty expended in the settlement and effectively reduce the Policies['] limits and the fact that Liberty tendered payment of the entire $3

million policy limits for Shaw's benefit, which included the full $1.25 million deductible amount." (*Id*. at 3–4.)

The allegedly "new" argument made by Shaw, that AIG's payments "reduced the outstanding deductible amount that Liberty could advance, and for which Liberty could subsequently seek reimbursement[,]" is a "meritless contention [that] is not substantively different than Shaw's earlier claim that AIG's payments satisfied Shaw's deductible [amounts]." (*Id*. at 5–6.) Liberty insists that the "Policies do not say that other insurer's payments reduce the amounts Liberty can advance under the deductible endorsement . . ." and, in fact, "state the opposite: Shaw is exclusively liable for reimbursement; Liberty can advance the entire policy limits – which it did – and then seek reimbursement." (*Id*. at 6.) Liberty maintains that AIG's payments are simply not damages sustained by Shaw. "If AIG were unhappy about the allocation of defense costs and timing of Liberty's participation in the defense, that would be AIG's claim." (*Id*.)

Regarding the unjust enrichment claim, Liberty maintains that Shaw is asking the Court once again to disregard the law and the terms of the Policies since neither provides such a claim to Shaw. (*Id*. at 7–8.) Finally, as to Shaw's bad faith claim, it also rests on the discredited and mistaken theory that AIG payments satisfy the deductible. (*Id*. at 8.)

As to Shaw's objections to the Court's consideration of documents attached to its Renewed Motion, the Court is entitled to consider these since they are specifically referenced in the Renewed Counterclaim and essential to Shaw's theories of recovery. (*Id*. at 8–9 (citing Doc. 65, Exhibits A through D); *see also id*. at 9 n.28 (citations omitted).)

## V.     Renewed Motion to Dismiss – Standard

In *Erickson v. Pardus*, 551 U.S. 89, 93 (2007), the Supreme Court explained:

Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Specific facts are not necessary; the statement need only " 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.' "

*Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Interpreting Rule 8(a) and *Twombly*, the Fifth Circuit explained:

The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]."

*Lormand v. US Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556) (emphasis added).

Later, in *In re Great Lakes Dredge & Dock Co. LLC.*, 624 F.3d 201 (5th Cir. 2010), the Fifth Circuit explained:

To avoid dismissal [under Fed.R.Civ.P. 12(b)(6)], "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). To be plausible, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. In deciding whether the complaint states a valid claim for relief, we accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff. [*Doe v. Myspace,* 528 F.3d 413, 418 (5th Cir. 2008)] (citing [*Hughes v. Tobacco Inst., Inc*., 278 F.3d 417, 420 (5th Cir. 2001)]). We do not accept as true "conclusory allegations, unwarranted factual inferences, or legal conclusions." *Ferrer v. Chevron Corp*., 484 F.3d 776, 780 (5th Cir. 2007) (quoting *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)); *see also Iqbal*, 129 S.Ct. at 1940 ("While legal conclusions can provide the complaint's framework, they must be supported by factual allegations.").

*Id.* at 210.

Analyzing the above case law, our brother in the Western District stated:

14

Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S.Ct. at 1949, *Twombly*, 555 U.S. at 556, 127 S.Ct. at 1965. This analysis is not substantively different from that set forth in *Lormand*, *supra*, nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of Fed. Rule Civ. P. 8(a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. This standard is met by the "reasonable inference" the court must make that, with or without discovery, the facts set forth a plausible claim for relief under a particular theory of law provided there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim." *Lormand*, 565 F.3d at 257; *Twombly*, 555 U.S. at 556, 127 S.Ct. at 1965.

*Diamond Services Corp. v. Oceanografia, S.A. De C.V.*, No. 10-177, 2011 WL 938785, at *3

(W.D.La. Feb. 9, 2011) (citation omitted).

Afterward, in *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787 (5th Cir. 2011),

the Fifth Circuit explained:

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" A claim for relief is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."

*Id.* at 796 (internal citations omitted).

Finally, in *Thompson v. City of Waco, Texas*, 764 F.3d 500 (5th Cir. 2014), the Fifth Circuit

recently summarized the Rule 12(b)(6) standard as thus:

15

> We accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff. We need not, however, accept the plaintiff's legal conclusions as true. To survive dismissal, a plaintiff must plead enough facts to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Our task, then, is to determine whether the plaintiff stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success.

*Id.* at 502–503 (internal citations and quotations omitted).

