# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

LIBERTY MUTUAL FIRE INSURANCE
COMPANY

VERSUS

THE SHAW GROUP, INC. (n/k/a CB&I
GROUP, INC.)

CIVIL ACTION

NO. 3:20-CV-871-JWD-RLB

## RULING ON LIBERTY MUTUAL FIRE INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Before the Court is *Liberty Mutual Fire Insurance Company's Motion for Summary Judgment* ("Motion" or "Renewed MSJ") filed by plaintiff Liberty Mutual Fire Insurance Company ("Liberty"). (Doc. 80.) It is opposed by defendant and counterclaimant The Shaw Group Inc. n/k/a CB&I Group Inc. ("Shaw"). (Doc. 85.) Liberty filed a reply. (Doc. 86.) The Court has carefully considered the law, facts in the record, and arguments and submissions of the parties and is prepared to rule. For the following reasons, the Motion is granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

This dispute concerns two commercial general liability policies issued by Liberty to Shaw covering the policy periods of September 1, 2003, to September 1, 2004, (Doc. 25-2), and September 1, 2004, to September 1, 2005, (Doc. 25-3) (collectively, the "Policies"). (Doc. 80-1 at 5–6; Doc. 80-2 at 2, ¶ 1.)  Each policy had a $1.5 million aggregate limit, subject to deductibles of $500,000 and $750,000 respectively. (Doc. 25-2 at 1, 42; Doc. 25-3 at 1, 42.)

Endorsements to each policy required Shaw to reimburse Liberty for both damages and defense costs, including amounts paid in settlement, "up to the deductible amount" for a covered claim. (Docs. 25-2 and 25-3 at 42.) Both Liberty and Shaw agree that the "deductible" included both settlement proceeds and defense costs. (Doc. 80-2 at 3, ¶ 7; Doc. 85-1 at 3, ¶ 7; *see also* Doc.

18-1 at 5–6; Doc. 52 at 1–3.) Thus, while Liberty might advance the entire $3 million limit, Shaw's deductible requirements had the effect of reducing the policies' limits, so that Shaw would owe $1.25 million in deductible reimbursement when Liberty expended the full $3 million. (Doc. 18-1 at 7.)

Shaw purchased a third primary insurance policy from Chartis Specialty Insurance Company, n/k/a AIG Specialty Insurance Company ("AIG") for the same time periods that Liberty's policies covered ("AIG Policy").[1] (Doc. 85-1 at 20–21, ¶¶ 26–27.) The AIG Policy had a $1 million deductible. (*Id*.)

In 2012, certain Shaw affiliates[2] were named as defendants in the First Amended Complaint of litigation involving the alleged exposure of certain workers to harmful levels of mercury at a plant owned and operated by Occidental Chemical Corporation ("Occidental" or "OxyChem"). (Doc. 80-2 at 4, ¶ 16; Doc. 85 at 5) ("Abernathy Lawsuit").)[3] On November 15, 2013, Shaw demanded defense and indemnity from Liberty with respect to the Abernathy Lawsuit. (Doc. 80-2 at 5, ¶ 17.) Shaw claims that Liberty repeatedly rejected Shaw's tender and wrongfully denied coverage. (Doc. 85-1 at 18, ¶ 20.) From Liberty's perspective, the initial rejection was because of multiple coverage defenses. (Doc. 80-2 at 5–6, ¶¶ 19–20.) In any event, after some 17 months, on June 5, 2015, Liberty agreed to participate in Shaw's defense subject to a reservation of rights. (Doc. 85-1 at 18, ¶ 20; Doc. 80-2 at 6, ¶ 20.)

According to Shaw, during the 17 months in which Liberty refused to defend Shaw, Shaw's other primary insurer, AIG, incurred some of the costs of defending the Abernathy Lawsuit. (Doc.

---

[1] Contractor's Pollution Liability Policy No. CPO 61823904. (Doc. 85-1 at 20, ¶ 26.)
[2] "Shaw" will be used herein to include both Shaw and these affiliates. Liberty does not dispute that Shaw and its affiliates are named insureds under the Liberty Policies.
[3] *Abernathy, et al. v. Occidental Petroleum Corporation, et al.*, No. 2011-900266, originally filed in the Circuit Court of Colbert County, Alabama. Both parties refer to this as the "Abernathy Lawsuit", and so will the Court. The first through seventh amended complaints of the Abernathy Lawsuit are found at Doc. 85-6 through Doc. 85-12.

85-1 at 19, ¶ 22.) Shaw claims that the AIG Policy paid "defense costs of at least $666,978.96 for which Liberty was responsible . . . ." (*Id.* at 19, ¶ 22.)[4] In addition, Shaw claims that it was forced to incur "at least $150,831.07" in "post-tender defense cost[s,]" (*id.*),[5] i.e. defense costs which Shaw paid directly to third parties. When these amounts are combined with the amounts paid by Shaw directly to Liberty, Shaw claims that it "fully satisfied and, in fact, has overpaid the deductibles." (*Id.*)

According to Shaw, once Liberty began defending Shaw in July of 2016, Liberty began invoicing Shaw for defense costs, and, as a result of an "administrative error" by Shaw, it paid $62,242.65 to Liberty. (Doc. 85-1 at 11, ¶ 25; *see also* Doc. 83-11 at 9–10, ¶ 31.)[6]

In or around December 2019, Shaw and its insurers settled the Abernathy Lawsuit, (Doc. 10 at 27, ¶ 48), for a total of $26,543,092.50, (Doc. 85-1 at 10, ¶ 23; *see also* Doc. 80-2 at 6, ¶ 23; Doc. 18-4 at 1, 3, ¶ 1.) Of that amount, Liberty contributed $3 million, and AIG contributed $3.3 million. (Doc. 85-1 at 10, ¶ 23; *see also* Doc. 80-2 at 6, ¶ 23.) Other insurers paid the rest. (*Id.*)

In March of 2020, in connection with the settlement of the Abernathy Lawsuit, Shaw and its insurers entered into a Settlement and Mutual Release Agreement ("Insurance Settlement") (Doc. 80-2 at 6, ¶ 22). It sets forth the various amounts that the respective parties would contribute to fund the settlement. (*Id.*; *see also* Doc. 25-5 at 3, ¶1.) It also purports to settle certain claims as between Shaw and its insurers but reserves certain rights to both Shaw and Liberty. (Doc. 80-2 at 6, ¶ 24; Doc. 25-5 at 4–6, ¶¶ 4, 7, 10.)

---

[4] In earlier briefing, Shaw used a slightly different number: $665,591.56. (Doc. 23 at 6 (citing Doc. 10, ¶¶ 33–34, 38).)
[5] In earlier briefing, Shaw claimed $155,894.82 was paid by it directly for its defense. (Doc. 23 at 7 (citing Doc. 10 at 26, ¶ 40).)
[6] There is a minor discrepancy in the position of the parties as to the amount Shaw allegedly paid as a result of its alleged "administrative error". Liberty claims that amount is $60,834.37. (Doc. 1 at 12, ¶ 46.) Shaw claims that it is $62,242.65. (Doc. 56 at 15, ¶ 60; *id.* at 16-17, ¶ 71; Doc. 83-11 at 9-10, ¶ 31.) This results in a difference in the calculation of the amount claimed by Liberty to be owed by Shaw net of amounts paid by Shaw directly to Liberty. That amount is $749,583.63, according to Liberty (Doc. 1 at 19, ¶ 82). It is $748,130.35 if Shaw's figures are correct. This discrepancy cannot be resolved on summary judgment.

In May of 2020, Liberty demanded full payment of $1.25 million for deductibles and threatened to file suit should Shaw fail to pay (or commit to pay) the full amount within twenty-one days. (Doc. 85 at 12.) Shaw alleges that on October 9, 2020, Liberty stated it would refrain drawing on Shaw's letter of credit if Shaw committed to pay $439,627 within thirty days. (*Id*. at 13.) Shaw paid that amount on October 29, 2020. (*Id*.)

