## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

**LIBERTY MUTUAL FIRE INSURANCE
COMPANY**

                                    **CIVIL ACTION**

**VERSUS**

                                    **NO. 20-871-JWD-RLB**

**THE SHAW GROUP, INC. (n/k/a CB&I
GROUP, INC.)**

## RULING ON LIBERTY MUTUAL INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Before the Court is *Liberty Mutual Insurance Company's [Third] Motion for Summary Judgment* (Doc. 121) ("*Motion*" or "*Third MSJ*")[1] filed by plaintiff Liberty Mutual Insurance Company ("Liberty" or "Plaintiff"). It is opposed by defendant The Shaw Group, Inc (n/k/a CB&I Group, Inc. ("Shaw" or "Defendant").[2] Liberty filed a reply. (Doc. 128.) The Court has carefully considered the law, facts in the record, and arguments and submissions of the parties and is prepared to rule. For the reasons which follow, the *Motion* is granted in part and denied in part.

## I.        FACTUAL AND PROCEDURAL BACKGROUND

It is necessary to again review parts of the extensive factual and procedural history of the case in order to give context for Liberty's *Motion*. However, the Court will review only those parts of the history relevant to the issues raised in this *Motion*.[3]

This dispute concerns two commercial general liability insurance policies issued by Liberty to Shaw covering the policy periods of September 1, 2003, to September 1, 2004, (Doc. 25-2), and

---

[1] Liberty's first motion for summary judgment ("*Original MSJ*"), (Doc. 25), was denied without prejudice. (Doc. 42.) Liberty's second motion for summary judgment ("*Renewed MSJ*"), (Doc. 80), was granted in part and denied in part. (Doc. 94.)

[2] The Court notes that Liberty's caption on its Motion shows Shaw as n/k/a McDermott International, Inc.

[3] A more complete procedural history up until the ruling on Liberty's *Renewed MSJ* can be found at Doc. 94 at 1–6.

1

September 1, 2004, to September 1, 2005, (Doc. 25-3) (collectively, the "Policies"). (Doc. 123-1 at 1, ¶ 1;[4] *see also* Doc. 80-1 at 5–6; Doc. 80-2 at 2, ¶ 1.) Each Policy had a $1.5 million aggregate limit, subject to deductibles of $500,000 and $750,000, respectively. (Doc. 25-2 at 1, 42; Doc. 25-3 at 1, 42.)

Endorsements to each Policy required Shaw to reimburse Liberty for both damages and defense costs, including amounts paid in settlement, "up to the deductible amount" for a covered claim. (Docs. 25-2 and 25-3 at 42.) Both Liberty and Shaw agree that the "deductible" included both settlement proceeds and defense costs. (Doc. 80-2 at 3, ¶ 7; Doc. 85-1 at 3, ¶ 7; *see also* Doc. 18-1 at 5–6; Doc. 52 at 1–3.) Thus, while Liberty might advance the entire $3 million limit, Shaw's deductible requirements had the effect of reducing the Policies' limits so that Shaw would owe $1.25 million in deductible reimbursement when Liberty expended the full $3 million. (Doc. 18-1 at 7.)

Shaw purchased a third primary insurance policy from Chartis Specialty Insurance Company, n/k/a AIG Specialty Insurance Company ("AIG") for the same time periods covered by Liberty's Policies ("AIG Policy").[5] (Doc. 85-1 at 20–21, ¶¶ 26–27.) The AIG Policy had a $1 million deductible. (*Id.*)

In 2012, certain Shaw affiliates[6] were named as defendants in the First Amended Complaint of litigation involving the alleged exposure of certain workers to harmful levels of mercury at a plant owned and operated by Occidental Chemical Corporation ("Occidental" or "OxyChem").

---

[4] Doc. 123-1 is Shaw's *Response to Liberty Mutual Fire Insurance Company's Statement of Uncontested Facts and Statement of Additional Material Facts which are Relevant to Motion*, which incorporates Liberty's asserted uncontested fact and Shaw's response. Because it incorporates both, the Court will, for convenience, refer to this document only. Unless indicated otherwise, the facts recited herein are either admitted, qualified, or denied in such a way as to not dispute the asserted fact. *See* M.D La. Civ. R. 56(c), (f).

[5] Contractor's Pollution Liability Policy No. CPO 61823904. (Doc. 85-1 at 20, ¶ 26.)

[6] "Shaw" will be used herein to include both Shaw and these affiliates. Liberty does not dispute that Shaw and its affiliates are named insureds under the Liberty Policies.

(Doc. 123-1 at 2, ¶ 3; *see also* Doc. 80-2 at 4, ¶ 16; Doc. 85 at 5) ("Abernathy Lawsuit").)[7] On November 15, 2013, Shaw demanded defense and indemnity from Liberty with respect to the Abernathy Lawsuit. (Doc. 80-2 at 5, ¶ 17.)

Shaw claims that Liberty repeatedly rejected Shaw's tender and wrongfully denied coverage. (Doc. 85-1 at 18, ¶ 20.) From Liberty's perspective, the initial rejection was because of multiple coverage defenses. (Doc. 80-2 at 5–6, ¶¶ 19–20.) In any event, after some 17 months, on June 5, 2015, Liberty agreed to participate in Shaw's defense subject to a reservation of rights. (Doc. 123-1 at 2–3, ¶ 4; *see also* Doc. 85-1 at 18, ¶ 20; Doc. 80-2 at 6, ¶ 20.)

According to Shaw, during the 17 months in which Liberty refused to defend Shaw, Shaw's other primary insurer, AIG, incurred some of the costs of defending Shaw in the Abernathy Lawsuit. (Doc. 85-1 at 19, ¶ 22.) Shaw claims that the AIG Policy paid "defense costs of at least $666,978.96 for which Liberty was responsible . . . ." (*Id.* at 19, ¶ 22.)[8] In addition, Shaw claims that it was forced to incur "at least $150,831.07" in "post-tender defense cost[s,]" (*id.*),[9] i.e., defense costs which Shaw paid directly to third parties. When these amounts are combined with the amounts paid by Shaw directly to Liberty, Shaw claims that it "fully satisfied and, in fact, has overpaid the deductibles." (*Id.*)

In or around December 2019, Shaw and its insurers settled the Abernathy Lawsuit, (Doc. 10 at 27, ¶ 48), for a total of $26,543,092.50, (Doc. 123-1 at 4, ¶ 7; Doc. 85-1 at 10, ¶ 23; *see also* Doc. 80-2 at 6, ¶ 23; Doc. 18-4 at 1, 3, ¶ 1.) Of that amount, Liberty contributed $3 million, and AIG contributed $3.3 million. (Doc. 85-1 at 10, ¶ 23; *see also* Doc. 80-2 at 6, ¶ 23.) Other insurers

---

[7] *Abernathy, et al. v. Occidental Petroleum Corporation, et al.*, No. 2011-900266, was originally filed in the Circuit Court of Colbert County, Alabama. Both parties refer to this as the "Abernathy Lawsuit", and so will the Court. The first through seventh amended complaints of the Abernathy Lawsuit are found at Doc. 85-6 through Doc. 85-12.

[8] In earlier briefing, Shaw used a slightly different number: $665,591.56. (Doc. 23 at 6 (citing Doc. 10, ¶¶ 33–34, 38).)

[9] In earlier briefing, Shaw claimed $155,894.82 was paid by it directly for its defense. (Doc. 123 at 4, citing Doc. 23 at 7 (citing Doc. 10 at 26, ¶ 40).) However, its opposition to this Motion, Shaw states that the correct amount is $150,831.07. (Doc. 123 at 4, n. 15, citing Doc. 85-14 at 8, ¶ 24.)

paid the rest. (*Id.*)

In March of 2020, in connection with the settlement of the Abernathy Lawsuit, Shaw and its insurers entered into a Settlement and Mutual Release Agreement ("Insurance Settlement") (Doc. 123-1 at 3–4, ¶ 6; *see also* Doc. 18-4 (Insurance Settlement); Doc. 80-2 at 6, ¶ 22). It sets forth the various amounts that the respective parties would contribute to fund the settlement. (*Id.*; *see also* Doc. 25-5 at 3, ¶ 1.) It also purports to settle certain claims as between Shaw and its insurers but reserves certain rights to both Shaw and Liberty. (Doc. 80-2 at 6, ¶ 24; Doc. 25-5 at 3–6, ¶¶ 2, 4, 7, 10.)