## VI.    Renewed Motion to Dismiss – Discussion

### A.  The Issues

Shaw's Amended Counterclaim utilizes four theories of liability to recover damages and a return of the alleged "overpayment" of monies paid by AIG and Shaw in satisfaction of its deductible obligation: "Count I: Satisfaction of Deductible and Recovery of Overpayment" (Doc. 56 at ¶¶ 81–91); "Count II: Unjust Enrichment/Payment of a Thing Not Owed" (*Id*. at ¶¶ 92–95); "Count III: Breach of Contract" (*Id*. at ¶¶ 92–113); and "Count IV: Bad Faith Recovery under La. Rev. Stat. §§ 22:1973 and 22:1892" (*Id*. at ¶¶ 114–120). These theories of liability and the allegations made by Shaw to support them mirror in large measure those made in Shaw's Original Counterclaim.

Shaw claims however that it has made new allegations and attempted to clarify and expand on its original arguments. Specifically, Shaw argues that its Amended Counterclaim "clarify[ies] and expound[s] the factual and legal bases for these claims and for Shaw's entitlement to recovery, in accordance with this Court's Ruling." (Doc. 66 at 2.) Although Shaw fails to specify in its opposition to the Renewed Motion what new allegations of fact or law it made in its Amended Counterclaim, it does so in its opposition to Liberty's Sanctions Motion (Doc. 72), where it points the Court to additional factual allegations in its Amended Counterclaim: "(1) clarifying that, though the Liberty Policies use the label 'deductible,' the policy language infuses the deductible

16

with characteristics and features of a self-insured retention, which courts have treated differently from a deductible" (Doc 72 at 2 (citing the Amended Counterclaim, Doc. 56 at ¶¶ 18, 81)); "(2) emphasizing that, in contrast to a typical deductible arrangement, the Liberty Policies provide that Liberty is not bound to advance 'deductible amounts' " (*id*. (citing Doc. 56 at ¶¶ 13–18)); "(3) explaining that if Liberty does not advance those deductible amounts, then they must be paid by Shaw, necessarily reducing the deductible amount that Liberty can recoup" (*id*. (citing Doc. 56 at ¶¶ 15–18, 81–84)); "(4) bringing to the Court's attention various pertinent policy provisions establishing the parties' obligations that were not extensively discussed in Shaw's original counterclaim" (*id*. (citing Doc. 56 at ¶¶ 15–18, 81–84)); and "(5) explaining that Shaw was forced to use other self-depleting insurance that Shaw had obtained for its own benefit to satisfy Liberty's defense obligations, resulting in funds that should have remained available to satisfy liability obligations not being available to protect Shaw" (*id*. at 2–3 (citing Doc. 56 at ¶¶ 42–47)).

Shaw's response to Liberty's Sanctions Motion also provides a clearer articulation of Shaw's arguments of why a) its Amended Counterclaim is not merely, as Liberty suggests, a "craftily reworded" rearticulation of the same arguments made in its original counterclaim and b) why the Amended Counterclaim should not suffer the same fate as the Original Counterclaim. Specifically, Liberty's Renewed Motion and Sanctions Motion should be denied because:

> (1) Liberty had the "right and duty to defend" Shaw against the underlying litigation; (2) the limits of liability are not reduced by Liberty's payment of defense costs; (3) defense costs are included in the amounts subject to the Liberty Policies' respective deductible endorsements; (4) Shaw is responsible for defense costs and damages *up to* the deducible amount; (5) Liberty has the right ***but not the duty*** to advance any part or all of the deductible amount; (6) ***if*** Liberty exercises its right to advance deductible amounts, any such deductible amounts properly advanced by Liberty must be reimbursed; and (7) where Liberty is obligated to provide a defense but fails to do so, and/or declines to exercise its right to advance defense costs as deductible amounts, then the insured (Shaw) has no choice but to pay those defense costs, which payments are in partial satisfaction of the deductible amount. Because Shaw is responsible for the payment of defense costs up to the deducible amount,

those payments necessarily must reduce the "deductible amount" which Liberty can advance and for which it can subsequently seek reimbursement.

(Doc. 72 at 10 (citations to Amended Counterclaim omitted).)

In the memorandum supporting the Renewed Motion, Liberty acknowledges that Shaw has added additional allegations in its Amended Counterclaim but insists these do not cure the fatal defects in Shaw's Original Counterclaim as reflected in the Court's Original Ruling. (*See, e.g.*, Doc. 65-1 at 8, 13; Doc. 69 at 5–6.) For instance, while Shaw

adds an allegation that 'Liberty may decline to advance deductible amounts, in which case those amounts, which are the legal obligation of Liberty, must be paid to the respective service providers (such as defense counsel)" (Rec. Doc. 56 at ¶ 81)[,]…this allegation fails to cure the defect as Shaw candidly ignores the fact that Liberty did not decline to advance the deductible amount because it tendered payment of the entire $3 million limit which included the full $1.25 million deductible amount.