On December 23, 2020, Liberty sued Shaw in this Court, (Doc. 1), demanding $749,538.63 representing, Liberty alleges, that part of the $1.25 million deductible not reimbursed by Shaw, (*id*. at 14, ¶ 54), plus late payment charges, (*id*. at 18, ¶ 76). Liberty also asked the Court to declare that it is entitled to "draw on Shaw's letter of credit . . . to secure payment of the $749,538.63[,]" plus the late charge. (*Id*. at 19, ¶ 82.)

On April 23, 2021, Shaw filed an answer and counterclaim ("Original Counterclaim"). (Doc. 10.) In it, Shaw denied responsibility and liability for the amounts claimed by Liberty, (*see id.* at 35), and further claimed that by virtue of Liberty's wrongful conduct, Liberty owed Shaw damages for unjust enrichment, breach of contract and bad faith under Louisiana Revised Statutes Section 22:1973, (*id*. at 31–35, ¶¶ 67–91).

On June 4, 2021, Liberty filed a motion to dismiss Shaw's counterclaim ("Original MTD"). (Doc. 18.) Shaw filed an opposition, (Doc. 23), and Liberty filed a reply, (Doc. 29). On March 25, 2022, the Court issued a ruling granting in part and denying in part Liberty's motion to dismiss Shaw's Original Counterclaim ("Original MTD Ruling"). (Doc. 53.) As is discussed in more detail *infra*, the Original MTD Ruling granted six parts of Liberty's Original MTD and denied the remaining parts. (Doc. 53 at 46–47.) The Court also granted Shaw 28 days "in which to amend the Counterclaim to cure the deficiencies detailed in this ruling." (*Id*. at 47.)

In July of 2021, Liberty filed a motion for summary judgment (Doc. 25) ("Original MSJ")

which was opposed by Shaw (Doc. 35). Liberty filed a reply. (Doc. 41.) The Court denied Liberty's Original MSJ without prejudice to permit Shaw to complete the discovery it requested in connection with a Rule 56(d) request. (Doc. 42.)

On April 27, 2022, Shaw filed CB&I Group Inc.'s First Amended and Restated Counterclaim ("Amended Counterclaim"). (Doc. 56.) Liberty then filed Liberty Mutual Insurance Company's Motion to Dismiss First Amended and Restated Counterclaim ("Renewed MTD") (Doc. 61) which Shaw opposed, (Doc. 66). Liberty filed a reply. (Doc. 73.) On February 9, 2023, the Court issued its ruling granting in part and denying in part Liberty's Renewed MTD. (Doc. 91.) The details of this ruling as it impacts Liberty's current Motion will be discussed *infra*.

On July 8, 2022, Liberty filed Liberty Mutual Insurance Company's Motions for Sanctions Pursuant to Federal Rule of Civil Procedure 11(c)(2) ("Sanctions Motion") (Doc. 70) which Shaw opposes, (Doc. 72), and in response to which Liberty filed a reply, (Doc. 73). That motion is pending.

As mentioned above, Liberty files the present summary judgment motion seeking the same relief it sought in its Original MSJ plus additional relief in the form of dismissal of Shaw's breach of contract and bad faith claims based on Liberty's alleged failure to defend. (Doc. 80 at 1–2.)

Central to all issues except those surrounding Liberty's failure to defend is Shaw's contention that it owes Liberty no money because, in part, Liberty wrongfully failed to credit towards its deductible obligation the following amounts:

$666,978.96    Defense costs paid by AIG on behalf of Shaw which was in fact owed by Liberty. (*See, e.g.*, Doc. 85-1 at 19, ¶ 22; *see also* Doc. 85 at 9.)

$150,831.07    Defense costs paid by Shaw directly to third parties. (Doc. 85-1 at 19, ¶ 22; *see also* Doc. 85 at 9)

$62,242.65    Deductible amount paid by Shaw to Liberty allegedly as a result of

5

an "administrative error[.]" (Doc. 85-1 at 19, ¶ 22 n.17; *see also* Doc. 85 at 10 n.39.)

<u>$439,627.00</u>   Deductible amount paid by Shaw to Liberty allegedly only to avoid Liberty drawing on Shaw's letter of credit. (Doc. 85-1 at 19, ¶ 22; *see also* Doc. 85 at 13.)

Total:  $1,319,679.68 (Doc. 85-1 at 19, ¶ 22.)

According to Shaw, the total of these payments exceeds by $69,679.68 the total combined deductible of $1,250,000 and therefore represents an overpayment which Liberty owes to Shaw. (*Id.*) Shaw's Amended Counterclaim utilizes four theories of liability to recover damages and a return of the alleged overpayment of monies paid by AIG and Shaw in satisfaction of Shaw's deductible obligation: "Count I: Satisfaction of Deductible and Recovery of Overpayment" (Doc. 56 at 19–21, ¶¶ 81–91); "Count II: Unjust Enrichment/Payment of a Thing Not Owed" (*Id.* at 21–23, ¶¶ 92–95); "Count III: Breach of Contract" (*Id.* at 23–25, ¶¶ 96–113); and "Count IV: Bad Faith Recovery under La. Rev. Stat. §§ 22:1973 and 22:1892" (*Id.* at 26–27, ¶¶ 114–120). These theories of liability and the allegations made by Shaw to support them mirror in large measure those made in Shaw's Original Counterclaim.

## II.   SUMMARY OF ARGUMENTS

### A. Summary of Liberty's Arguments

Liberty asks this Court to grant summary judgment:

> (i) requiring Shaw to reimburse the remaining amounts owed toward the full $1.25 million deductible without any offset or credit from payments by Shaw or other insurers in defense costs; (ii) permitting Liberty to impose a "late payment" charge based upon Shaw's failure to reimburse the full deductible; (iii) declaring Liberty's rights to draw on Shaw's letter of credit; and (iv) dismissing with prejudice Shaw's remaining counterclaims for breach of contract (Count III) and bad faith (Count IV) based on Liberty's defense of Shaw in the *Abernathy* Lawsuit.

(Doc. 80 at 2.)

Liberty's Motion claims, based on undisputed facts, that Shaw is not entitled to a credit or offset for monies Shaw or Shaw's other insurer AIG paid in defense costs and therefore (i) Liberty is entitled to collect the remaining deductible amount from Shaw without a credit for said offsets; (ii) Liberty is entitled to recover a "late payment" charge as a result of Shaw's unjustified refusal to reimburse the full deductible, and (iii) Liberty is entitled to draw on Shaw's letter of credit to recover those sums. (*Id*. at 1.) Liberty also claims there is no genuine dispute "that Liberty did not owe any duty to defend Shaw based on the allegations in the First Amended Complaint filed in [the Abernathy Lawsuit]." (*Id*.) "Because these issues are all resolved within the corners of [the] undisputed documents, and because no evidence can be used to controvert those documents, summary judgment should be awarded to Liberty." (*Id*.)

### B.  Summary of Shaw's Arguments

According to Shaw, in the First Amended Complaint filed in the Abernathy Lawsuit ("FAC"), plaintiffs "undeniably alleged negligent acts and omissions of certain of the Shaw Defendants causing damages to the plaintiffs within the period of coverage provided by the Liberty Policies." (Doc. 85 at 2.) Because the FAC presented a possibility of liability under these policies, Liberty was obligated to defend Shaw. (*Id*. at 3.) Because Liberty delayed defending Shaw "for nearly seventeen months following Shaw's tender of its defense and indemnity to Liberty[,]" Liberty is liable for breach of contract (the Liberty Policies) and for bad faith under Louisiana's insurance law. (*Id*.)

Furthermore, Shaw claims Liberty waived its right to assert its no coverage defense by entering into the Insurance Settlement, (*id.* at 3, 12, 15–16), and is judicially estopped from raising that defense by virtue of its claim for reimbursement of the deductible Liberty paid in settling the claim, (*id*. at 12 n.47, 15–16).

As a result of Liberty's conduct, "Shaw has paid defense costs for which Liberty was responsible totaling $817,810.03."[7] (*Id.* at 4.) When this amount is combined with the $501,869.65 which Shaw paid directly to Liberty, the amount "exceeds the total deductible amount to which Liberty claims entitlement[.]" (*Id.*) Integral to Shaw's position is its contention that the amounts spent by Shaw and AIG on its behalf for defense costs, reduce its deductible obligation under the Liberty Policies. (*Id.* at 3–4.)