In May of 2020, Liberty demanded full payment of $1.25 million for deductibles and threatened to sue Shaw should it fail to pay (or commit to pay) the full amount within twenty-one days. (Doc. 85 at 12.) On December 23, 2020, Liberty sued Shaw in this Court, (Doc. 1), demanding $749,538.63 representing, Liberty alleges, that part of the $1.25 million deductible not reimbursed by Shaw, (*id.* at 14, ¶ 54), plus late payment charges, (*id.* at 18, ¶ 76).

On April 23, 2021, Shaw filed an answer and counterclaim ("*Original Counterclaim*"). (Doc. 10.) In it, Shaw denied responsibility and liability for the amounts claimed by Liberty, (*see id.* at 35–36), and further claimed that by virtue of Liberty's wrongful conduct, Liberty owed Shaw damages for unjust enrichment, breach of contract and bad faith under Louisiana Revised Statutes § 22:1973, (*id.* at 31–35, ¶¶ 67–91).

On June 4, 2021, Liberty filed a motion to dismiss Shaw's counterclaim ("*Original MTD*"). (Doc. 18.) Shaw filed an opposition, (Doc. 23), and Liberty filed a reply, (Doc. 29). On March 25, 2022, the Court issued a ruling granting in part and denying in part Liberty's *Original MTD* ("*Original MTD Ruling*"). (Doc. 53.) The *Original MTD Ruling* granted six parts of Liberty's *Original MTD* and denied the remaining parts. (*Id.* at 46–47.) Specifically, the Court ruled, in

pertinent part, as follows:

1) Liberty's [*Original MTD*] is **GRANTED** insofar as Shaw claims a credit for or right of reimbursement of AIG's payments of $665,591.56, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

2) Liberty's [*Original MTD*] is **GRANTED** insofar as Shaw claims a credit for $155,894.82 based on Shaw's contention that Shaw's payments to third parties reduced its deductible obligation to Liberty, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

3) Liberty's [*Original MTD*] is **GRANTED** insofar as Shaw claims amounts allegedly "overpaid" above the Liberty Policies' combined deductibles of $1,250,000, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

4) Liberty's [*Original MTD*] is **GRANTED** to the extent Shaw is demanding repayment of amounts paid by Shaw directly to Liberty (approximately $501,869.65) based on the assumption that Shaw is entitled to take credit for the amounts paid by AIG, and this claim is **DISMISSED WITHOUT PREJUDICE**.

5) Liberty's [*Original MTD*] is **GRANTED** as to Shaw's bad faith claims for Liberty's alleged (a) seeking to recover from Shaw deductible amounts that had already been satisfied and/or that Liberty was aware Shaw disputed, and (b) wrongfully threatening to draw on Shaw's letter of credit for amounts not due, and these claims will be **DISMISSED WITHOUT PREJUDICE**.

6) Liberty's [*Original MTD*] is **GRANTED** insofar as Shaw claims damages for unjust enrichment, and this claim will be **DISMISSED WITHOUT PREJUDICE**.

(*Id.* at 46–47.)

The Court also granted Shaw 28 days "in which to amend the Counterclaim to cure the deficiencies detailed in this ruling." (*Id.* at 47.)

In July of 2021, Liberty filed its "*Original MSJ*", (Doc. 25), which was opposed by Shaw, (Doc. 35). Liberty filed a reply. (Doc. 41.) The Court denied Liberty's *Original MSJ* without prejudice to permit Shaw an opportunity to complete the discovery it requested in connection with its Rule 56(d) request. (Doc. 42.)

On April 27, 2022, Shaw filed *CB&I Group Inc.'s First Amended and Restated Counterclaim* ("*Amended Counterclaim*"). (Doc. 56.) Liberty then filed *Liberty Mutual Insurance Company's Motion to Dismiss First Amended and Restated Counterclaim* ("*Renewed MTD*"), (Doc. 61), which Shaw opposed, (Doc. 66). Liberty filed a reply. (Doc. 69.) On February 9, 2023, the Court issued its ruling granting in part and denying in part Liberty's *Renewed MTD*. (Doc. 91.) Pertinent to the present *Motion*, the Court ruled as follows:

1) Liberty's [*Renewed MTD*] is **GRANTED** insofar as Shaw claims a credit for or right of reimbursement of AIG's payments of $665,591.56, and this claim will be **DISMISSED WITH PREJUDICE**.

2) Liberty's [*Renewed MTD*] is **GRANTED** insofar as Shaw claims a credit for $155,894.82 based on Shaw's contention that Shaw's payments to third parties reduced its deductible obligation to Liberty, and this claim will be **DISMISSED WITH PREJUDICE**.

3) Liberty's [*Renewed MTD*] is **GRANTED** insofar as Shaw claims amounts allegedly "overpaid" above the Liberty Policies' combined deductibles of $1,250,000, and this claim will be **DISMISSED WITH PREJUDICE**.

4) Liberty's [*Renewed MTD*] is **GRANTED** to the extent Shaw is demanding repayment of amounts paid by Shaw directly to Liberty (approximately $501,869.65) based on the assumption that Shaw is entitled to take credit for the amounts paid by AIG, and this claim is **DISMISSED WITH PREJUDICE**.

5) Liberty's [*Renewed MTD*] is **GRANTED** as to Shaw's bad faith claims for Liberty's alleged (a) seeking to recover from Shaw deductible amounts that had already been satisfied and/or that Liberty was aware Shaw disputed, and (b) wrongfully threatening to draw on Shaw's letter of credit for amounts not due, and these claims will be **DISMISSED WITH PREJUDICE**.

6) Liberty's [*Renewed MTD*] is **GRANTED** insofar as Shaw claims damages for unjust enrichment, and this claim will be **DISMISSED WITH PREJUDICE**.

(*Id.* at 31–32.)

On September 2, 2022, Liberty filed its "*Renewed MSJ*." It was opposed by Shaw, (Doc. 85), and Liberty filed a reply, (Doc. 86). Pertinent to the present *Motion*, the Court ruled as follows:

In Conclusion, *Liberty Mutual Fire Insurance Company's* [*Renewed MSJ*] (Doc. 80) is **GRANTED** in part and **DENIED** in part.

The [*Renewed MSJ*] is **GRANTED** and judgment rendered in favor of Liberty and against Shaw in the amount of $1,250,000 subject to a credit for amounts Shaw paid directly to Liberty to satisfy its deductible obligation, said amount to be determined at trial.[10]

The [*Renewed MSJ*] is **GRANTED** and judgment rendered in favor of Liberty and against Shaw declaring that Shaw must pay the late payment charges pursuant to the Deductible Guarantee, from a date to be determined at trial until paid.

The [*Renewed MSJ*] is **GRANTED** and judgment rendered in favor of Liberty and against Shaw declaring that Liberty is entitled to enforce its rights against Shaw's Letter of Credit in the amount of $1[,]250,000 less payments made by Shaw directly to Liberty in satisfaction of its deductible obligation, that amount to be determined at trial.

(Doc. 94 at 31–32.)

More specific to issues raised here, the Court wrote:

While, for purposes of this Renewed MSJ, the Court is not bound by its previous rulings, the Court has reviewed the issues raised here twice before and reached the same conclusion each time. The Court sees nothing in Shaw's opposition to the present motion, (*see e.g.*, Doc. 85 at 6–7, 9, 23–24), that is different from its previous arguments and Shaw has raised no questions of fact which preclude granting a summary judgment on this issue. For the reasons given in its prior rulings, (Doc. 53 at 34; Doc. 91 at 21–23), the Court rejects Shaw's arguments. Summary judgment is granted on Liberty's Renewed MSJ ruling that Shaw is not entitled to a credit or offset for the $150,831.07 it paid in defense costs before Liberty assumed its defense. . . .

[A]lthough the Court ruled as a matter of law that the Policies do not give Shaw the automatic credit it seeks for the $150,831.07 it paid to third parties in defense costs, it also ruled that Shaw has a right to pursue this amount in its claims for breach of contract and for bad faith, as is discussed in detail in another part of this ruling. (*See also* Doc. 53 at 34–41.)

(*Id.* at 13.)