(Doc. 61-1 at 8.)

In addition, argues Liberty, "Shaw's allegation is illogical and contrary to the policy's terms. Liberty has no obligation to advance the deductible and therefore has no obligation to pay amounts an advance may be used to pay." (*Id.* at 8 n.6.)

As the Court stated in its Original Ruling, and it remains true for purposes of the Renewed Motion, "all of [Shaw's] claims, to one degree or another, hinge on the validity of Shaw's claim (disputed by Liberty) that defense costs paid by AIG and Shaw to others reduces the amount owed by Shaw on the deductible." (Doc. 53 at 25.) The Court will therefore again analyze—in light of the renewed and added allegations of the Amended Counterclaim—first, whether AIG's payment of $665,591.56 in defense costs had the effect of reducing the deductible amount owed by Shaw, and then will do the same for the $155,894.92 paid by Shaw to others in defense costs. The Court will then discuss the results of that analysis on the asserted causes of action.

**B.  Was Liberty's deductible reduced by AIG's payments?**

In the Court's Original Ruling, it quoted and then analyzed in detail the "Amendatory Endorsement – Deductible" clause, the same clause upon which Shaw now focuses its argument. (*See, e.g.*, Doc. 66 at 2–3.) The Court concluded, based on the clear and unambiguous language in this clause and other parts of the Policies, that AIG's payments to others for defense costs did not reduce Shaw's deductible amount. "The language here is clear and explicit: Shaw's deductible obligation requires it to *reimburse* to *Liberty* expenses that *Liberty* advanced. . . . and AIG's payment of third parties on Shaw's behalf does not satisfy that obligation." (Doc. 53 at 32.) Furthermore, the Policies are clear that "*you* [i.e., the insured, Shaw] will reimburse us for any amounts that we advance or are by law required to pay [and] [i]f we exercise the right [to advance the deductible payment], *you* must promptly reimburse us for any such amounts advanced." (*Id.* (quoting Doc. 18-2 at 42) (emphasis added).) The Policies are clear that "[a]ll such [deductible] amounts advanced shall remain your [Shaw's] sole and exclusive responsibility." (Doc. 53 at 33 (quoting Doc. 18-2 and 18-3 at 42).)

Shaw hinges its argument in part on the Court's mistaken reference to Shaw seeking recovery of AIG's payment of defense costs, "*which Shaw reimbursed to AIG* . . ." (Doc. 66 at 9 (citing the Court's Ruling, Doc. 53 at 29).) First, it is clear from a full reading of the Court's Original Ruling that the Court was aware that Shaw was seeking credit or a reduction for amounts AIG had paid on Shaw's behalf and not a credit or reduction for what Shaw paid to AIG, and second, this mistaken reference had nothing to do with the Court's decision. (*See, e.g.*, Doc. 53 at 25 ("Shaw alleges that Liberty also breached the Liberty Policies by . . . 'failing to credit [Shaw] for payments made by AIG on behalf of [Shaw] in satisfaction of [Shaw's] deductible obligation to Liberty . . .' ").)

As to AIG's payments to third parties, the Court agrees with Liberty when it states:

The only "new" argument Shaw raises is that AIG's payments "reduced the outstanding deductible that Liberty could advance, and for which Liberty could subsequently seek reimbursement." But this meritless contention is not substantially different than Shaw's earlier claims that AIG's payments satisfied Shaw's deductible obligation. The Policies do not say that other insurer's payments reduce the amounts Liberty can advance under the deductible endorsement and there are no other provisions in the Policies that provide that provide that Liberty's reimbursement rights are impacted by other insurers' payments. In fact, the Policies state the opposite: Shaw is exclusively liable for reimbursement; Liberty can advance the entire policy limits – which it did – and then seek reimbursement.

(Doc. 69 at 5–6 (citing Doc. 18-2 at 42).)

The AIG policy was not an excess policy over the Liberty Policies. They were co-primary policies with each insurer having its own independent rights and each owing its own independent obligations. (Doc. 56 at 11, ¶ 43 ("[B]oth the Liberty Policies and the AIG Policy provided primary coverage to the Shaw Defendants in connection with the Abernathy Lawsuit for the Liability Coverage Period.").) The Court agrees with Liberty that the "Policies do not say that other insurer's payments reduce the amounts Liberty can advance under the deductible endorsement . . ." and, in fact, "state the opposite: Shaw is exclusively liable for reimbursement; Liberty can advance the entire policy limits – which it did – and then seek reimbursement." (Doc. 69 at 6.) AIG's payments are simply not damages sustained by Shaw nor do they provide the basis for a reduction in Shaw's deductible obligation to Liberty. "If AIG were unhappy about the allocation of defense costs and timing of Liberty's participation in the defense, that would be AIG's claim, not Shaw's claim." (*Id*.)[6] Liberty's Renewed Motion on this issue is granted.