Shaw claims that it owes no " 'late payment charges' on invoices which Shaw disputed from the start and which Liberty expressly directed Shaw to 'ignore.' " (*Id.* at 4.) "Finally, Liberty cannot demonstrate entitlement to draw on Shaw's letter of credit for amounts which remain in dispute and that ultimately are not owed." (*Id.*) Thus, argues Shaw, "Liberty's MSJ should be denied in its entirety." (*Id.*)

## III.    STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the mover bears his burden of showing that there is no genuine issue of fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . .   [T]he nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S. Ct. 1348 (1986) (internal citations omitted). The non-mover's burden is not satisfied by "conclusory allegations, by unsubstantiated assertions, or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and internal

---

[7] This amount includes $666,978.96 which AIG, a co-primary insurer of Shaw, paid in defense costs in connection with the *Abernathy* Lawsuit for which Shaw claims a credit or right of offset against its deductible obligation to Liberty. (Doc. 85 at 4 n.6.)

quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further:

> In resolving the motion, the court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion.

*Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991).

## IV.    ISSUES

The Renewed MSJ raises the following issues:[8]

1) Is Shaw obligated as a matter of law repay Liberty the combined $1.25 million deductibles subject a credit for $501,869.65[9] Shaw paid directly to Liberty? This issue requires resolution of the following subsidiary issues:

   a. Are this Court's rulings on Liberty's Original MTD (Doc. 18) and its Renewed MTD (Doc. 61) granting in part and denying in part these two motions (Docs. 53 and 91 respectively), the "law of the case" precluding further consideration of certain issues raised in the present Motion?

   b. Is Shaw not entitled as a matter of law to an offset or credit of the $150,831.07 paid by Shaw to third parties in defense costs against Liberty's deductible claim, regardless of whether Liberty breached the contracts of insurance and acted in bad faith as alleged by Shaw?

   c. Is Shaw not entitled as a matter of law to a credit or offset of the $666,978.96 paid by AIG in defense costs on Shaw's behalf against Liberty's deductible claim?

2) Is Liberty entitled as a matter of law to a late payment charge?

---

[8] While Shaw argues that consideration of this Renewed MSJ is premature because "the Court has not yet ruled on Liberty's [Renewed MTD] (R. Doc. 61)," (Doc. 85 at 1), the Court has now ruled on Liberty's Renewed MTD, (Doc. 91), and therefore turns to the present motion.

[9] Again, Liberty claims this amount is $500,461.37. (Doc. 1 at 14, ¶ 54.)

3) Is Liberty entitled as a matter of law to draw on Shaw's letter of credit to enforce Shaw's obligation of repayment?

4) As to Shaw's breach of contract and bad faith claims:

    a. Did Liberty waive its right to argue that it provided no coverage to Shaw as to the First through the Fifth Amended Complaints in the Abernathy Lawsuit when it entered into the Insurance Settlement?

    b. Is Liberty "judicially estopped" from arguing it provided no coverage to Shaw as to the First through the Fifth Amended Complaints in the Abernathy Lawsuit because Liberty now claims a right of reimbursement of monies it paid in the defense and settlement of the Abernathy Lawsuit?

    c. If Liberty has not by virtue of the Insurance Settlement waived its right to argue it provided no coverage as to the First through the Fifth Amended Complaints and is not judicially estopped from doing so, were the allegations in the First and Fifth Amended Complaints in the Abernathy Lawsuit such that Liberty owed a duty to defend Shaw?

    d. Are there questions of fact which preclude summary judgment on the issue of Liberty's alleged bad faith?

The Court notes that issues 1, 1a. and 1b. listed above were raised in Liberty Mutual Fire Insurance Company's Motion for Summary Judgment ("Original MSJ") (Doc. 25), which was opposed by Shaw, (Doc. 35), with Liberty filing a reply, (Doc. 41). The Original MSJ was denied without prejudice to allow Shaw to complete Rule 56(d) discovery before the matter was submitted. (Doc. 42.) In this Renewed MSJ, Liberty attempts to "re-urge" the Original MSJ, representing to the Court that, "[n]ow that the discovery deadline has passed, and Shaw did not uncover any evidence that could create an issue of fact, summary judgment should be entered on these issues." (Doc. 80-1 at 1 n.1.)

Ordinarily, the Court would not allow a motion for summary judgment dismissed without prejudice to be "re-urged" in this manner. However, because Shaw has not objected (and, indeed has briefed these issues in its opposition) and because the Court has dealt with these same issues

in its rulings on Liberty's Original MTD, (Doc. 53), and Liberty's Renewed MTD, (Doc. 91), the Court will exercise its discretion and take up all issues in connection with the present Motion.

The Court will address the issues in turn.

**V.    ARE THIS COURT'S ORIGINAL RULINGS IN LIBERTY'S ORIGINAL MTD, (DOC. 18), OR ITS RENEWED MTD, (DOC. 61), GRANTING IN PART AND DENYING IN PART THESE TWO MOTIONS, (DOCS. 53 AND 91 RESPECTIVELY), THE "LAW OF THE CASE" PRECLUDING FURTHER CONSIDERATION OF CERTAIN ISSUES RAISED IN THE PRESENT MOTION?**

Liberty argues that "summary judgment is appropriate on the issues raised by Liberty's [Original MSJ] (Rec. Doc. 25) on its affirmative claims for recovery of the deductible, as this Court has already effectively concluded in [its "Original Ruling" (Doc. 53)] that Shaw must reimburse the deductible, and that payments by Shaw and other insurers in defense costs do not satisfy that obligation." (Doc. 80-1 at 3.) Thus, "[t]his decision is the law of the case . . ." (*Id.* (without citation of authority).)

Shaw counters that as to the claims dismissed in the Court's Original Ruling, the dismissals were without prejudice and the Court granted Shaw leave to amend its Original Counterclaim. (Doc. 85 at 24 (citing Doc. 53 at 46–47).) Shaw did file an Amended Counterclaim (Doc. 56) and, argues Shaw, the Court has not yet ruled on Liberty's Renewed MTD. (Doc. 85 at 24.)[10] Thus, argues Shaw, there is no final decision on these issues. Furthermore, the "law of the case doctrine 'does not operate to prevent a district court from reconsidering prior rulings[.]' " (*Id.* (quoting *Stoffels ex rel. SBC Tel. Concession Plan v. SBC Commc'ns, Inc.*, 677 F.3d 720, 727 (5th Cir. 2012)).)

---

[10] The Court has since ruled on Liberty's Renewed MTD. (*See* Doc. 91.) In this ruling, the Court again held that Liberty's deductible obligation was not reduced by AIG's payments, (*id.* at 19–20), or Shaw's payments to third parties, (*id.* at 21–23).

On this issue, The Court agrees with Shaw.

> Federal Rule of Civil Procedure 54(b) confirms the trial court's necessary authority to correct itself. It provides that until the court expressly directs entry of final judgment, an order that resolves fewer than all of the claims among all of the parties "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." And so the Supreme Court has said that "every order short of a final decree is subject to reopening at the discretion of the district judge." [*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 12 n.14 (1983) (dictum)]. These and like statements reflect the power to revise. Occasionally the undoubted power to revise is reflected in statements that law-of-the-case principles do not apply to trial-court rulings. That view, baldly expressed, may generate some confusion. Only if law-of-the-case rules are seen as constraints on authority is it helpful to say that the rules do not apply to reconsideration by a trial court. The policies that support adherence to earlier rulings without perpetual reexamination surely do apply, whatever label is used. These policies regulate exercise of the undoubted power to reconsider. The "law-of-the-case" label is a convenient way of invoking these policies and is often used.

18B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 4478.1 (3d ed. 2022).

Because a district court may reconsider, revise or reverse its prior interlocutory judgment, the Court here chooses not to base its decision on the law of the case doctrine.

> Under Federal Rule of Civil Procedure 54(b), "a court retains jurisdiction over all the claims in a suit and may alter any earlier decision at its discretion until final judgment has been issued on a claim or on the case as a whole*." Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 259 F. Supp. 2d 471, 475 (M.D. La. Sept.23, 2002). Furthermore, the law-of-the-case doctrine does not bar the instant Motion, since "in civil cases a district court is not precluded by the law-of-the-case doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not immutable and lack res judicata effect." *United States v. Palmer*, 122 F.3d 215, 220–221 (5th Cir. 1997).