---

[10] As stated in the Court's ruling, this amount could not be determined with precision from the record. There is a minor discrepancy in the position of the parties as to the amount Shaw allegedly paid as a result of its alleged "administrative error." Liberty claims that amount is $60,834.37. (Doc. 1 at 12, ¶ 46.) Shaw claims that it is $62,242.65. (Doc. 56 at 15, ¶ 60; *id.* at 16–17, ¶ 71; Doc. 83-11 at 9–10, ¶ 31.) This results in a difference in the amount Liberty claims from Shaw. It is $749,583.63, according to Liberty. (Doc. 1 at 19, ¶ 82.) It is $748,130.35, if Shaw's figures are correct. This discrepancy could not be resolved on summary judgment.

The Court renewed its ruling with respect to Shaw's claim for a credit for amounts AIG paid third parties for defense costs.

> Like the previous issue, this is one which the Court has considered and ruled on in two separate rulings. (Doc. 53 at 29–34; Doc. 91 at 19–20.) The Court is unmoved by Shaw's latest briefing which adds no new legal arguments nor does it raise any disputed material fact issues. Accordingly, summary judgment is granted on Liberty's Renewed MSJ, ruling that Shaw is not entitled to a credit or offset for the $666,978.96 AIG paid in defense costs in the Abernathy Lawsuit.

(Doc. 94 at 14.)

In the present *Motion* (Liberty's *Third MSJ*), Liberty asks the Court to (1) dismiss Shaw's remaining counterclaims for breach of the insurance contract and bad faith since Shaw released those claims in the Insurance Settlement; (2) require Shaw to pay a late payment charge under the parties' "Master Agreement for Guarantee of 'Deductible' and/or 'Loss Limit' reimbursement # 7022"; and (3) require Shaw to pay prejudgment interest on the principal amount and late payment charge. (Doc. 121 at 1–2.) These issues will be considered separately.

## II.    WERE SHAW'S REMAINING CLAIMS RELEASED IN INSURANCE SETTLEMENT?

### A.  Summary of Parties' Arguments

#### 1.  *Liberty's Argument re Released Claims*

Reduced to its essence, Liberty argues that when Shaw entered into the Insurance Settlement reached in the Abernathy Lawsuit, it agreed to the Settlement's broad release of Liberty "from any claims for 'bad faith,' 'attorney fees,' 'claims for defense,' 'statutory penalties of any kind,' or for 'equitable relief.' " (*Id.* at 10–11 (cleaned up) (citing Doc. 25-5 at 3–4, ¶ 2); *see also id.* at 13.)[11] Thus, Shaw's counterclaims for breach of the insurance contract and bad faith were expressly released.

---

[11] More specifically,

Liberty recognizes that this Court earlier held that Shaw's counterclaims against Liberty for breach of contract and bad faith were not subject to the release and were preserved by virtue of Paragraph 10 of the Insurance Settlement because they "pertained" to Shaw's deductible claim. (*Id.* at 18 (citing the Court's ruling at Doc. 53).) But, argues Liberty, that ruling was in response to a 12(b)(6) motion where the Court based its ruling on the assumed truth of Shaw's allegations as it was required to do. "But this case is now far beyond the 12(b)(6) stage." (*Id.*)

Furthermore, and more fundamentally, the Court held then and in subsequent rulings that Shaw was not entitled to a credit or offset of its deductible obligation based on payments Shaw or its other insurer made for defense costs and dismissed those claims. (*Id.* at 18–19 (citing Doc. 53 at 32, 34; Doc. 91 at 6, 20, 23, 31; Doc. 94 at 13, 14).) Therefore, argues Liberty, any remaining claims for breach of the insurance contracts or bad faith

> are stand-alone claims untethered to the deductible claims. That now-failed theory is the only hook that Shaw's remaining claims had to Paragraph 10 of the Insurance Settlement. Shaw, therefore, cannot create a genuine dispute of material fact, and this Court's pre-discovery ruling under Rule 12(b)(6) does nothing to prevent the entry of summary judgment dismissing Shaw's remaining claims.

(*Id.* at 19–20.)

### 2. Shaw's Argument re Released Claims

Shaw acknowledges that the Court's earlier rulings "determined that Shaw was not entitled to a credit or offset to reduce its deductible obligations for defense costs paid to third parties . . . by . . . [AIG] in defense costs in the Abernathy Lawsuit. (Doc. 123 at 2; *see also id.* at 8.) Shaw

---

the Insurance Settlement broadly provides a release of 'any and all claims, actions, causes of action, obligations, indebtedness, breaches of duty, breaches of claims handling, bad faith . . . other equitable relief, . . . including attorneys' fees, claims for defense and/or indemnity and/or insurance coverage of any kind (including, but not limited to, any claims for bad faith whether known or unknown, . . . past or present . . . , relating to or arising out of the Underlying Lawsuits and the claims against Shaw that are being settled by the Shaw settlement[.]

(Doc. 121-1 at 13 (citing Doc. 25-5 at 3–4, ¶ 2).)

also concedes that "[a]dditionally, the Court found that the amounts paid by Shaw to third parties for defense costs 'cannot be deducted from Shaw's deductible obligation.' " (*Id.* at 8 (quoting Doc. 53 at 34).)

"However, in [this] same ruling, the Court [held] that Shaw had a right to pursue these costs in its claims for breach of contract and bad faith." (*Id.* at 8 (citing Doc. 53 at 34–41).) "The Court reiterated this holding in its ruling on Liberty's renewed MSJ." (*Id.* (citing Doc. 94 at 13 which, in turn, cites Doc. 53 at 34–41).) Therefore, concludes Shaw, "Shaw's remaining breach of contract claims and bad faith claims, both of which were based on defense costs that Shaw incurred as a result of Liberty's failure to defend, were preserved and not released through the Insurance Settlement." (*Id.*)

In response to Liberty's argument that the Court's earlier rulings on Liberty's motions to dismiss were made in the context of a Rule 12(b)(6) motion based on Shaw's *allegations* as opposed to the present motion for summary judgment, Shaw responds that "the Court's consideration of the Insurance Settlement expanded Liberty's motion to dismiss making it more akin to a motion for summary judgment." (*Id.* at 6.)

### 3. *Liberty's Reply re Released Claims*

Liberty reiterates its earlier arguments but emphasizes that

Shaw's argument ignores the distinction between a denial on a 12(b)(6) motion to dismiss based on the plaintiff's pleadings – which must be assumed true and considered under the narrow *Twombley* standard – and a motion for summary judgment filed after discovery is closed – based on undisputed facts, this Court's prior rulings, and the law, without any presumption of truthfulness.

(Doc. 128 at 2.)

Because the Court was required to apply the 12(b)(6) standard in considering Liberty's earlier motions to dismiss, the Court was required to accept as true Shaw's allegations that "its

counterclaims all 'pertained' to the deductible because they entitled Shaw to a credit or offset on the deductible obligations." (*Id.*) Those earlier rulings

> did not decide the issue of the release's applicability to Shaw's remaining counterclaims on summary judgment and does not bar this Court's consideration of this motion, based on the Court's subsequent rulings that none of the counterclaims, including these two remaining claims pertain to the deductible as a matter of law.

(*Id.*)

Based on the Court's earlier summary judgment ruling that Shaw is not entitled to a credit or offset on its deductible for the amounts it paid in defense costs, Shaw no longer has any counterclaim that "pertain[s]" to the deductible "as required to fall within the release's narrow exception." (*Id.* at 3.) "In other words, now that the Court has held multiple times [that] Shaw's counterclaims cannot impact the deductible, the remaining counterclaims do not 'pertain to the deductible[,]' and the narrow exception to the release is inapplicable." (*Id.* at 3–4.)

### B.  Discussion re Released Claims

The pertinent portions of the relevant paragraphs of the Insurance Settlement read as follows:

> 2.    <u>Shaw Release of Insurers</u>
> Except for and subject to the rights specifically reserved in Paragraph 10 below, with respect to the policies issued to Shaw . . . by the Insurers . . . and in consideration of . . . payments by the Insurers of the $26,543,092.50 required by the Shaw Settlement . . ., Shaw . . . hereby release[s], aquit[s], and discharge[s] the Insurers . . .  from any and all claims, actions, causes of actions, obligations, indebtedness, breaches of duty, breaches of claims handling, bad faith, claims for declaratory relief, claims for injunctive relief and other equitable relief, suits, liens, damages, losses, costs or expense, including attorney fees, claims for defense and/or indemnity and/or insurance coverage of any kind (including but not limited to, any claims for bad faith or statutory penalties of any kind) . . . past, present or future . . . relating to or arising out of the Underlying Lawsuits and the claims against Shaw that are being settled by the Shaw Settlement. . . . This reservation by Shaw is not inconsistent with, nor is it intended to nullify Liberty Mutual's . . . right to pursue collection of any deductibles owned under [its policy] . . . as specifically reserved below in paragraph[ ] 7.