---

[6] According to Shaw's Amended Counterclaim, Liberty, AIG, and Zurich reached a cost share agreement wherein Shaw's three insurers agreed to share the defense costs incurred in the defense of Shaw Defendants. (Doc. 56 at 13, ¶ 53.)

### C.  Was Liberty's deductible reduced by Shaw's payment of defense costs to third persons?

The Court stated in its Original Ruling:

> It is not clear from the Counterclaim whether Shaw is claiming a credit against the deductible for the $155,894.82 paid by Shaw to third parties for defense costs based on the same arguments it makes in connection with the amounts paid by AIG. (*See, e.g.*, Doc. 10 at 33, ¶¶ 80–82.) For the reasons previously detailed, because this money was not paid to Liberty to reimburse it for money Liberty spent, this amount cannot be deducted from Shaw's deductible obligation on this ground.

(Doc. 53 at 34.)

The Court has carefully reviewed the Amended Counterclaim and Shaw's memoranda opposing the Renewed Motion and finds no reason to change its Original Ruling. Each of the two Policies had a $1.5 million aggregate limit, subject to deductibles of $500,000 and $750,000 respectively. (Doc. 18-2 at 1, 42; Doc. 18-3 at 1, 42.) Endorsements to each Policy required Shaw to reimburse Liberty for "both damages and defense costs, including amounts paid in settlement, 'up to the deductible amount' for a covered claim." (Doc. 18-1 at 5–7 (Docs. 18-2 and 18-3 at 42).) Liberty and Shaw agree that the "deductible" included both settlement proceeds and defense costs. (Doc. 18-1 at 5–6; Doc. 52 at 1–3.)

Importantly, both Policies provide that "[Liberty] will have the right and ***duty* to defend** the insured against any 'suit' seeking those damages." (Doc. 18-2 at 67 (emphasis added); Doc. 18-3 at 65 (emphasis added).) This allegation is based on language in both Liberty Policies which provides "[Liberty] ha[s] the right but ***not the duty to advance*** any part of the deductible amount." (Docs. 18-2 and 18-3 at 42 (emphasis added).) As mentioned above, Liberty concedes that Shaw adds an allegation in the Amended Counterclaim that "Liberty may decline to advance deductible amounts, in which case those amounts, which are the legal obligation of Liberty, must be paid directly to the respective service providers (such as defense counsel)." (Doc. 61-1 at 8 (citing Doc.

56 at ¶ 81).) Thus, the Policies provide that Liberty has the duty to defend but does not have the duty to pay defense costs up to the deductible amount. However, if Liberty does choose to exercise its right to advance any part of the deductible amount by way of defense costs or damages, "[Shaw] must promptly reimburse [Liberty] for any such amounts advanced." (Docs. 18-2 and 18-3 at 42.)

In its previous ruling, the Court held that "Shaw's claim meets the requirements for breach of contract: the existence of an insurance contract between the parties, an alleged breach and resulting damages . . . [and therefore] Shaw has stated a claim for breach of contract for the recovery of damages caused by the breach, including $155,894.82." (Doc. 53 at 35.) Thus, if Liberty breached its obligations and duty to defend as summarized in the Court's previous ruling (Doc. 53 at 34–35 (citing Doc. 10 at 26, ¶ 40; *id*. at 33, ¶ 79; *id.* at 21, ¶ 17; *id*. at 22, ¶ 20; *id* at 34, ¶ 89)), then Shaw is entitled to recover as damages the $155,894.82 it paid in defense costs.[7]

Furthermore, the Court's previous ruling preserved Shaw's ability to claim the $155,894.82 as damages for Liberty's alleged bad faith in "willfully misrepresenting both the underlying facts giving rise to Shaw's exposure in the Abernathy lawsuit and the provisions in the Liberty Policies in order to wrongfully deny coverage." (Doc. 53 at 40 (citing Doc. 10 at 24, ¶ 89; *id.* at 19–24, ¶¶ 6–31).)

But Shaw goes further, arguing that, even without a breach of contract or bad faith, "the policy language *implies* that should Liberty fail or decline to exercise its right to advance deductible amounts, any deductible amount paid by the insured to others (i.e., defense counsel, expert witnesses, etc.) necessarily must reduce the remaining deductible amount under the Liberty Policies." (Doc. 56 at 4, ¶ 16 (emphasis added).) It posits as an example, a hypothetical where

---

[7] Liberty states that, in its Renewed Motion, it does not seek to dismiss Shaw's breach of contract count but "vehemently denies Shaw is owed those amounts under a breach of contract theory or any theory." (Doc. 61-1 at 8 n.7.)