*Louisiana Fish Fry Prod., Ltd. v. Bruce Foods Corp.*, No. 11-557, 2013 WL 2458445, at *2 (M.D. La. June 6, 2013).

However, as discussed below, Shaw has offered nothing in its opposition to the current Motion to warrant a result different than that reached by this Court in its two previous rulings.

VI.    **IS SHAW NOT ENTITLED AS A MATTER OF LAW TO AN OFFSET OR CREDIT OF $150,831.07 PAID BY SHAW TO THIRD PARTIES IN DEFENSE COSTS AGAINST LIBERTY'S DEDUCTIBLE CLAIM, REGARDLESS OF WHETHER LIBERTY BREACHED THE CONTRACTS OF INSURANCE AND WHETHER SHAW ACTED IN BAD FAITH AS ALLEGED BY SHAW?**

While, for purposes of this Renewed MSJ, the Court is not bound by its previous rulings, the Court has reviewed the issues raised here twice before and reached the same conclusion each time. The Court sees nothing in Shaw's opposition to the present motion, (*see e.g.*, Doc. 85 at 6–7, 9, 23–24), that is different from its previous arguments and Shaw has raised no questions of fact which preclude granting a summary judgment on this issue. For the reasons given in its prior rulings, (Doc. 53 at 34; Doc. 91 at 21–23), the Court rejects Shaw's arguments. Summary judgment is granted on Liberty's Renewed MSJ ruling that Shaw is not entitled to a credit or offset for the $150,831.07 it paid in defense costs before Liberty assumed its defense.

The Court stresses however, two additional points. First, both parties agree that Shaw is entitled to a credit on its deductible obligation for monies Shaw paid directly to Liberty. (Doc. 91 at 6 n.5 (quoting Doc. 53 at 36).) Liberty seeks no more in its Complaint.  (Doc. 1 at 14, ¶ 54), demanding the principle sum of $749,538.63, plus late charge, representing the $1,250,000 deductible less amounts paid by Shaw directly to Liberty in satisfaction of its deductible obligation.

Second, although the Court ruled as a matter of law that the Policies do not give Shaw the automatic credit it seeks for the $150,831.07 it paid to third parties in defense costs, it also ruled that Shaw has a right to pursue this amount in its claims for breach of contract and for bad faith, as is discussed in detail in another part of this ruling. (*See also* Doc. 53 at 34–41.)

VII.    **IS SHAW NOT ENTITLED AS A MATTER OF LAW TO A CREDIT OR OFFSET OF THE $666,978.96 PAID BY AIG IN DEFNSE COSTS ON SHAW'S BEHALF AGAINST LIBERTY'S DEDUCTIBLE CLAIM?**

Like the previous issue, this is one which the Court has considered and ruled on in two separate rulings. (Doc. 53 at 29–34; Doc. 91 at 19–20.) The Court is unmoved by Shaw's latest briefing which adds no new legal arguments nor does it raise any disputed material fact issues. Accordingly, summary judgment is granted on Liberty's Renewed MSJ, ruling that Shaw is not entitled to a credit or offset for the $666,978.96 AIG paid in defense costs in the Abernathy Lawsuit.

VIII.    **IS LIBERTY ENTITLED AS A MATTER OF LAW TO A LATE PAYMENT CHARGE?**

As a part of Liberty's agreement to provide coverage to Shaw, Shaw and Liberty entered into a second agreement to secure Liberty's deductible obligation. (*See* Doc. 25-4.) The agreement is titled "Master Agreement for Guarantee of 'Deductible' and/or 'Loss Limit' Reimbursement # 7022". (*Id*. at 1, which the Court will refer to as "Deductible Guarantee".) According to Liberty, "[t]he Deductible Guarantee entitles Liberty to impose a 'late payment charge' if Shaw does not timely reimburse the deductible." (Doc. 80-1 at 6 (citing Doc. 25-4 at 2, ¶ 5).) "The Deductible Guarantee also requires Shaw to procure a letter of credit [("LOC")] to secure repayment of the deductible and Liberty's other obligations under the Policies, and Shaw is required to list Liberty as a beneficiary." (*Id*. (citing Doc. 25-4 at 2, ¶ 6).) The LOC is found in the record at Doc. 25-9. Liberty argues that because Shaw owes the unpaid balance on the deductible, it also owes the late charge as set out in the Deductible Guarantee. (Doc. 80-1 at 6.)

The Deductible Guarantee provides:

> Should any reimbursement, premium payment or amounts due not be made within said twenty (20) day period of the due date, then, in addition to all other rights and remedies available to Liberty Mutual

hereunder, under the policies, or at law or in equity, Liberty Mutual shall be entitled to receive a late payment charge computed at a rate of Prime Rate (as published in the Wall Street Journal) plus 1% per annum on the overdue amount, for actual days elapsed from the due date until paid.

(Doc. 25-4 at 2, ¶ 5(a).)

Shaw disputes it has an obligation for a late payment as "Paragraph 5(b) of the Deductible Guarantee permits Shaw to withhold disputed amounts and entitles Liberty to recover interest on those amounts only 'if the disputed advance amount is resolved in Liberty's favor.' " (Doc. 85 at 30 (quoting Doc. 25-4 at 2–3, ¶ 5(b)).) Because Shaw had started paying its own defense costs by the time Liberty began making payments to defend Shaw, "Shaw immediately disputed the first deductible invoices . . . and explicitly advised Liberty as early as July 8, 2016 that Shaw considered its deductibles under the Liberty Policies to have already been satisfied." (Doc. 85 at 30 (citing Doc. 85-1, ¶ 33 and materials cited therein).)

Further, Shaw argues that later, Liberty advised Shaw to " 'ignore any invoices related to the Abernathy claim' pending resolution of the issue of whether Shaw was responsible for any further deductible amounts . . . ." (*Id*. (citing Ryan Decl., Ex. 5, ¶ 32, and Ex. J thereto).) According to Shaw, "Liberty never advised Shaw of any purported resolution of this issue[,]" and indeed, the issue has never been resolved. (*Id*. (citing Ryan Decl., Ex. 5, ¶ 33).)

In its reply, Liberty argues that Shaw misinterprets Paragraph 5(b) of the Deductible Guarantee because it involves only disputes over "miscalculate[ions]" of amounts due which entitle Shaw to withhold payment and here, the dispute is not one regarding calculations but rather one regarding whether Shaw has an obligation to pay any of the deductible. (Doc. 86 at 9 (citing Doc. 25-4 at 2, ¶ 5).) Furthermore, as argued elsewhere in Liberty's briefing, its statement to Shaw to "ignore" the invoices from the Abernathy litigation was made before Liberty tendered its full

$3 million dollars to settle the case and, contrary to Shaw's representation that Liberty never advised Shaw of any purported resolution, Liberty "sent Shaw multiple letters demanding the deductible." (Doc. 86 at 10 (citing Liberty's Complaint, Doc. 1 at 13, ¶ 50).)

Paragraph 5(b) of the Deductible Agreement states in pertinent part:

> Should a dispute arise as to an amount due within the 'Deductible . . .' based on the Policyholder's good faith belief that Liberty Mutual has, *because of an administrative error, miscalculated the Deductible*, then the Policy Holder, after written notice to Liberty Mutual indicating the nature and the amount of the dispute agrees to . . .
>
> (2) Pay the Deductible . . . net of the disputed amount . . .

(Doc. 25-4 at 2–3, ¶ 5(b).)

Here, the Court agrees with Liberty. The above quoted language is clear. The dispute over the deducible reimbursement did not involve a miscalculation caused by an administrative error. The dispute is over the correct interpretation of the Policies and whether, under that interpretation, Shaw owes any amount on the deductible.