11

***

7.    <u>Liberty Mutual's Reservation of Rights and Exceptions to Release of Shaw</u>
Notwithstanding . . . any other provision of this Agreement, and in consideration of
Liberty Mutual's payment on behalf of Shaw for the settlement memorialized in the
Shaw Settlement, Shaw and Liberty Mutual agree and acknowledge that the Shaw
Agreement and this Agreement are not intended to and do not alter or affect any
rights of Liberty Mutual or obligations of Shaw owed to Liberty Mutual under the
Liberty Mutual Policies. . . . Shaw and Liberty Mutual further agree that Liberty
Mutual's rights and claims to recover from Shaw arising out of the deductible
provisions of the Liberty Mutual Policies are expressly reserved, and are not
addressed, waived, released or affected by the Shaw Settlement or this Agreement.

***

10.    <u>Shaw's Exceptions to Release of Insurers</u>
Notwithstanding the agreements in the Shaw Settlement between certain Claimants
in the Lawsuits and . . . Shaw[,] . . . or any other provision of this Agreement, Shaw
and the Insurers agree and acknowledge that the Shaw Settlement and this
Agreement are not intended to and do not alter or affect any rights, claims or
defenses that Shaw may have *pertaining to the deductible claims* excepted and
reserved by the Insurers in Paragraph[ ] 7 . . . of this Agreement, and Shaw's rights,
claims and defenses are expressly reserved, and are not addressed, waived, released
or affected by the Shaw Settlement or this Agreement.

(Doc. 18-4 at 3–6, ¶¶ 2, 7, 10 (emphasis added).)

In its ruling on *Liberty's Original MTD*, the Court held as a threshold matter that Shaw's

counterclaim demanding a credit against its deductible obligation for amounts it and AIG paid

third parties in defense costs was not released in the Insurance Settlement's Paragraph 2 because

this claim "pertain[ed] to the deductible" and was thus specifically reserved to Shaw by Paragraph

10 of the same agreement. (Doc. 53 at 20–25.) Had the Court ruled otherwise, there would have

been no need to consider Liberty's other arguments in its *Original MTD*.

In this same ruling, the Court also held that "Shaw's claim meets the requirements for

breach of contract: the existence of an insurance contract between the parties, an alleged breach

and resulting damages. Shaw has therefore stated a claim for breach of contract for the recovery of damages caused by the breach, including [$150,831.07]." (*Id.* at 35 (citation omitted).) However, the Court emphasized:

> For purposes of the present *Motion* [*to Dismiss*], these allegations must be taken as true and viewed in the light most favorable to Shaw . . . . Furthermore, as this Court has already explained, because these allegations are alleged to have adversely affected Shaw's deductible obligation, they "pertain" to the deductible and were reserved in the Insurance Settlement.

(*Id.*)

In this first ruling on Shaw's bad faith claim, the Court denied Liberty's motion to dismiss Shaw's claim of "willfully misrepresenting facts giving rise to Shaw's exposure in the Abernathy Lawsuit and the provisions in Liberty's Policies in order to wrongfully deny coverage." (*Id.* at 40.) But this ruling also was premised on its "[a]ssuming the truth of Shaw's allegations and drawing all reasonable inferences in favor of Shaw . . . ." (*Id.*)

In its ruling on Liberty's *Renewed MTD*, the Court again found, based on the language in the Policies, that Shaw was not entitled to a credit against or reduction of its deductible obligation for amounts it and AIG paid in defense costs. (Doc. 91 at 19–23.) While the Court held that Shaw continued to state a claim for "bad faith under La. R.S. [§] 22:1973 (1) misrepresenting pertinent facts and/or policy provisions relating to the Abernathy Lawsuit and (2) wrongfully denying coverage with respect to the Abernathy Lawsuit . . . ,"[12] the Court found that "Shaw's Amended Counterclaim does not state a claim insofar as it . . . seeks to recover from Shaw deductible amounts that Shaw claims had already been satisfied and/or that Liberty was aware that Shaw

---

[12] This holding is dicta since Liberty represented that its *Renewed MTD* "does not seek dismissal of Shaw's breach of contract claim for $155,894.82 . . . and attendant claim for bad faith." (Doc. 61-1 at 2 n.1.)

disputed . . . ." (*Id.* at 29.)[13] Significantly, Liberty's *Renewed MTD* did not raise the issue of whether Shaw's claims against Liberty not pertaining to the deductible were released in Paragraph 2 of the Insurance Settlement.

In its ruling on Liberty's *Renewed MSJ*, the Court again held (for the first time in the context of a motion for summary judgment), that Shaw was not entitled to a credit or offset on its deductible obligation for amounts it and AIG paid third parties in defense costs. (Doc. 94 at 13–14.) While the Court held that there were questions of fact precluding summary judgment as to Liberty's alleged bad faith failure to defend Shaw in the Abernathy Lawsuit, (*id.* at 23–31), the issue of whether Shaw had released its bad faith claims unrelated to the deductibles by virtue of Paragraph 2 of the Insurance Settlement was not raised in this Motion and, indeed, had never previously been raised.

The Court stated in dicta that Shaw could pursue its claim for the amounts it paid in defense costs to third parties as damages allegedly suffered by Shaw as a result of breach of contract and bad faith.

> [A]lthough the Court ruled as a matter of law that the Policies do not give Shaw the automatic credit it seeks for the $150,831.07 it paid to third parties in defense costs, it also ruled that Shaw has a right to pursue this amount in its claims for breach of contract and for bad faith as is discussed in another part of this ruling.

(*Id.* at 13. *See also id.* at 21–31; Doc. 53 at 34–41.)

That conclusion was correct at the time since, in that scenario, the $150,831.07 would be sought as an item of damage and not as a credit or offset against the deductible. As such, it would not be subject to the Court's ruling that Shaw was not entitled to a credit or offset of the deductible. However, in the present *Motion*, Liberty raises for the first time this argument: if the $150,831.07

---

[13] As to this latter claim, the Court stated "this argument is based on Shaw's re-urged and recycled argument that payments made by AIG and Shaw for defense costs reduced its deductible obligation. The Court is unpersuaded for reasons given in its original ruling." (Doc. 91 at 26 (citing Doc. 53 at 40–41).)

is not being sought as a credit against the deductible, then the claim is not preserved by Paragraph 10 of the Insurance Settlement and must therefore necessarily be subject to Paragraph 2's broad release of all other claims, including bad faith claims. (Doc. 121-1 at 16–17.)[14] On this point, the Court agrees with Liberty.

The only claims reserved to Liberty in the Insurance Settlement are those "pertaining to the deductible." (Doc. 53 at 20–25.) The Court has held repeatedly that Shaw is not entitled to a credit on its deductible obligation for amounts it or others paid on its behalf for defense costs. Therefore, any other damage claim it may have arising from Liberty's alleged breach of contract and bad faith do not pertain to the deducible, are not saved to Paragraph 10 of the Insurance Settlement, and were released by virtue of the very broad language of Paragraph 2.

Shaw argues that, in its previous rulings, "the Court held that Shaw had a right to pursue these costs in its claims for breach of contract and bad faith." (Doc. 123 at 2 (citing Doc. 53 at 34–41).) "The Court reiterated this holding in its ruling on Liberty's renewed MSJ." (*Id.* at 8 (citing Doc. 94 at 13 which, in turn, cites Doc. 53 at 34–41).) Therefore, concludes Shaw, "Shaw's remaining breach of contract claims and bad faith claims, both of which were based on defense costs that Shaw incurred as a result of Liberty's failure to defends, were preserved and not released through the Insurance Settlement." (*Id.*)

Shaw's argument falls short for the reason iterated above: Shaw's claims "pertaining to" the deductible, while initially found to be preserved by Paragraph 10, were nonetheless dismissed in the earlier motions because, under the terms of the Policies, Shaw's deductible obligation is not reduced by amounts Shaw or others paid to third parties. The Court's statement that Shaw could pursue the amount it paid in defense costs as an item of damage for bad faith was made before

---

[14] The Court notes that even had Liberty previously raised this point and the Court ruled on it, the Court could revise the ruling pursuant to Federal Rule of Civil Procedure 54(b).