Liberty declines to advance and therefore Shaw pays $100,000 in legal costs covered by one of the Liberty Policies; if this occurred, "then this would reduce the outstanding deductible amount under that policy from $500,000 to $400,000." (*Id.* at 4–5, ¶ 17.) In this case, "Liberty would not be entitled to seek reimbursement of the full $500,000 deductible." (*Id.*) To adopt Liberty's position that it is entitled to the full $500,000, argues Shaw, would have "the effect of increasing the deductible amount[.]" (Doc. 66 at 3.)

But these are not the facts alleged in Shaw's Amended Counterclaim. Shaw concedes that Liberty paid on Shaw's behalf the full $3 million dollar policy limits of the two Liberty Policies including the full $1,250,000 deductible portion. (Doc. 56 at 15, ¶ 61.) Under these circumstances, to adopt Shaw's position and give it credit for the $155,894.82 it paid directly in defense costs in addition to the $3 million already paid by Liberty on Shaw's behalf would effectively increase the limits of the two Policies. This interpretation is not warranted by the language of the Policies. Liberty's Renewed Motion is granted in this regard.

### D.  Does Shaw's Amended Counterclaim state a claim for unjust enrichment?

In its Original Ruling, the Court said: "[H]ere, neither party questions the existence or validity of the insurance contract[s] at issue." (Doc. 53 at 43.) Indeed, it is the Liberty Policies that formed the foundation of Shaw's Original Counterclaim. Thus, as the Court wrote, "[t]he question is whether the contract[s] w[ere] breached and, if so, what damages flow from that breach." (*Id.*) Shaw makes no new allegations or arguments in its Amended Counterclaim or briefing in opposition to the Renewed Motion to change this. (Doc. 56 at 21–22, ¶¶ 92–95.) The result and rationale for the Court's dismissal of Shaw's claim for unjust enrichment remains unchanged.

As the Court explained in *Sun Coast Contracting Servs.*:

A plaintiff need not ultimately prevail on another claim for a court to find that it was available. "The existence of a 'remedy' which precludes application of unjust

enrichment does not connote the ability to recoup your impoverishment . . . It merely connotes the ability to bring the action or seek the remedy." *Carriere v. Bank of La.,* 702 So. 2d 648, 672 (La. 1996). For example, courts have found remedies at law available even when claims based in law were time-barred or never advanced. *See, e.g., Walters v. MedSouth Record Mgmt., LLC,* 38 So. 3d 241, 242 (La. 2010); *JP Mack Indus. LLC v. Mosaic Fertilizer, LLC,* 970 F. Supp. 2d 516, 520–23(E.D.La.2013).

*Sun Coast Contracting Servs.,* 2014 WL 7246936, at *4.

Under these circumstances, the Court finds that Shaw fails to state a valid claim for unjust enrichment. *JMF Med., LLC v. Team Health, LLC*, 490 F. Supp. 3d 947, 980 (M.D. La. 2020) (deGravelles, J.); *Andretti Sports Mktg. Louisiana, LLC v. NOLA Motorsports Host Comm., Inc.*, No. 15-2167, 2015 WL 13540096, at *7–8 (E.D. La. Dec. 2, 2015) ("The existence of another remedy at law will preclude an unjust enrichment claim."); *Reel Pipe, LLC v. USA Comserv, Inc.*, No. 18-6646, 2019 WL 127055, at *4 (E.D. La. Jan. 8, 2019) ("USA Comserv cannot state a claim for unjust enrichment because other remedies are available at law." (citation omitted)); *Cf. Schott*, 2019 WL 4741811, at *17 (declining to dismiss unjust enrichment claim because, *inter alia*, "the validity of the other claims in the *Complaint* [was] still in question.").

As Liberty correctly argues: "The mere fact that a plaintiff does not successfully pursue another available remedy does not give the plaintiff the right to recover under the theory of unjust enrichment." (Doc. 61-1 at 10 (quoting *Walters v. MedSouth Record Management, LLC*, 38 So. 3d 241, 242 (La. 2010)).) "Here, Shaw pleads three other claims against Liberty alongside their unjust enrichment claim. As the Fifth Circuit, Louisiana Supreme Court, Middle District of Louisiana, and this very court have all held, the mere existence of these alternative theories directly forecloses Shaw's ability to pursue unjust enrichment." (*Id*.)

In its opposition, Shaw quotes part of this Court's Original Ruling but ignores altogether the other half including, most importantly, the Court's holding that, regardless of the ultimate

success or failure of its other claims, their existence precludes Shaw's claim for unjust enrichment. Liberty's Renewed Motion on this issue is granted.