Shaw also points to the following email from a Liberty claims representative dated January 15, 2019, regarding the ongoing dispute as to whether the deductible was owed: "It is yet to be determined whether or not [Shaw] is responsible for reimbursement of amounts related to the Abernathy claim. Until that has been resolved, please ignore any invoices related to the Abernathy claim . . . ." (Doc. 85-14 at 74–75.) But this email was written, as argued by Liberty, before Liberty completed its evaluation of Shaw's argument that it was entitled to a credit for amounts Shaw paid to third parties and that AIG had paid on its behalf, rejected same, and made demand in letters for the full amount of the deductible. (Doc. 86 at 10.) The email, indeed, was written long before Liberty's Complaint, (Doc. 1), demanding payment of the unpaid part of the deductible. (*Id.*) No reasonable juror could conclude that Liberty's directive for Shaw to "ignore any invoices related

to the Abernathy claim" remained in effect and could be relied upon by Shaw after Liberty paid its full policy limit, issued letters demanding payment of the deductible and ultimately filed suit to recover same.

However, it is unclear precisely when the demand letters to Shaw referred to in Liberty's Complaint, (Doc. 1 at 13, ¶ 50), were sent and received. Therefore, while the Court finds as a matter of law that Shaw owes the late payment charge, the amount of that charge will be determined at trial.

## IX.   IS LIBERTY ENTITLED AS A MATTER OF LAW TO DRAW ON SHAW'S LETTER OF CREDIT TO ENFORCE SHAW'S OBLIGATION OF REPAYMENT?

As mentioned above, the Deductible Agreement "require[d] Shaw to procure a [LOC] to secure [Shaw's] repayment of the deductible and Liberty's other obligations under the Policies, and Shaw [was] required to list Liberty as a beneficiary." (Doc. 80-1 at 6 (citing Doc. 25-4 at 3, ¶ 6).) Shaw obtained that letter of credit to secure the Policies' deductible obligation and other obligations owed to Liberty. (Doc. 25-9 at 2, ¶ 8.) Liberty argues that the Deductible Agreement also "permits Liberty to draw on Shaw's letter of credit in the event Shaw fails to reimburse Liberty deductible amounts." (Doc. 80-1 at 6 (citing Doc. 25-4 at 3, ¶ 10).)

Shaw responds in three ways: first, that "Liberty expressly agreed not to draw on the LOC in exchange for Shaw's October 29, 2021, payment of $439,627." (Doc. 85 at 31 (citing Hagan Decl., Doc. 85-13 at 14, ¶¶ 47–48, Exs. P (Doc. 85-13 at 198–99) and Q (Doc. 85-13 at 200–05), as well as the Ryan Decl., Doc. 85-14 at 11, ¶ 38).) Second, as argued by Shaw throughout, it owes no money to Liberty on the deductible and therefore Shaw should not be allowed to draw on its LOC for amounts not owed. (Doc. 85 at 31.) Finally, in the alternative, Shaw argues that the

amount owed is a question of fact inappropriate for resolution at the summary judgment stage. (*Id.*)

In reply, Liberty argues that Shaw's arguments are a mere regurgitation of its prior failed attempts to avoid its deductible obligation. (Doc. 86 at 10.)

As to Shaw's first argument, that "Liberty expressly agreed not to draw on the LOC in exchange for Shaw's October 29, 2021, payment of $439,627[,]" (Doc. 85 at 31), the Court disagrees. In the October 9, 2020 letter from Liberty's counsel to Shaw's counsel, Liberty's counsel stated that "if Shaw commits to paying within thirty days the undisputed $439,627 it has already conceded is owed, Liberty agrees to refrain from exercising its rights to draw on the LOC for the remaining deductibles while we negotiate and/or litigate Shaw's obligation to pay the remaining $810,373 under the policies, plus the late payment charge, and Liberty's rights to draw on the LOC." (Doc. 62-4 at 1.) Liberty has not drawn on the letter of credit and is presently litigating the issue. Part of this litigation involves Liberty's current demand for summary judgment. The Court does not find that Liberty's agreement prevents it from pursuing and obtaining summary judgment on this issue.

Shaw's second argument, that it doesn't owe the deductible because of the credit it should get from its payment of defense costs and those of AIG on its behalf, has been previously made by Shaw and previously rejected by this Court in its rulings on Liberty's two previous motions to dismiss Shaw's counterclaim (Docs. 53 and 91). The Court reaches the same conclusion for purposes of this Motion.

In conclusion, the Court finds that Liberty is entitled to draw on Shaw's LOC but agrees with Shaw's alternative argument that summary judgment as to a specific amount is premature

since the precise amount owed by Liberty is uncertain and depends on facts which must be resolved at trial.

## X.    DID LIBERTY WAIVE ITS RIGHT TO ARGUE THAT IT PROVIDED NO COVERAGE AS TO THE FIRST THROUGH THE FIFTH AMENDED COMPLAINTS IN THE ABERNATHY LAWSUIT WHEN IT ENTERED INTO THE INSURANCE SETTLEMENT?

Shaw claims that Liberty's release of certain claims against Shaw in the Insurance Settlement "eviscerat[es] Liberty's right to dispute coverage for the Abernathy Lawsuit." (Doc. 85 at 3.) "[T]hrough the Insurance Settlement, Liberty waived any right to contest coverage." (*Id*. at 12.) In support of its argument, Shaw points the Court to Paragraph 4 of the Insurance Settlement where Liberty " 'release[d] Shaw from any and all claims or liabilities arising out of or in any way related to the [Abernathy Lawsuit]' subject to those rights specifically reserved in Paragraph 7 thereof—namely, those 'arising out of the deductible provisions of the [Liberty Policies] . . . ." (Doc. 85 at 16 (quoting Insurance Settlement, Ex. 83-10 at 164–65, ¶¶ 4 and 7).)

Liberty responds it did not release its argument that it provided no coverage under the FAC. Rather, Liberty agreed to release only "claims or liabilities" arising out of the Abernathy Lawsuit. (Doc. 86 at 3 (quoting Doc. 85-13 at 164, ¶ 4).) "Liberty's present motion regarding the absence of a duty to defend is not a 'claim' against Shaw, or a 'liability' of Shaw arising out of the Abernathy Lawsuit that would fall under the release language." (*Id*.) Furthermore, the Insurance Agreement specifically reserved Liberty's right to pursue recovery of the deductible and its argument of no coverage as to the First through Fifth Amended Complaints in the Abernathy Lawsuit is made in connection with its pursuit of the deductible. (*Id*.)

The Court agrees with Liberty that its argument that the Policies provided no coverage as to the First through Fifth Amended Complaints is a defense to Shaw's Amended Counterclaim and is neither a "claim" nor "liability" released by the Insurance Settlement. Furthermore, the argument

19

is part and parcel of the dispute over the deductible and therefore was excepted from the release and reserved to the parties. (*See* Doc. 83-10 at 2, ¶ 7.) The Court made a similar ruling preserving Shaw's breach of contract and bad faith claims, (*see* Doc. 53 at 20–25), which Liberty claimed were released in the Insurance Settlement, (Doc. 18-1 at 10–17).

### XI.   IS LIBERTY "JUDICIALLY ESTOPPED" FROM ARGUING IT PROVIDED NO COVERAGE TO SHAW AS TO THE FIRST THROUGH THE FIFTH AMENDED COMPLAINTS IN THE ABERNATHY LAWSUIT BECAUSE LIBERTY NOW CLAIMS A RIGHT OF REIMBURSEMENT OF MONIES IT PAID IN THE DEFENSE AND SETTLEMENT OF THE ABERNATHY LAWSUIT?

Shaw argues that because Liberty is demanding deductible amounts based on a covered occurrence under the Policies, it cannot at the same time claim there is no coverage under these same Policies. (Doc. 85 at 15–16; *see also id.* at 12 n.47.) "The legal doctrine of judicial estoppel precludes a party from taking a duplicitous position with the Court on a single issue, yet this is exactly what Liberty [has done]." (*Id.* at 16 (citing *Gabarick v. Laurin Mar (Am.) Inc.*, 753 F.3d 550, 553 (5th Cir. 2014)).)

Liberty disagrees.