Liberty's present *Motion* arguing for the first time that damage items unrelated to the deductible were released by Paragraph 2. The Court finds that all of Shaw's remaining claims unrelated to the deductible were released by the broad and unambiguous language of Paragraph 2 of the Insurance Settlement. *Liberty's Third MSJ* is therefore granted on this issue.

### III.    CALCULATION OF LATE FEE

#### A.  Summary of Issue to be Decided

Liberty and Shaw entered into a Deductible Guarantee Agreement which reads as follows:

> Should any reimbursement, premium payment or amounts due not be made within said twenty (20) day period of the due date, then, in addition to all other rights and remedies available to Liberty Mutual hereunder, under the policies, or at law or in equity, Liberty Mutual shall be entitled to receive a late payment charge computed at a rate of Prime Rate (as published in the Wall Street Journal) plus 1% per annum on the overdue amount, for actual days elapsed from the due date until paid.

(Doc. 25-4 at 2, ¶ 5(a).)

The Court previously ruled as a matter of law that Liberty is entitled payment of the late fee, (Doc. 94 at 13–17), but because "it is unclear precisely when the demand letters to Shaw referred to in the Complaint . . . were sent and received[,]" the Court denied summary judgment as to the amount owed by Shaw, (*id.* at 17). In its *Third MSJ*, Liberty avoids this factual dispute by "seeking the late payment charge from the date of demand." (Doc. 121-1 at 21.) Shaw admits it executed the Deductible Guarantee Agreement but disputes Liberty's interpretation of it. (Doc. 123-1 at 10, ¶ 21.)

The disagreement over the clause's interpretation centers on whether, as Shaw argues, the interest rate to be applied in calculating the late fee is "fixed," i.e., the Prime Rate in effect twenty-one days after the deductible obligations became due must be applied to all sums owed, (Doc. 123 at 14–17), or, as Liberty maintains, a "fluctuating rate" must be used, incorporating the Prime Rate as that rate has changed yearly since the deductible became due, (Doc. 121-1 at 20–25).

16

**B.  Summary of Parties' Arguments re Calculation of Late Fee**

*1.  Liberty's Argument re Method of Calculation of the Late Fee*

Liberty makes two main arguments in support of its interpretation. First, it argues that using a fluctuating or floating rate "is in step with the Deductible Guarantee's language[,]" (Doc. 121-1 at 23), because the Prime Rate "by its very nature fluctuates[,]" (*id.* at 24 (citing BLACK'S LAW DICTIONARY (7th ed. 2000).) Second, according to Liberty, this interpretation is "reinforced" by La. Civ. Code art. 2053, which requires doubtful provisions of a contract to "be interpreted in light of the nature of the contract, equity, usage, the conduct of the parties before and after the formation of the contract and other contracts of like nature between the same parties." (*Id.*) It then points the Court to the Declaration of its Accounting Manager for Collections, Justin Gauthier, who states that Liberty has used floating prime rate in other collection matters. (Doc. 121-3 at 4, ¶ 16.)

Finally, Liberty argues that Shaw's interpretation of a fixed rate would defeat the purpose of the late charge (to incentivize the debtor to promptly pay) since the prime rate has increased over the last several years. (Doc. 121-1 at 25.) Liberty argues that the amount owed using its method of calculation is $182,043.84. (*Id.* at 23.)

*2.  Shaw's Argument re Method of Calculation of the Late Fee*

Shaw argues that its interpretation is consistent with La. Civ. Code art. 2000, which states:

When the object of the performance is a sum of money, damages for delay in performance are **measured by the interest on that sum from the time it is due**, at the rate agreed by the parties or, in the absence of agreement, at the rate of interest as fixed by R.S. 9:3500.

(Doc. 123 at 14.)

Because the rate in force twenty days after Liberty's May 11, 2020 demand was 3.25%, when the additional 1% is added per the agreement, the rate applicable to the late charge is a fixed, non-fluctuating 4.25%. (*Id.*)

17

Second, the fixed rate is consistent with the usual principle of contractual interpretation that "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation of it may be made in search of the parties' intent." (*Id.* at 15 (internal quotations omitted) (citing *Trinity Med. Servs., LLC v. Merge Healthcare Sols., Inc.*, No. 17-592, 2020 WL 97162, at *14 (M.D. La. Jan. 8, 2020) (deGravelles, J.)).)

Finally, Shaw contends that Liberty's argument that a fluctuating rate incentivizes prompt payment because of increasing rates "fails to recognize that a 'decreasing' interest rate would incentivize prompt payment because the obligor could borrow money at a lower rate to pay off the late payment charge that was running at the higher rate in effect when the debt became due." (*Id.* at 16.)

Utilizing its method, Shaw indicates the amount owed should be $127,230.73. (*Id.*)

### 3. Liberty's Reply re Method of Calculation of the Late Fee

Liberty responds that the language of the agreement that the late payment charge "shall be computed at a rate of Prime Rate . . . plus 1% per on nonpayment . . . for actual days elapsed . . . means [ ] Prime Rate for each day of nonpayment." (Doc. 128 at 8 (internal quotations omitted).) Shaw's reliance on La. Civ. Code art. 2000 is misplaced because the article does not, as Shaw suggests, state that the rate is fixed on the due date. (*Id.*) Nor does La. R.S. § 9:3500 support Shaw since "[i]t applies to legal interest, not agreed upon computations." (*Id.*)

### C. Discussion re Calculation of the Late Fee

The clause at issue reads:

> Should any reimbursement, premium payment or amounts due not be made within said twenty (20) day period of the due date, then, in addition to all other rights and remedies available to Liberty Mutual hereunder, under the policies, or at law or in equity, Liberty Mutual shall be entitled to receive a late payment charge computed at a rate of Prime Rate (as published in the Wall Street Journal) plus 1% per annum on the overdue amount, for actual days elapsed from the due date until paid.

(Doc. 25-4 at 2, ¶ 5(a).)

The provision is silent on the issue raised. The "late payment charge [is] computed at a rate of Prime Rate . . . plus 1% per annum on the overdue amount, for the actual days elapsed from the due date until paid." (*Id.*) While it is true that the Prime Rate fluctuates from year to year, there is no indication in the language of the clause making clear whether the parties intended the Prime Rate used for the calculation to be that which existed at the time the payment became due, as suggested by Shaw, or the rate as it fluctuated year to year until the payment was made. The provision is ambiguous. "A contract is ambiguous . . . 'when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction.' " *Guillory v. Carrington Mortg. Servs., LLC*, No. 22-192, 2024 WL 1020555, at *10 (M.D. La. Mar. 8, 2024) (deGravelles, J.) (quoting *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (quoting *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996))).)

> "[W]hen the terms of a written agreement are susceptible to more than one interpretation, or there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed, parol evidence is admissible to clarify the ambiguity or to show the intention of the parties." [*Brock Servs., L.L.C. v. Rogillio*, 936 F.3d 290, 298 (5th Cir. 2019)] (citing *Condrey v. SunTrust Bank of Ga.*, 429 F.3d 556, 563 (5th Cir. 2005)). *See also Scafidi v. Johnson*, 420 So. 2d 1113, 1115 (La. 1982) ("Between the parties to an instrument, parol evidence is admissible . . . to explain an ambiguity when such explanation is not inconsistent with the written terms . . . ." (quotation omitted) (cited with approval by *Brock Servs.*)).

> "A doubtful provision must be interpreted 'in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties.' " *Greenwood 950, L.L.C. v. Chesapeake La., L.P.*, 683 F.3d 666, 669 (5th Cir. 2012) (quoting La. Civ. Code art. 2053). "According to the Civil Code, equity 'is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another,' and usage is 'a practice regularly observed in affairs of a nature identical or similar to the

object of a contract subject to interpretation.' " *Id.* at 669 n.13 (quoting La. Civ. Code art. 2055).

Additionally, "[n]ontechnical words in a contract must be given their generally prevailing meaning, and each contract provision must be interpreted in light of the other contract provisions so that each is given the meaning suggested by the contract as a whole." *Id.* at 669 (citing La. Civ. Code arts. 2047, 2050).