### E. Does Shaw's Amended Counterclaim state a claim for bad faith under La. R.S. 22:1973 and La. R.S. 22:1892?

In its Original Ruling, the Court found that Shaw's Original Counterclaim stated a claim for bad faith under La. R.S. 22:1973 for (1) misrepresenting pertinent facts and/or policy provisions relating to the coverages applicable to the Abernathy Lawsuit, and (2) wrongfully denying coverage with respect to the Abernathy Lawsuit. However, the Court found that Shaw's Original Counterclaim did not state a claim for (3) seeking to recover from [Shaw] deductible amounts that had already been satisfied and/or that Liberty was aware [Shaw] disputed, and (4) wrongfully threatening to draw on [Shaw's] letter of credit for amounts not due and/or that Liberty was aware [Shaw] disputed. (Doc. 53 at 40–41.)

Shaw repeats these identical allegations in its Amended Counterclaim (Doc. 56 at 26, ¶ 115), but adds three allegations of fact to support its fourth bad faith claim, threatening to draw on Shaw's letter of credit: (1) when Liberty threatened to draw on Shaw's letter of credit, Liberty failed to credit Shaw with Shaw's $60,000 payment Liberty acknowledged having received (Doc. 56 at 26, ¶ 116);[8] (2) in January, 2019, Liberty advised  Shaw "not to pay invoices pertaining to the Abernathy lawsuit because Liberty had not yet determined whether [Shaw] was responsible for reimbursement of those amounts (*id.* at 26–27, ¶ 117; *see also id.* at 56, ¶ 60); and (3) Liberty's counsel offered to refrain from drawing on the letter of credit while the parties negotiated or litigated the remainder of Liberty's demand, but now threatens to draw on it (Doc. 56 at 18, ¶ 76).[9]

---

[8] Shaw continues to assert that it paid this amount "as a result of an administrative error." (Doc. 56 at 26 n.9; *see also* Doc. 66 at 18 n.44.) While Shaw refers here to $60,000, the precise amount it claims to have paid as a result of administrative error is $62,242.65. (*See, e.g.*, Doc. 53 at 35 (citing Doc. 10 at 27, ¶ 47).)

[9] This allegation is part of Shaw's bad faith allegations (Doc. 56 at 26–27, ¶¶ 114–120), but is included in Shaw's argument on this issue. (Doc. 66 at 17.)

While Liberty makes substantive arguments responding to these allegations (Doc. 61-1 at 13–14; Doc. 69 at 8–10), Liberty points out that "Shaw has not alleged how it was damaged by Liberty seeking recovery of the deductible or advising it would exercise its fully enforceable rights to draw on the letter of credit . . ." (Doc. 61-1 at 13.)

As to Shaw's first two allegations of bad faith where the Court found Shaw properly stated a claim for bad faith, the Court's Original Ruling is unaffected. As to the third allegation, based on Liberty seeking to recover "deductible amounts that had already been satisfied," this argument is based on Shaw's re-urged and recycled argument that payments made by AIG and Shaw for defense costs reduced its deductible obligation. The Court is unpersuaded for reasons given in its Original Ruling (Doc. 53 at 40–41) and earlier in this Ruling.

As to the final allegation of bad faith, based on Liberty's threat to draw on Shaw's letter of credit, the Court agrees with Liberty that Shaw fails to show how it was damaged by Liberty's alleged conduct in this regard. Liberty has not drawn on the letter of credit and indeed currently has pending before the Court a motion for summary judgment in which Liberty asks the Court to rule, as a matter of law, that it is entitled to draw on the letter of credit. (Doc. 80.) Indeed, while Shaw paid Liberty $439,627 when Liberty threatened to draw on its letter of credit, Shaw admits that the amount paid was an "undisputed amount" owed to Liberty (Doc. 56 at 17–18, ¶ 75) and this is confirmed by the October 9, 2020, letter from Liberty's counsel. (Doc. 62-4, referred to in Shaw's Amended Counterclaim, Doc. 56 at 18, ¶ 76.) But the failure to prove actual damages is not reason alone for dismissing Shaw's bad faith claim since a penalty may be awarded for the breach of these statutes, even in the absence of actual damages. *See, e.g.*, La. R.S. 22:1973(C); La. R.S. 22:1892(B)(1).