> Judicial estoppel does not apply here because Liberty's position has been entirely consistent throughout this litigation (and throughout its handling of Shaw's defense of the Abernathy Lawsuit). Liberty initially declined to defend Shaw because the allegations in the Abernathy Lawsuit did not trigger any duty under the Policies' applicable coverage period—the same position Liberty asserts in the present motion. After certain amendments [to the Abernathy Complaint], Liberty then agreed to defend Shaw, and ultimately paid $3 million in limits toward the Insurance Settlement to resolve the claims against Shaw. . . . Liberty's present motion seeks a ruling regarding the absence of a duty to defend Shaw based on the earlier complaints in the Abernathy Litigation, whereas Liberty seeks reimbursement on the deductible based on its contribution to the Insurance Settlement.

(Doc. 86 at 2 (internal citations omitted).)

The Court agrees with Liberty. Liberty's claim of no coverage applies to the earlier Abernathy Complaints. Its claim for deductible reimbursement applies, on the other hand, to its payment of defense costs and settlement proceeds which came in response to later amendments to the complaints in the Abernathy Lawsuit. There is no inconsistency as charged by Shaw and judicial estoppel does not apply.

### XII. WERE THE ALLEGATIONS IN THE FIRST AND/OR FIFTH AMENDED COMPLAINTS IN THE ABERNATHY LAWSUIT SUCH THAT, UNDER THE LIBERTY POLICIES, LIBERTY OWED SHAW A DUTY TO DEFEND?

#### A. Liberty's Argument

Liberty begins its argument by pointing to the coverage provisions in the Policies which protect against personal injury or property damage caused by an occurrence that takes place in the "coverage territory" during the "policy period" of 2003 to 2005. (Doc. 80-1 at 5 (citing Doc. 25-2 at 9 and 25-3 at 9).) Quoting paragraphs 36, 7a. and 39 of the Abernathy First Amended Complaint, Liberty insists that "[t]here are no allegations that Shaw began any work [at the OxyChem plant] before 2008, and there are no allegations of personal injury occurring within the 2003-2005 coverage period." (*Id*. at 7.)

Although there is an "allegation that a Shaw entity entered into a contract in 2004, there are no allegations that Shaw did (or did not do) anything under this contract, and there are no allegations of 'personal injury' caused by Shaw during the coverage period resulting from this contract or otherwise." (*Id*.) Thus, under the "eight corners rule" comparing the allegations of the operative complaint to the provisions of the policy, (*id*. at 11–12), "coverage does not attach to the [First Amended Complaint] because there was no personal injury that could have been caused by Shaw that 'occur[ed] during the policy period' of 2003-2005[,]" (*id*. at 12).

21

### B.  Shaw's Argument

Shaw responds by emphasizing that, "[u]nder Louisiana law, an insurer's duty to defend arises '**whenever the pleadings against the insured disclose even a possibility of liability under the policy**.'" (Doc. 85 at 17 (quoting *State Farm Fire and Cas. Co. v. Target Corp*., 939 F. Supp. 2d 593, 601 (M.D. La. 2011) (internal citations omitted; emphasis in original)).) Furthermore, "the duty to defend arises 'if there are any facts, which, if taken as true, support a claim for which coverage is not unambiguously excluded . . . . The complaint is 'liberally interpreted' for purposes of determining whether coverage is unambiguously excluded.'" (*Id*. (quoting *Compl. of Stone Petrol. Corp*., 961 F.2d 90, 91 (5th Cir. 1992) (internal citations omitted)).) "[T]he test of a liability insurer's duty to defend is not whether the allegations unambiguously fall within coverage but, rather, whether the allegations do not unambiguously prevent a conclusion that coverage could exist." (*Id*. (quoting *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 873 (5th Cir. 2009)).)

Shaw claims the Abernathy FAC "undeniably disclosed a possibility of liability of certain Shaw Defendants under the Liberty Policies" because it alleged that "from 2004 and extending through July 2010," Oxy Chem contracted with one or more Shaw Defendants to perform various services associated with the decommissioning of the OxyChem facility. (Doc. 85 at 17 (citing, inter alia, FAC, ¶ 16).) Shaw argues that, while the allegation does not specifically allege that Shaw's employees caused an injury during the 2003-2005 time frame, this is a possibility that can be inferred and cannot be unambiguously excluded. (*Id*.)

Shaw also points the Court to paragraph 17 of the FAC which alleges that "co-defendant Shaw Maintenance also provided personnel and services at the subject facility contemporaneous with co-defendant Shaw Global" and there is nothing in the allegations of negligent acts and omissions that unambiguously states that these occurred outside the policy period. (*Id*. at 18

(quoting FAC, ¶ 17).) In addition, Shaw alleges that the Abernathy plaintiffs' Fifth Amended Complaint "included additional allegations further confirming that various Shaw Defendants allegedly undertook duties to the plaintiffs, and breached those duties, causing damages to the plaintiffs, *within the Liberty Coverage Period*." (*Id*. at 19 (citing Fifth Am. Compl., ¶¶ 14(c), 15(b) and 15(c)).) Yet, "Liberty continued to wrongfully deny coverage for another thirteen months thereafter." (*Id*.)

Shaw argues that, despite Liberty's argument to the contrary, the FAC did allege negligent acts attributable to the Shaw Defendants causing injury during the policy period because Louisiana law recognizes the "exposure theory" where "'coverage is triggered by the mere exposure to the harmful conditions during the policy period.'" (*Id*. at 19–20 (quoting *Cole v. Celotex Corp.*, 599 So. 2d 1058, 1076 (La. 1992)).)

### C.  Liberty's Reply

In its reply, Liberty insists that the only allegation involving Shaw Defendants in the FAC is that, while a contract with Shaw was signed in 2004, the process of decommissioning the outdated facility did not begin until 2008, outside the policy period. (Doc. 86 at 4.) "There is no ambiguity as to when the events that potentially triggered coverage occurred, the FAC clearly alleges that Shaw did not provide any services or personnel until OxyChem began decommissioning work in 2008—well outside Liberty's coverage period." (*Id*.)

Liberty concedes that the Fifth Amended Complaint does allege that " '[f]rom on or about 2004 . . . [Shaw] undertook to provide for and supervise workplace safety in and around the subject facility,' 'to monitor worker and workplace mercury levels,' " and " 'to oversee and implement workplace safety protocols.' " (*Id*. at 5 (quoting Docs. 85 at 19 and 85-10 at 8–9, ¶¶ 14(c), 15(b) and 15(c)).) But, according to Liberty,

the Fifth Amended Complaint provided a clear basis to conclude that the occurrence and damage occurred outside the policy periods, because plaintiffs also allege, "[i]n 2010, one or more of the Oxy Defendants contracted with Co-Defendant Shaw Maintenance, for continued services of the same nature, related to facility decommissioning work that had commenced in 2008, and took over as the [']named['] employer for some or all of the Shaw Plaintiffs who were prior to that time, employed by Co-Defendant . . . Shaw Global." Put simply, although the Fifth Amended Complaint alleges Shaw "undertook to provide and supervise workplace safety" from 2004, the other paragraphs clarify that this work did not "commence" until 2008 when the decommissioning work began.

(*Id*. at 5–6 (quoting Doc. 85-10 at 15, ¶ 34).)

### D. Discussion

#### 1. Policy Provisions and Allegations of First Amended Complaint

The parties largely agree on the parts of the First and Fifth Amended Complaints and the Liberty Policies relevant to determining whether the Liberty Policies provided coverage or at least triggered Liberty's duty to defend Shaw in the *Abernathy* litigation. It is of course the conclusions to be drawn from those "eight corners" about which there is vehement disagreement.

The Abernathy Lawsuit concerned injuries and deaths resulting from exposure of workers to toxic levels of mercury caused at a chlor-alkali plant in Muscle Shoals, Alabama operated by OxyChem. (*See generally*, Doc. 83-3 at 8–13, ¶¶ 27–57.) The Liberty Policies protected against personal injury or property damage caused by an "occurrence" that took place in the "coverage territory" during the "policy period" of 2003 to 2005. (Doc. 80-1 at 5 (citing Doc. 25-2 at 9 and 25-3 at 9).)