"If an ambiguity remains after applying the other general rules of construction, then the ambiguous contractual provision is to be construed against the drafter." *Brock Servs.*, 936 F.3d at 298 (quoting *Chinook USA, L.L.C. v. Duck Commander, Inc.*, 721 F. App'x 361, 366 (5th Cir. 2018)) (citing La. Civ. Code art. 2056 ("In case of doubt *that cannot otherwise be resolved*, a provision in a contract must be interpreted against the party who furnished its text." (emphasis added by *Brock Servs.*))).

*Guillory*, 2024 WL 1020555, at *10.

Liberty is right that La. Civ. Code art. 2053 requires doubtful provisions of a contract to "be interpreted in light of the nature of the contract, equity, usage, the conduct of the parties before and after the formation of the contract and other contracts of like nature between the same parties." (Doc. 121-1 at 24 (quoting La. Civ. Code art. 2053).) While Liberty states that "[u]sing floating rates is typical," (*id.*), it provides no examples for this "typicality" other than its reference to the legal rate of interest, (*id.* (citing La. R.S. § 12:4202).)

Liberty argues that general usage ("a practice regularly observed") of the fluctuating rate is shown by the Declaration of its Accounting Manager for Collections, Justin Gauthier, to the effect that "I adjusted the Prime Rate [in my calculation here] as it changed, as Liberty has done in prior collection matters." (Doc. 121-3 at 4, ¶ 16.) But Gauthier does not specify whether Liberty calculated it in this manner in all, some, many, or a few of Liberty's collection matters.

When there is ambiguity, the ambiguous clause is normally interpreted against the one drafting the contract. *Guillory*, 2024 WL 1020555, at *10; *see also Cummings v. Allstate Prop. & Cas. Ins. Co.*, 675 F. Supp. 3d 660, 672 (M.D. La. 2023) ("[T]he ambiguous contractual provision

is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." (internal quotations omitted) (quoting *La. Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 764 (La. 1994) (deGravelles, J.))).

Although the "Master Agreement for the Guarantee of 'Deductible' and/or 'Loss Limit' Reimbursement # 2022[,]" (Doc. 121-3 at 5–8), appears to be a Liberty document, the parties have pointed the Court to no record evidence showing whether or not Shaw's representatives may have had some role in negotiating the text or drafting the document.

> Ultimately, because "[i]ntent is an issue of fact which is to be inferred from all of the surrounding circumstances," *Guidry*, 512 F.3d at 181 (citations omitted), "when a contract is ambiguous, the trier of fact must resolve the factual issue of intent, and judgment on the pleadings or summary judgment is improper," *id.* (citing *Invs. Syndicate of Am., Inc. v. City of Indian Rocks Beach*, 434 F.2d 871, 877–78 (5th Cir. 1970) (finding that dismissal on the pleadings was error when the contract at issue was ambiguous); *Gertler v. City of New Orleans*, 2003-2131 (La. App. 4 Cir. 9/1/04), 881 So. 2d 792, 796 ("If the language of [a contract] is ambiguous or susceptible to multiple interpretations, the intent of the parties must be determined and summary judgment is inappropriate.")); *see also Liberty Mut. Ins. Co. v. Pine Bluff Sand & Gravel Co.*, 89 F.3d 243, 246 (5th Cir. 1996) ("[A]mbiguity in the terms of a contract gives rise to a fact question concerning the intent of the parties." (cited with approval by Guidry)); *Delaware Valley Fish Co. v. 3South LLC*, No. 21-141, 2023 WL 2416372, at *9–10 (M.D. La. Mar. 8, 2023) (deGravelles, J.) (denying summary judgment based on ambiguous contract). "Granting summary judgment on an ambiguous contract may be appropriate only in the very rare circumstance where 'there is no issue of material fact concerning the pertinent intent' of the parties." *Guidry*, 512 F.3d at 181 n.5 (quoting *Sanders v. Ashland Oil, Inc.*, 96-1751 (La. App. 1 Cir. 6/20/97), 696 So. 2d 1031, 1035).

*Guillory*, 2024 WL 1020555, at *11.

> Louisiana Civil Code Article 2057 states:

> In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a particular obligation.

> Yet, if the doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party, the contract must be interpreted in a manner favorable to the other party whether obligee or obligor.

La. Civ. Code art. 2057.

In this case, it is impossible to state based on record evidence whether one or both parties drafted the agreement and whether this "doubt arises from lack of a necessary explanation that one party should have given, or from negligence or fault of one party."  Therefore, Liberty's *Third MSJ* on this issue is denied.

## IV.    RECOVERY OF PREJUDGMENT INTEREST

### A.  Summary of Parties' Arguments re Prejudgment Interest

#### 1.  Liberty's Argument re Prejudgment Interest

Liberty argues that it is entitled to an award of prejudgment interest on the late payment charge. (Doc. 121-1 at 26–29.) This is because the late payment charge is not, as suggested by Shaw, "interest" subject to La. Civ. Code art. 2001's prohibition against charging interest on interest but rather is "stipulated or liquidated damages [agreed to by the parties] to be owed as a result of a breach of the contract." (*Id.* at 27 (citing La. Civ. Code arts. 2000, 2005).) As such, interest may be awarded. (*Id.* (citing *Abdelqader v. Ramos*, 2022-0305 (La. Ct. App. 4 Cir. 11/30/22), 353 So. 3d 750, 754; *Whitbeck v. Champagne*, 2014-245 (La. Ct. App. 3 Cir. 10/1/14), 149 So. 3d 372, 386).) Because "[s]tipulated damages is a separate obligation owed under La. Civ. Code art. 2005[,] . . . , interest is owed." (*Id.* at 28.)

Alternatively, argues Liberty, even if the late payment charge is interest, "La. Civ. Code art. 2001's prohibition does not apply to commercial or business transactions" like this one. (*Id.* (citing La. R.S. § 9:3509; *Vignette Publ'n, Inc. v. Harborview Enters., Inc.*, 2000-1711 (La. Ct. App. 4 Cir. 9/12/01), 799 So. 2d 531).) Nor does it apply to charges assessed because of the nonpayment of a loan. (*Id.* (citing La. R.S. § 9:3505(2)).)

## 2. *Shaw's Argument re Prejudgment Interest*

Shaw responds that the Deductible Guarantee is not stipulated damages as Liberty posits but rather is "contractually agreed-upon interest[,]" and therefore, because of La. Civ. Code art. 2000's prohibition, "Liberty is not entitled to prejudgment interest of the principal owed." (Doc. 123 at 17.) Indeed, Shaw has filed its own motion for summary judgment on this issue asking the Court to so rule. (Doc. 119.) Liberty opposes the motion, (Doc. 125), and Shaw filed a reply, (Doc. 127). The same arguments were made by Shaw and Liberty in connection with both motions, and the Court has considered the briefing in connection with both motions in deciding this issue.

Shaw points the Court to *Thrift Funds of Baton Rouge, Inc. v. Jones*, 274 So. 2d 150, 155 (La. 1973) for the proposition that "damages due for delay in the performance of an obligation to pay money are called interest." (Doc. 123 at 18 (quoting *Thrift Funds of Baton Rouge, Inc.*, 274 So. 2d at 155 (quoting La. Civ. Code art. 1935, now La. Civ. Code art. 2000)).) All but one of the cases cited by Liberty in support of its argument that the late payment charge is a stipulated damage involved situations where the object of performance was other than the payment of a sum of money. (*Id.* at 19.) According to Shaw, the one case that did involve payment of money as the contract's object, *Whitbeck v. Champagne*, "directly supports Shaw's position." (*Id.*) Shaw insists that the other case cited by Liberty, *Abdelqader v. Ramos*, also "supports Shaw's position that Liberty is not entitled to prejudgment interest on the late payment charge." (*Id.* at 20.)