Even if Shaw had alleged some damage from the alleged bad faith for threatening to draw on Shaw's letter of credit, the Court finds that on the allegations made, Shaw fails to state a claim for bad faith. A threshold question involved in deciding whether Shaw's Amended Counterclaim states a claim in this regard is whether the Court can consider the documents attached to Liberty's Renewed Motion. While Shaw objects to the documents attached to Liberty's Renewed Motion (Doc. 66 at 18), each of these documents is mentioned in Shaw's Amended Counterclaim: Doc. 62-1 is mentioned in Doc. 56 at ¶ 69; Doc. 62-2 is mentioned in Doc. 56 at ¶ 72; Doc. 62-3 is mentioned in Doc. 56 at ¶ 73; and Doc. 62-4 is mentioned in Doc. 56 at ¶ 76. The Court can consider documents which are attached to a motion to dismiss where the complaint refers to the documents and they are central to the claim. *Thompson v. Bos. Sci. Corp.*, No. 21-594, 2022 WL 4593086, at *8 (M.D. La. Sept. 29, 2022) (deGravelles, J.); *Liberty Mut. Fire Ins. Co. v. Shaw Grp., Inc.*, No. 20-871, 2022 WL 896804, at *10 (M.D. La. Mar. 25, 2022) (deGravelles, J.).

In reviewing the allegations in light of these documents, the Court concludes that, accepting Shaw's well-pleaded facts as true and construing the complaint in the light most favorable to Shaw, this part of the Amended Counterclaim fails to state a claim upon which relief can be granted. As to Shaw's first assertion, that Liberty failed to give Shaw credit for the approximate $60,000 it claims it paid to Liberty as a result of an administrative error, Shaw failed to include the $60,000 in the amounts it claimed as credits against the amount being demanded by Liberty and never advised Liberty that the deductible obligation should be credited this much. (*See* Docs. 62-1 and 62-2.) Moreover, as this Court pointed out in its Original Ruling, Liberty has given Shaw credit for that amount in the present suit. (Doc. 53 at 35–36.)

As to Shaw's allegation that in January of 2019, Liberty advised Shaw "not to pay invoices pertaining to the Abernathy lawsuit because Liberty had not yet determined whether [Shaw] was

responsible for reimbursement of those amounts," (Doc. 56 at 26–27, ¶ 117; *see also id.* at 15, ¶ 60), Liberty correctly counters that the January, 2019 email

> was sent before the March 2020 Insurance Settlement and Liberty's subsequent May 2020 demands for reimbursement of the deductible, all of which gave Shaw notice of the amounts owed under the deductible. Once Liberty paid $3 million in policy limits toward the Insurance Settlement in March 2020, and leaving no doubt that Shaw owed the full deductible, Liberty properly made demand on Shaw for the deductible in May 2020. Liberty's much earlier "standstill offer" prior to the Insurance Settlement does nothing to create a bad faith claim.

(Doc. 61-1 at 14.)

The Court agrees. The January 19, 2019 email sent because Liberty has not yet determined whether Shaw was responsible for that amount was supplanted by Liberty's subsequent payment of the Policies' $3 million dollar limits and its demand to Shaw based thereon.

Shaw's final allegation in support of its claim that Liberty was in bad faith for threatening to draw on Shaw's letter of credit is that Liberty's counsel offered to refrain from drawing on the letter of credit while the parties negotiated or litigated the remainder of Liberty's demand, but now threatens to draw on it. (Doc. 56 at 18, ¶ 76.) But Shaw fails to adequately allege that Liberty has breached its agreement. In the October 9, 2020 letter from Liberty's counsel to Shaw's counsel, Liberty's counsel  states that "if Shaw commits to paying within thirty days the undisputed $439,627 it has already conceded is owed, Liberty agrees to refrain from exercising its rights to draw on the LOC for the remaining deductibles while we negotiate *and/or litigate* Shaw's obligation to pay the remaining $810,373 under the policies, plus the late payment charge, and Liberty's rights to draw on the LOC." (Doc. 62-4 at 1 (emphasis added).) Liberty has not drawn on the letter of credit and is presently litigating the issue.[10] This is not a plausible allegation of bad faith.

---

[10] As mentioned above, currently pending before the Court is Liberty's motion for summary judgment in which Liberty asks the Court to rule, as a matter of law, that it is entitled to draw on the letter of credit. (Doc. 80.)

In sum, the Court's Original Ruling stands despite Shaw's new allegations. Shaw has stated a claim for bad faith under La. R.S. 22:1973 for (1) misrepresenting pertinent facts and/or policy provisions relating to the coverages applicable to the Abernathy Lawsuit, and (2) wrongfully denying coverage with respect to the Abernathy Lawsuit. However, the Court finds that Shaw's Amended Counterclaim does not state a claim insofar as it (3) seeks to recover from Shaw deductible amounts that Shaw claims had already been satisfied and/or that Liberty was aware that Shaw disputed, and (4) seeks recovery for Liberty's threatening to draw on Shaw's letter of credit for amounts allegedly not due and/or that Liberty was aware Shaw disputed.

## VII.    LEAVE TO AMEND

Shaw does not seek in the alternative another opportunity to amend. Should it do so, the Court will deny such request.