According to the FAC, the defendants included four Shaw entities: Shaw Management Services One, Inc. ("Shaw Management"), (Doc. 83-3 at 4, ¶ 7.a.);[11] the Shaw Group, Inc. ("Shaw Group"), (*id*. at 6, ¶ 15.a.); Shaw Global Energy Services, LLC F/K/A Shaw Global Energy Services, Inc. ("Shaw Global"), (*id*. at 7, ¶ 16.a.); and Shaw Maintenance, Inc. ("Shaw Maintenance"), (collectively "Shaw Defendants" or "Shaw"), (*id*. at ¶ 17.a.) Plaintiffs in the Abernathy Lawsuit were former or current employees of Shaw Global and/or Shaw Maintenance ("Shaw Plaintiffs"). (*Id*. at 4, ¶ 6.)

It alleged that "[f]rom 2004 and extending through July 2010, Shaw Global contracted with co-defendant Oxy-Chem to provide services and personnel to decommission and dismantle a portion of the subject facility as is hereafter set out." (*Id*. at 7, ¶ 16.b.) It is alleged that "[f]rom 2008 *and at all times material hereto*, Shaw Management undertook to provide for and supervise workplace safety in and around the subject facility and to monitor worker and workplace mercury levels . . . ." (*Id*. at 4, ¶ 7.b. (emphasis added).) It alleged that "[f]rom 2008 *and at all times material hereto*, the Shaw Group undertook to establish rules and policies to ensure workplace safety . . . [and] to oversee and implement a mercury testing program for the Shaw Plaintiffs." (*Id*. at 6, ¶¶ 6.b. and 6.c.) (emphasis added).) In addition, it alleged that by virtue of a 2010 contract with OxyChem, Shaw Maintenance "succeeded . . . Shaw Global in providing services and personnel to decommission and dismantle a portion of the subject facility . . ." (*Id*. at 7, ¶ 17.b.)

The FAC also alleged that "[a]s of 2004, the OxyChem facility was the single greatest source of mercury air emissions in Alabama", (*id*. at 10, ¶ 34), "[and] [b]y its own reckoning, in 2003 and 2004 alone, OxyChem released over 3000 pounds of mercury at and around its facility, most of it into the air in vapor form[,]" (*id*. at ¶ 35). It alleges that "[i]n 2008, OxyChem began the

---

[11] While the First Amended Complaint is included in different parts of the record, the Court will refer primarily to Doc. 83-3.

process of decommissioning the outdated facility and demolishing/dismantling it for proper disposal." (*Id*. at 11, ¶ 36.) Importantly, the FAC alleged that "*[a]t times material hereto*, the Shaw Plaintiffs came into contact with mercury at the subject facility, such as caused them toxic exposures." (*Id*. at ¶ 40 (emphasis added).)

Paragraph 47 of the FAC alleged that "Shaw Global had a duty not to act, or fail to act, in a manner that would expose non-employee workers to mercury or would otherwise endanger those workers as to mercury in or from the facility." (*Id*. at 12, ¶ 47.) The Shaw Plaintiffs were alleged, without reference to any specific date, to have been "exposed to mercury at or from the subject facility and, in direct and proximate relationship thereto, suffered personal injuries and damages . . . ." (*Id*. at 13, ¶ 55.) One worker, Bobby Ray Abernathy is alleged to have, on January 25, 2010, "died from the effects of mercury poisoning . . . related to his exposure to toxic levels of mercury exposure at the subject facility[,]" but the allegation provided no dates of exposure. (*Id*. at ¶ 54.)

Paragraph 60 of the FAC itemized specific acts and omissions of all defendants, including Shaw Global. There was no allegation tying these acts and omissions to a given date or dates.

### 2. Standard for Invoking Duty to Defend

The standard for an insurer's duty to defend is well known.

> In general, a liability insurer owes two duties to its insured: the duty to defend and the duty to indemnify. Although related, an insurer's duty to defend is separate and distinct from its duty to indemnify. *Cambridge Integrated Servs. Grp., Inc. v. Concentra Integrated Servs., Inc.*, 697 F.3d 248, 254 (5th Cir. 2012) (applying Louisiana law); *Morad v. Aviz*, No. CV 12-2190, 2013 WL 1403298, at *3 (E.D. La. Apr. 5, 2013); *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 872 (5th Cir. 2009).

> Under Louisiana law, whether the insurer owes a duty to defend is determined by application of the "eight corners rule," which directs the court to examine the four corners of the complaint and the four corners of the insurance policy without resort to extrinsic evidence.

> *Arch Ins. Co. v. Outreach Cmty. Dev. Corp.*, No. CV 15-721, 2017
> WL 8944048, at *5 (M.D. La. Dec. 21, 2017) (deGravelles, J.)
> (citing *Mossy Motors, Inc. v. Cameras Am.*, 04-0726 (La. App. 4
> Cir. 3/2/05), 898 So. 2d 602, 606); Martco, 588 F.3d at 872; *Moore
> v. Home Depot USA, Inc.*, 352 F. Supp. 3d 640, 649 (M.D. La. 2018)
> (Jackson, J.). If the facts alleged in the complaint could "possibly
> fall within matters covered under the policy," then the duty to defend
> is triggered. *Arch Ins.*, 2017 WL 8944048, at *5 (citing *Martco*, 588
> F.3d at 872). Although many of the claims alleged may be clearly
> precluded under an applicable policy exclusion, if the complaint
> discloses "a single allegation" for which coverage is "not
> unambiguously excluded," a duty to defend nevertheless exists. Id.
> (citing *Hanover Ins. Co. v. Superior Labor Servs., Inc.*, No. CV 14-
> 1930, 2017 WL 2973079, at *9 (E.D. La. July 12, 2017)).

*Endurance Am. Ins. Co. v. ABC Caulking Contractors, Inc.*, No. CV 20-174-JWD-RLB, 2021 WL
4097142, at *7 (M.D. La. Sept. 8, 2021) (deGravelles, J.).

In determining whether an insurer has a duty to defend, the "Court must liberally interpret
the complaint." *Lamar Advert. Co. v. Cont'l Cas. Co.*, 396 F.3d 654, 660 (5th Cir. 2005) (citing
*Compl. of Stone Petrol. Corp.*, 961 F.2d at 91).)

### 3. Analysis

Liberty argues that the FAC did not trigger its duty to defend because there was no
allegation of wrongdoing or injury which occurred in the 2003-2005 time period. "There are no
allegations that Shaw began any work [at the OxyChem plant] before 2008, and there are no
allegations of personal injury occurring within the 2003-2005 coverage period." (Doc. 80-1 at 7.)
And although there is an "allegation that a Shaw entity entered into a contract in 2004, there are
no allegations that Shaw did (or did not do) anything under this contract, and there are no
allegations of 'personal injury' caused by Shaw during the coverage period resulting from this
contract or otherwise." (*Id.*)

27

Liberty parses the FAC far too thin, especially given the standard the Court must follow, i.e., construing the complaint liberally, and "if the complaint discloses a single allegation for which coverage is not unambiguously excluded, a duty to defend exists." *Endurance Am. Ins. Co.,* at *7 (cleaned up). The FAC alleged that Shaw Global contracted with OxyChem beginning in 2004 to provide services and personnel to decommission and dismantle a portion of the subject facility, (Doc. 83-3 at 7, ¶ 16.b.); that "[a]s of 2004, the OxyChem facility was the single greatest source of mercury air emissions in Alabama[,] [and] [b]y its own reckoning, in 2003 and 2004 alone, OxyChem released over 3000 pounds of mercury at and around its facility, most of it into the air in vapor form[,]" (Doc. 83-3 at 10, ¶¶ 34, 35); and that "*[a]t times material hereto*, the Shaw Plaintiffs came into contact with mercury at the subject facility, such as caused them toxic exposures[,]" (*id*. at 11, ¶ 40 (emphasis added).) Employees of Shaw Global were included among the "Shaw Plaintiffs." (*Id*. at 4, ¶ 6.) A reasonable inference to be drawn from these allegations is that 2003 and 2004 were "times material" to the allegations during which Shaw Global contracted to and did provide services and personnel to the OxyChem plant and during which time workers were exposed. Certainly, this inference is not clearly and unambiguously excluded.