Because La. Civ. Code art. 2001 is more specific than "the general law" set out in Article 2005, "rules of statutory construction require the application of the specific law, Article 2001." (*Id.* at 20–21.) Liberty's attempted reliance on La. R.S. § 9:3505(2) fails because "Liberty did not *loan* Shaw any amounts[,]" and the "advance on the deductible is not the type of loan contemplated by Section 9:3505." (*Id.* at 21 (emphasis added); *see also* Doc. 127 at 5.) Without citation to authority,

Shaw argues that Liberty's reliance on this statute "is incorrect because this statute was enacted in connection with traditional bank loans." (Doc. 127 at 5.) According to Shaw, "[i]n this case, Liberty's demand is clearly not a loan as it involves a contract for payments due pursuant to an insurance contract." (*Id.*)

Furthermore, La. R.S. § 9:3509.2(2)'s exception to La. Civ. Code art. 2001 does not apply because the late payment charge was not for "commercial, business, or agricultural" purposes but, rather, was "executed for security purposes." (Doc. 123 at 21–22.)

### 3. Liberty's Reply re Prejudgment Interest

Liberty replies that, while the late payment charge utilized interest rates, it was in fact "stipulated damages owed 'in addition to all other rights and remedies' per the parties' agreement in the Deductible Guarantee" and are therefore not interest. (Doc. 128 at 8.) "Shaw has no answer to the fact that it agreed to the payment of the late payment charge, <u>in addition</u> to all other rights and remedies . . . ." (*Id.* at 9.)

Liberty describes as "ludicrous" Shaw's argument that Liberty's advance of $1.75 million with the intent that Shaw repay that amount is not a loan and therefore insists that La. R.S. § 9:3502(2) does apply. (*Id.*) Liberty concludes that the late payment charge is not interest, but even if it is, La. R.S. § 9:3505 and § 9:3509 block the application of Article 2001. (*Id.*)

Finally, despite Shaw's argument to the contrary, Liberty maintains that both *Whitbeck* and *Abdelqader* support its position that prejudgment interest may be awarded on stipulated damages. (*Id.* at 10.)

**B.  Discussion re Prejudgment Interest**

In its *Motion*, Liberty asks the Court to award legal or judicial prejudgment interest[15] on the entire amount owed by Shaw including the late payment charge. (Doc. 121-1 at 26–29.) The following questions have been raised in connection with this issue:

(1) Is the late payment charge prohibited interest on interest under La. Civ. Code art. 2001 or, alternatively, is it stipulated damages for nonpayment allowed by La. Civ. Code art. 2005;

(2) Even if the late payment charge is interest, may Liberty nonetheless collect both the late payment charge and judicial interest based on the "commercial, business, or agriculture" exception to Article 2001 found in La. R.S. § 9:3509.2(2); and

(3) Even if the late payment charge is interest, may Liberty nonetheless collect both the late payment charge and judicial interest since it is a "charge[ ] assessed because of the nonpayment of [a] loan" under La. R.S. § 9:3505(2).

(*Id.*) These issues will be considered separately.

Because this is a diversity case, Louisiana law applies. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, (1938). In discerning Louisiana law, federal courts must be mindful of Louisiana's civil law tradition.

Our task is to determine as best we can how the Louisiana Supreme Court would decide it. When the absence of a controlling high court decision requires us to make an "Erie guess" about Louisiana law, we consider many of the same sources we use when guessing the law of other jurisdictions: decisions and reasoning of the state's courts; general rules of the jurisdiction, such as those governing statutory interpretation; and secondary sources like treatises. But Louisiana's "civilian methodology" means the pecking order of those sources is different than it is for a common law state. Louisiana's Constitution, codes, and statutes are of paramount importance to its judges. The doctrine of stare decisis, a creature of common law, is alien to the civilian system. Unlike stare decisis, which can flow from one decision, in the civil system numerous court decisions must agree on a legal issue to establish jurisprudence constante (French for constant jurisprudence). And even when that consensus exists in the caselaw, it remains only persuasive authority for

---

[15] In suits for breach of contract, judicial prejudgment interest is due from the date of the breach. *Heritage Worldwide, Inc. v. Jimmy Swaggart Ministries*, 95-0484 (La. Ct. App. 1 Cir. 11/16/95), 665 So. 2d 523, 530 ("Unlike judgments in ex delicto actions wherein legal interest attaches from judicial demand under La. R.S. [§] 13:4203, interest is recoverable on debts arising ex contractu from the time they become due, unless otherwise stipulated.") *See also Rainbow Gun Club, Inc. v. Denbury Res., Inc.*, 2017-997 (La. Ct. App. 3 Cir. 5/23/18), 247 So. 3d 844, 850.

the Erie guess; we are not strictly bound by the decisions of Louisiana's intermediate courts.

*Jorge-Chavelas v. La. Farm Bureau Cas. Ins. Co.*, 917 F.3d 847, 850–51 (5th Cir. 2019) (cleaned up).

> *1.  Is the late payment charge prohibited interest on interest under La. Civ. Code art. 2001?*

The Deductible Guarantee Agreement's "late payment charge" clause reads in pertinent part as follows:

> Should any reimbursement, premium payment or amounts due not be made within said twenty (20) day period of the due date, then, in addition to all other rights and remedies available to Liberty Mutual hereunder, under the policies, or at law or in equity, Liberty Mutual shall be entitled to receive a late payment charge computed at a rate of Prime Rate (as published in the Wall Street Journal) plus 1% per annum on the overdue amount, for the actual days elapsed from the date due until paid.

(Doc. 25-4 at 2, ¶ 5(a).)

> Louisiana Civil Code Articles 2000 and 2001 read, in pertinent part, as follows:

> When the object of the performance is a sum of money, damages for delay in performance are measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500. The obligee may recover these damages without having to prove any loss, and whatever loss he may have suffered he can recover no more.

La. Civ. Code art. 2000.

> Interest on accrued interest may be recovered as damages only when it is added to the principal by a new agreement of the parties made after the interest has accrued.

*Id.* art. 2001.

Reading the plain text of these two provisions, it is clear that ordinarily, when the object of the performance is a sum of money (as it is here), the parties may agree in the contract to a rate of interest to be charged as damages for late payment or, absent an agreement, the obligor can recover

such interest damages "at the rate of legal interest as fixed by R.S. 9:3500." *Id.* art. 2000.[16] But, absent "a new agreement of the parties made after the interest has accrued," the obligor cannot do both. *Id.* art. 2001. *S. Trace Prop. Owner's Ass'n v. Williams*, 52,653 (La. Ct. App. 2 Cir. 9/25/19), 280 So. 3d 826, 835; *Doerle Food Servs., L.L.C. v. River Valley Foods, L.L.C.*, 52,601 (La. Ct. App. 2 Cir. 5/22/19), 273 So. 3d 656, 665; *Heritage Worldwide, Inc.*, 665 So. 2d at 530; *Ken's Const. Co. v. Liles*, 560 So. 2d 103, 106 (La. Ct. App. 3 Cir. 1990).

As explained in a noted treatise on Louisiana obligations:

> In Louisiana, interest upon interest may be recovered as damages for delay, but only when it has been added to the principal by a new agreement of the parties made after the interest has accrued. It should be clear that such rule addresses itself to interest upon interest as damages for delay exclusively, and not to the case of interest as compensation for the use of money, as when the parties to a loan have agreed that the interest owed thereon will be compounded, nor does it address itself to the case of discounted promissory notes. It should also be clear that, for the special agreement of the parties to be valid, the interest upon interest which will be charged must be past due, and that such an agreement made before that interest has thus accrued is null.

6 Saúl Litvinoff, Louisiana Civil Law Treatise: The Law of Obligations, Putting in Default of Damages § 9.9 (2d ed. 1999).

Liberty argues that because "stipulated damage[s] . . . is a separate obligation owed under La. Civ. Code art. 2005 . . . , interest is owed." (Doc. 121-1 at 28; *see also id.* at 27 (citing *Abdelqader*, 353 So. 3d at 754; *Whitbeck*, 149 So. 3d at 386).) Article 2005 states:

> Parties may stipulate the damages to be recovered in case of nonperformance, defective performance, or delay in performance of an obligation.

> That stipulation gives rise to a secondary obligation for the purpose of enforcing the principal one.

---

[16] *See also* 6 Saúl Litvinoff, Louisiana Civil Law Treatise: The Law of Obligations, Putting in Default of Damages § 9.8 (2d ed. 1999) ("[I]t is lawful for the parties to a contract to agree to a specific rate of interest to be paid by the obligor of a sum of money, either as damages for delay in performing his obligation—moratory damages, that is—or as a charge for the use of money, provided, however, that such rate is agreed on in writing.").

La. Civ. Code art. 2005.