Federal Rules of Civil Procedure 15(a) "requires a trial court to grant leave to amend freely, and the language of this rule evinces a bias in favor of granting leave to amend." *Jones v. Robinson Prop. Grp., L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (cleaned up). However, "[l]eave to amend is in no way automatic, but the district court must possess a 'substantial reason' to deny a party's request for leave to amend." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 378 (5th Cir. 2014) (quoting *Jones*, 427 F.3d at 994 (citation and internal quotation marks omitted)). The Fifth Circuit further described the district courts' discretion on a motion to amend as follows:

> The district court is entrusted with the discretion to grant or deny a motion to amend and may consider a variety of factors including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failures to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , and futility of the amendment." [*Jones*, 427 F.3d at 994] (citation omitted). "In light of the presumption in favor of allowing pleading amendments, courts of appeals routinely hold that a district court's failure to

> provide an adequate explanation to support its denial of leave to amend justifies reversal." *Mayeaux v. La. Health Serv. and Indent. Co.*, 376 F.3d 420, 426 (5th Cir. 2004) (citation omitted). However, when the justification for the denial is "readily apparent," a failure to explain "is unfortunate but not fatal to affirmance if the record reflects ample and obvious grounds for denying leave to amend." *Id.* (citation and internal quotation marks omitted).

*Id.*

In addition, the Fifth Circuit has made clear that "[d]enying a motion to amend is not an abuse of discretion if allowing an amendment would be futile." *Id.* (citing *Briggs v. Miss.*, 331 F.3d 499, 508 (5th Cir. 2003)). An amendment would be deemed futile "if it would fail to survive a Rule 12(b)(6) motion." *Id.* (citing *Briggs*, 331 F.3d at 508).

Having carefully considered the matter, the Court will deny leave to amend. First, as stated above, "repeated failures to cure deficiencies by amendments previously allowed" is a factor to consider when granting or denying leave to amend, as is undue delay. *Id.* (citation omitted). Here, Shaw had the benefit of the Court's ruling on Liberty's original motion to dismiss, yet Shaw failed to cure the deficiencies of the Original Counterclaim (Doc. 10). Second, even putting this aside, further amendment would be futile; Shaw has shown, through its failure to properly amend, that it simply lacks viable claims and has no further allegations to make. Consequently, Shaw will be denied leave to amend, and the deficient claims outlined above will be dismissed with prejudice. *See Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 679 (M.D. La. 2019) (deGravelles, J.) (denying leave to amend when plaintiff should have had notice of issue from court's ruling on original motion to dismiss, and when further amendment would be futile); *Skinner v. Ard*, 519 F. Supp. 3d 301, 321–22 (M.D. La. 2021) (deGravelles, J.) (same); *Martin v. Roy*, No. 20-339, 2022 WL 894599, at *13 (M.D. La. Mar. 25, 2022) (deGravelles, J.) (same).

## VIII.  CONCLUSION

For the foregoing reasons, *Liberty Mutual Insurance Company's Motion to Dismiss First Amended and Restated Counterclaim* (Doc. 61) is granted in part and denied in part as follows:

1) Liberty's Renewed Motion is **GRANTED** insofar as Shaw claims a credit for or right of reimbursement of AIG's payments of $665,591.56, and this claim will be **DISMISSED WITH PREJUDICE**.

2) Liberty's Renewed Motion is **GRANTED** insofar as Shaw claims a credit for $155,894.82 based on Shaw's contention that Shaw's payments to third parties reduced its deductible obligation to Liberty, and this claim will be **DISMISSED WITH PREJUDICE**.

3) Liberty's Renewed Motion is **GRANTED** insofar as Shaw claims amounts allegedly "overpaid" above the Liberty Policies' combined deductibles of $1,250,000, and this claim will be **DISMISSED WITH PREJUDICE**.

4) Liberty's Renewed Motion is **GRANTED** to the extent Shaw is demanding repayment of amounts paid by Shaw directly to Liberty (approximately $501,869.65) based on the assumption that Shaw is entitled to take credit for the amounts paid by AIG, and this claim is **DISMISSED WITH PREJUDICE**.

5) Liberty's Renewed Motion is **GRANTED** as to Shaw's bad faith claims for Liberty's alleged (a) seeking to recover from Shaw deductible amounts that had already been satisfied and/or that Liberty was aware Shaw disputed, and (b) wrongfully threatening to draw on Shaw's letter of credit for amounts not due, and these claims will be **DISMISSED WITH PREJUDICE**.

6) Liberty's Renewed Motion is **GRANTED** insofar as Shaw claims damages for unjust enrichment, and this claim will be **DISMISSED WITH PREJUDICE**.

7) In all other respect, Liberty's Renewed Motion is **DENIED**.


Signed in Baton Rouge, Louisiana, on <u>February 9, 2023</u>.


**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**