Further, the FAC alleged that "Shaw Global had a duty not to act, or fail to act, in a manner that would expose non-employee workers to mercury or would otherwise endanger those workers as to mercury in or from the facility." (*Id*. at 12, ¶ 47.) The Shaw Plaintiffs are alleged, without reference to any specific date, to have been "exposed to mercury at or from the subject facility and, in direct and proximate relationship thereto, suffered personal injuries and damages . . . ." (*Id*. at 13, ¶ 55.) Of the acts and omissions that all defendants (including Shaw Global) are alleged to have committed causing Plaintiffs' injuries and death (again without any time limitation), all seem to be related to the general operation of the plant and none limited merely to its decommissioning.

(*Id*. at 14–16, ¶¶ 59, 60.a.–60.k.) While the First Amended Complaints alleged that "the process of decommissioning the outdated facility" began in 2008, (*id*. at 11, ¶ 36), this at most, creates an ambiguity and, given the other allegations mentioned above, does not unambiguously exclude coverage.

Therefore, the Court denies Liberty's Renewed MSJ insofar as it seeks dismissal of Shaw's breach of contract and bad faith claims based on Liberty's alleged misrepresentations and failure to defend Shaw. The Court does the same as to Liberty's failure to defend the Fifth Amended Complaint where the following allegation makes the material time frame even clearer. (Doc. 85-10 at 8, ¶¶ 14.c–14.d.) ("From at or about 2004 . . . the Shaw Group further undertook . . . singly or in conjunction [with] . . . one or more Co-Defendant[s][ ] to oversee and implement workplace safety protocols, including those related to mercury exposure, on-site at the subject facility . . . [and] to advise workers on-site as to the risks of on-site mercury exposure.") *See also id*. at 9, ¶¶ 15b.–15.d., where similar allegations were made against Shaw Management.

## XIII.  ARE THERE QUESTIONS OF FACT WHICH PRECLUDE SUMMARY JUDGMENT OF THE ISSUE OF LIBERTY'S ALLEGED BAD FAITH?

Liberty argues that "Shaw's bad faith claim should be dismissed for the threshold reason that Liberty did not owe any duty to defend Shaw based upon the FAC." (Doc. 80-1 at 15.) In the alternative, Liberty argues that even if it did have a duty to defend, "[w]hen an insurer withholds a defense based on a genuine (good faith) dispute about coverage—i.e., if there is not a 'clear duty to defend' based on the policies' terms—an insurer cannot be said to have acted arbitrarily and capriciously as required to state a bad faith claim." (*Id*. at 16 (quoting *XL Specialty Ins. Co. v. Bollinger Shipyards, Inc*., 954 F. Supp. 2d 440, 447–48 (E.D. La. 2013).) Thus, argues Liberty, it could not possibly be found to have acted arbitrarily and capriciously. (*Id*.)

Shaw counters that even if this Court is not convinced that Liberty's "actions unequivocally entitle Shaw to recover penalties pursuant to" Louisiana's insurance bad faith statutes, "genuine issues of material fact preclude disposal of Shaw's bad faith claims on summary judgment." (Doc. 85 at 22 (citing *Brooks v. Safeco Ins. Co. of Am.*, No. 16-309, 2017 WL 8944056 at *4 (M.D. La. Nov. 13, 2017) (deGravelles, J.)).)

Here, the Court agrees with Shaw. Whether or not Liberty's denial of coverage was, under the facts alleged in the First through Fifth Amended Complaints, and as known to Liberty, arbitrary and capricious is a question of fact for the jury to decide.

> Whether an insurer's conduct is arbitrary and capricious is also finding of fact. [15 William Shelby McKenzie & H. Alston Johnson, III, La. Civ. L. Treatise: Insurance Law and Practice § 11:5 (4th ed. 2020)]. The Louisiana Supreme Court has cautioned that summary judgment is rarely appropriate when determining if an insurers actions were arbitrary and capricious. In *Merwin v. Spears*, 2012-0946 (La. 6/22/12), 90 So. 3d 1041, 1042, the Louisiana Supreme Court reversed a district court's grant of summary judgment explaining:
>
> > [F]or purposes of plaintiffs' penalty claim, the issue is whether Farmers' failure to make timely payment was arbitrary, capricious, or without probable cause. La. R.S. 22:1892. We conclude there are genuine issues of material fact as to whether Farmers' initial decision to deny the claim, based on its investigation and consultation with plaintiffs' expert, was reasonable under the totality of the facts. Therefore, the district court erred in granting summary judgment on this issue.
>
> *Merwin v. Spears*, 2012-0946 (La. 6/22/12), 90 So. 3d 1041, 1042.

*Lamar Advert. Co. v. Zurich Am. Ins. Co.*, No. CV 18-1060-JWD-RLB, 2021 WL 1200215, at *16 (M.D. La. Mar. 29, 2021). *See also Sacks v. Allstate Prop. & Cas. Ins. Co.*, No. CV 16-16578, 2017 WL 4791179, at *4 (E.D. La. Oct. 24, 2017) (Fallon, J.); *Brooks v. Safeco Ins. Co. of Am.*,

2017 WL 8944056 at *4; *Barnes v. Com. & Indus. Ins. Co.*, No. CIV.A. 11-0041, 2013 WL 2644456, at *2 (W.D. La. June 11, 2013) (Stagg, J.).

The case relied upon by Liberty, *XL Specialty Ins. Co. v. Bollinger Shipyards, Inc.,* is distinguishable for the same reason Judge Fallon found it to be so in *Paternostro v. Choice Hotel Int'l Servs. Corp.*, No. CIV.A. 13-0662, 2015 WL 471784, at *6 (E.D. La. Feb. 4, 2015)

> [I]n *XL Specialty Ins. Co. v. Bollinger Shipyards, Inc.*, 954 F. Supp. 2d 440, 446 (E.D. La. June 24, 2013), Judge Vance ruled that there was no duty to defend where the insurance policy explicitly provided the permissive right to defend but did not require a mandatory duty to defend until exhaustion occurred. *Id.* Unlike the language of the insurance policies in those two cases, which only invoked the duty to defend under one scenario—exhaustion—here the Allied World Policies also provide for the duty to defend under the second prong, irrespective of exhaustion. Therefore, the cases are distinguishable.

*Paternostro v. Choice Hotel Int'l Servs. Corp.*, 2015 WL 471784, at *6.

Here, like in *Paternostro*, and unlike *Bollinger Shipyards*, Liberty had a duty to defend not dependent on exhaustion. Whether or not Liberty's refusal to defend was arbitrary and capricious under the facts and circumstances of this case is a question of fact. Summary judgment on this issue is therefore denied.

## XIV.   CONCLUSION

In Conclusion, *Liberty Mutual Fire Insurance Company's Motion for Summary Judgment* (Doc. 80) is **GRANTED** in part and **DENIED** in part.

The Motion is **GRANTED** and judgment rendered in favor of Liberty and against Shaw in the amount of $1,250,000 subject to a credit for amounts Shaw paid directly to Liberty to satisfy its deductible obligation, said amount to be determined at trial.[12]

---

[12] As stated above, this amount cannot be determined with precision from the record. There is a minor discrepancy in the position of the parties as to the amount Shaw allegedly paid as a result of its alleged "administrative error." Liberty claims that amount is $60,834.37. (Doc. 1 at 12, ¶ 46.) Shaw claims that it is $62,242.65. (Doc. 56 at 15, ¶ 60; *id.* at

The Motion is **GRANTED** and judgment rendered in favor of Liberty and against Shaw declaring that Shaw must pay the late payment charges pursuant to the Deductible Guarantee, from a date to be determined at trial until paid.

The Motion is **GRANTED** and judgment rendered in favor of Liberty and against Shaw declaring that Liberty is entitled to enforce its rights against Shaw's Letter of Credit in the amount of $1.250,000 less payments made by Shaw directly to Liberty in satisfaction of its deductible obligation, that amount to be determined at trial.

In all other respects, the Motion is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>March 15, 2023</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

16–17, ¶ 71; Doc. 83-11 at 9–10, ¶ 31.) This results in a difference in the amount Liberty claims from Shaw net of amounts paid by Shaw directly to Liberty. It is $749,583.63, according to Liberty. (Doc. 1 at 19, ¶ 82) It is $748,130.35, if Shaw's figures are correct. This discrepancy cannot be resolved on summary judgment.