The Court agrees with Shaw that what Liberty calls its "late payment charge" is plainly "damages for delay in performance [which] are measured by the interest on that sum from the time it is due" and is therefore covered by La. Civ. Code arts. 2000 and 2001. Likewise, the Court agrees with Shaw that because Articles 2000 and 2001 cover agreements where the performance is a sum of money, like the agreement here, Article 2001 is more specific than the more general law set out in Article 2005, and rules of statutory construction require the application of the specific law, Article 2001. (Doc. 123 at 20–21 ("A well-known principle of statutory construction is that when there is both a general law and a specific law that address the same subject matter, the more specific legislative enactment should govern." (quoting *Story v. Our Lady of Lake Physician Grp.*, No. 17-651, 2018 WL 1902687, at *6 (M.D. La. Apr. 20, 2018) (deGravelles, J.))).)

In addition, the cases cited by Liberty to support its position, *Abdelqader v. Ramos*, *supra*, and *Whitbeck v. Champagne*, *supra*, are distinguishable. Neither case involved the question of whether a contractual late payment interest charge precludes the additional recovery of legal interest.

> 2. *Even if the late payment charge is interest, may Liberty nonetheless collect it and judicial interest based on the "commercial, business, or agriculture" exception to Article 2001 found in La. R.S. § 9:3509.2(2)?*

Liberty argues that even if an award of legal interest is prohibited interest on accrued interest, "La. Civ. Code art. 2001's prohibition does not apply to commercial or business transactions" like this one. (Doc. 121-1 at 28 (citing La. R.S. § 9:3509.2(2); *Vignette Publ'ns, Inc.*, 799 So. 2d 531).) Shaw responds that La. R.S. § 9:3509's exception to La. Civ. Code art. 2001 does not apply because the late payment charge was not for "commercial, business, or agricultural" purposes but rather was "executed for security purposes." (Doc. 123 at 21–22.)

La. R.S. § 9:3509.2(2) states:

> The general prohibition against the recovery of interest upon accrued interest, as expressed in Civil Code Article 2001, is subject to the following exceptions:
>
> ***
>
>      (2) In transactions entered into for commercial, business, or agricultural purposes. . . .

La. R.S. § 9:3509.2(2).

In this case, the Deductible Guarantee Agreement was entered into between Liberty and Shaw as a way of "guarantee[ing] the payment and reimbursement of all of [Shaw's] obligations to Liberty Mutual arising out of or in connection with [the Policies]." (Doc. 25-4 at 1.) Using the terms in their plain and ordinary meaning, this was clearly a "transaction[] entered into for commercial and business purposes" and therefore falls into the exception provided by § 9:3509.2(2).

Shaw points the Court to no statutory or jurisprudential definition that defies this common usage meaning of "commercial or business purposes." It provides no authority (or logic) for its argument that the late payment charge was not for "commercial, business, or agricultural" purposes because it was "executed for security purposes." (Doc. 123 at 22.) On the other hand, *Vignette Publications, Inc. v. Harborview Enterprises, Inc.*, *supra*, supports Liberty's position in that there, a garden-variety advertising contract was held to be a transaction entered into for commercial or business purposes for the purpose of applying § 9:3509.2(2)'s exception to La. Civ. Code arts. 2000 and 2001. Here, a contract to assure the payment of insurance policy deductible obligations is no less a transaction for commercial or business purposes.

The Court notes that in the context of other statutes in this Chapter, the phrase "commercial or business" has been interpreted broadly. *See, e.g.*, *Spencer v. Boucher*, 587 So. 2d 97, 102 (La.

Ct. App. 2 Cir. 1991) (finding that a loan had a business or commercial purpose under La. R.S. § 9:3509 where borrower used loan proceeds to pay off a mortgage on his home so he could open a convenience store); *Lagraize v. Basler*, 20-39 (La. Ct. App. 5 Cir. 9/9/20), 304 So. 3d 102, 113 (finding a loan at 25% interest rate used as down payment for businesses was not usurious due to the business or commercial exception under La. R.S. § 9:3500(D)).

Hence, the Court grants Liberty's *Motion* on this issue.

> 3. *Even if the late payment charge is interest, may Liberty nonetheless collect both the late payment charge and judicial interest since it is a "charge[ ] assessed because of the nonpayment of [a] loan" under La. R.S. § 9:3505(2)?*

Shaw argues that Liberty's reliance on La. R.S. § 9:3505(2) fails because "Liberty did not *loan* Shaw any amounts" and "the advance on the deductible is not the type of loan contemplated by Section 9:3505." (Doc. 123 at 21 (emphasis added); *see also* Doc. 127 at 5–6.) Without citation to authority, Shaw argues that Liberty's reliance on this statute "is incorrect because this statute was enacted in connection with traditional bank loans." (Doc 127 at 5.) According to Shaw, "[i]n this case, Liberty's demand is clearly not a loan as it involves a contract for payments due pursuant to an insurance contract." (*Id.*)

Relying on Black's Law Dictionary's definition of "loan,"[17] Liberty argues that the advancement of "$1.75 million for Shaw with the intent that Shaw repay Liberty based on the parties['] agreement is a loan" and to suggest otherwise is "ludicrous." (Doc. 128 at 9.)

La. R.S. § 9:3505(2) states:

> Notwithstanding any other law to the contrary, particularly but not exclusively R.S. 9:3500, and in addition to those fees, charges, costs and expenses ordinarily not considered interest and not included in the calculation of interest, the following charges, fees, costs and expenses shall not be considered interest *on any conventional obligation covered by R.S. 9:3502-9:3506*:

---

[17] "Delivery by one party to and receipt by another party of sum of money upon agreement, express or implied, to repay it with or without interest." BLACK'S LAW DICTIONARY 936 (6th ed. 1990).

\*\*\*

> (2) Charges assessed because of the nonpayment of the loan or any installment or part thereof after said loan or any installment of principal or interest thereof has become delinquent and is not timely paid, including cost of collecting and a reasonable attorney's fee, provided that such charges or the methods of fixing same are provided in writing in either *the note or the mortgage securing same*;

La. R.S. § 9:3505(2) (emphasis added).

On this issue, both parties have submitted woefully inadequate briefing. Liberty relies solely on Black's Law Dictionary to support its argument that Liberty's advance of monies on Shaw's behalf pursuant to the Policies is a "loan" for purposes of this provision and fails to address at all whether its agreement with Shaw constitutes a *conventional obligation covered by R.S. 9:3502-9:3506*, a necessary prerequisite for this provision to apply. Nor does Liberty address whether this provision is limited, as suggested by the emphasized language, to agreements in either a note or mortgage. Shaw does no better, simply stating without authority or argument that this statute was "enacted in connection with traditional bank loans" and that "[i]n this case, Liberty's demand is clearly not a loan as it involves a contract for payments due pursuant to an insurance contract." (Doc. 127 at 5.)

But it is Liberty's burden as movant to show that it is entitled to judgment as a matter of law under Federal Rule of Civil Procedure 56(a).

> "[I]f the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure [(that is, beyond doubt)] all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *peradventure*, Merriam-Webster's Dictionary (2022), https://www.merriamwebster.com/dictionary/peradventure (last visited July 13, 2022). *See also Universal Sav. Ass'n v. McConnell*, 14 F.3d 52 (5th Cir. 1993) (unreported) ("Where the summary judgment movant bears the burden of proof at trial, the summary judgment evidence must affirmatively establish the movant's entitlement to prevail as a matter of law."). That is,

> In contrast, if the movant bears the burden of proof on a claim at trial, then its burden of production is greater. It must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing. If the movant fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response.

10A MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE (WRIGHT & MILLER) § 2727.1 (4th ed. 2022).

Liberty has not met its burden as to this issue, and therefore, the *Motion* is denied.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that Liberty's *Third MSJ*, (Doc. 121), is **GRANTED IN PART** and **DENIED IN PART**.

Liberty's *Third MSJ* regarding Shaw's Counterclaims is **GRANTED**, and those claims are **DISMISSED WITH PREJUDICE**.

Liberty's *Third MSJ* with respect to whether it is entitled to an award of prejudgment interest in addition to Shaw's late payment charge is **GRANTED** since Liberty's Deductible Guarantee Agreement was a transaction entered into for commercial, business, or agricultural purpose.

In all other respects, Liberty's *Third MSJ* is **DENIED**.

Signed in Baton Rouge, Louisiana, on June 12, 2024.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**